April 7, 2004

**EXHIBIT A**

# COMMONWEALTH OF MASSACHUSETTS

Bureau of Special Education Appeals

Nelida[1]
vs.
Chicopee Public Schools

BSEA # 04-0093

BEFORE

LINDSAY BYRNE, HEARING OFFICER

DEREK BEAULIEU, ATTORNEY FOR PARENTS
CLAIRE THOMPSON, ATTORNEY FOR CHICOPEE PUBLIC SCHOOLS

---

[1] Nelida is a pseudonym selected by the Hearing Officer to protect the privacy of the Student in publicly available documents.

# COMMONWEALTH OF MASSACHUSETTS

## Bureau of Special Education Appeals

In Re: Nelida[1]
&
Chicopee Public Schools

BSEA#04-0093

## DECISION

This decision is issued pursuant to M.G.L. 71B and 30A, 20 U.S.C. § 1401 et seq., 29 U.S.C. 794 and the regulations promulgated under those statutes. A hearing was held on January 29th and 30th, and February 3rd and 4th, 2004, at the offices of Catuogno Reporting Services in Springfield, MA. Those present for all or part of the hearing were:

| | |
|---|---|
| | Mother |
| | Father |
| Jodi Rosol | Therapist, Mt. Tom Mental Health Center |
| Robert Kemper | Speech-Language Pathologist, Psycholinguistics Associates |
| David Drake | Headmaster, White Oak School |
| Susan Edgerly | Admissions Director, White Oak School |
| Tiffany Drumm | Tutorial Teacher, White Oak School |
| Judith Souweine | Psychologist |
| Andrea Cameron | Inclusion Teacher, 8th Gr., Chicopee Public Schools |
| Debra Schneeweis | Middle School Special Education Supervisor, Chicopee Public Schools |
| Janice Walsh | Special Education Teacher, Chicopee High School |
| Andrea Stolar | Special Education Supervisor, Chicopee High School |
| Daniel Schreier | Director of Special Education, Chicopee Public Schools |
| Andrea McGovern | Advocate for Parents |
| Derek Beaulieu | Attorney for Parents |
| Claire Thompson | Attorney for School |
| Lindsay Byrne | Hearing Officer, BSEA |

---

[1] Nelida is a pseudonym selected by the Hearing Officer to protect the privacy of the Student in publicly available documents.

The official record of the hearing consists of documents submitted by the Parents labeled P-1 through P-23, documents submitted by the School labeled S-1 through S-23 and S-25 through S-33, and approximately 24 hours of recorded oral testimony. Both parties submitted written closing arguments by February 27, 2004, and the record closed on that date.

## Issues

1. Whether the 2003-2004 Individualized Education Plan developed by Chicopee was reasonably calculated to provide a free, appropriate public education to Nelida in the least restrictive setting?

2. If not, whether the Parents are entitled to retroactive reimbursement of expenses associated with the unilateral placement of the Student at the White Oak School for the 2003-2004 school year?

## Summary of the Evidence

1. Nelida is a 15 year old resident of Chicopee. She was identified as a student with special learning needs in elementary school and received special education through the Chicopee Public Schools. In the 6th grade at the Fairview Middle School the Student was placed in an "inclusion" classroom ("staff" was designated as responsible for providing all academic services) with instruction in English and reading to take place in a self-contained classroom (again by "staff")[2]. No objective current performance levels nor measurable annual goals are listed on the 6th grade IEP. (P-23). For the 7th grade year, 2001-2002, the Student was placed in a regular education classroom. The IEP, which was developed in January 2002, lists "modified curriculum" as the only special education service. Though handwritten notes in the IEP allude to results on the IOWA test[3] there are no objective current performance levels nor measurable annual goals in the IEP. (P-22) The Student continued in a regular 8th grade program during the 2002-2003 school year under the IEP developed in January 2002. (P-1)

2. On December 4, 2002, as part of her 3 year re-evaluation, the school psychologist, Melissa Manello, conducted a routine psychological evaluation of the Student. She found the Student to have average cognitive potential and weak overall reading skills. On the Wechsler Individual Achievement Test the Student's reading composite scored fell at the 6th%. This placed her in the "borderline" range. Ms. Manello reported:

---

[2] The designation "staff" makes it impossible to determine which, if any, of the intended services were to be "special education".

[3] The IOWA test results were reported in grade equivalents as: Reading-5.6; Written-4.5, M. -4.8. The record does not show when or how the IOWA test was administered. (P-22)

Academically, [Student]'s basic reading and decoding skills, when presented with everyday words, falls at a beginning fourth grade level. Her ability to sound out unfamiliar or nonsense words is less developed and falls at an ending 2nd grade level. Her basic math numerical reasoning skills fall between a beginning 5th and ending 6th grade level. These comparisons though are simply the number of correct answers compared to other children [Student's] age. They do not take into account level of difficulty. Her teachers reported that at times she needs materials broken down and/or explained again. [Student]'s retention is poor unless the new concepts are reinforced. Test taking and study skills are also weak. She is hesitant about engaging in new tasks and demonstrates little self-initiative or self-motivation. She is making some progress with a modified 8th grade curriculum.

(P-5)

Ms. Manello concluded that the Student had a specific learning disability, and would benefit from reduced reading assignments. She recommended that the Student's basic decoding and phonetic skills be addressed. (P-5)

3. The Parents were alarmed at the low test scores reported by Ms. Manello. The Student's father testified that the scores were the same or lower than ones the Student had achieved during her previous three year evaluation in the fifth grade.[4] In addition, the father reported that the Student was "a mess" emotionally during the 8th grade. She was unhappy, anxious, quarrelsome, and reluctant to go to school. The Parents asked for more intensive small group academic instruction to address the Student's weaknesses and school anxiety. (Father)

4. Andrea Pickard Cameron, (BA Ed., certified Moderate Special Needs) described the schedule and mechanics of the 8th grade program she was responsible for delivering to the Student. Ms. Cameron, along with a paraprofessional, provided special education services to 24 students divided between 2 inclusion classes. Ms. Cameron did not know the educational background of the paraprofessional. They provided co-teaching or accommodations as necessary to the special education students. The Student attended reading, math and language arts class with Ms. Cameron and science and social studies with the paraprofessional. Ms. Cameron testified that she did not provide any direct instruction in reading to the Student. The inclusion reading program consisted of providing "easier material". If Ms. Cameron noticed the Student "struggling" she would help with comprehension by paraphrasing or chunking assignments. Ms. Cameron did not know the instructional level for the Student. She did not test the Student or keep a running portfolio of her work. She testified that, based on "observation", the

---

[4] Those re-evaluation results are not in the record.

Student made progress in reading and written language. Ms. Cameron attributed any difficulties the Student had in school to her anxiety. Ms. Cameron did not recommend any different or additional special education services for the Student during her 8th grade year. (Cameron)

5. During the winter, 2003, the Parents met with Ms. Cameron to request special education services targeted to the Student's reading and language weaknesses. At the meeting Chicopee offered a remedial reading program which was available to all 8th grade students. Enrolling in the remedial reading course would require the Student to eliminate a regular content course from her schedule. Chicopee also offered a self contained academic support class. This class focused on note taking, test taking, preteaching and reinforcement activities. There was no direct reading instruction in the academic support class. Chicopee also offered before and after school homework assistance and MCAS preparation. In addition, Chicopee stated that the Student could see a school guidance counselor or a peer mediator to address her anxiety and interpersonal concerns. The Parents did not accept any of these services as they believed the classes and interventions offered by Ms. Cameron did not address the Student's true learning needs. All were regular education services and none of the proferred services appeared on an IEP. (Cameron, Parent) On February 24, 2003, the school proposed an extended evaluation consisting of retesting by Ms. Manello. No additions or modifications to the Student's 8th grade inclusion program were to take place during the 8 week evaluation period. (P-2)

6. Ms. Manello retested on the Student on April 9, 2003. On the WIAT the Student's Basic Reading Score remained in the borderline range with a percentile rank of 8 and a grade equivalent of 4-9. Another reading subtest yielded a score in the average range: reading comprehension with a percentile of 32 and a grade equivalent of 6-5. The reading composite rose to a 13% with a grade equivalent of 5-7. Overall, the Student's standardized reading scores remained 2 to 4 years below grade level. Other reading measures reported by Ms. Manello were inconsistent with the comparable results obtained on two administrations of the WIAT, not explained fully in her evaluation report, and discounted by 2 reviewing psychologists. Therefore I give them little weight. Ms. Manello made no changes to her earlier recommendations as a result of the new testing information. (S-18; See also testimony of Souweine)

7. Robert Kemper, a licensed speech and language pathologist, conducted a "psycholinguistic evaluation" of the Student on April 22, 2003. On standardized measures of overall language functioning, the Student's scores ranged from average to poor. On tests targeted to assess the Student's reading functioning the results were uniformly below average ranging from a 9-6 to a 10-7 age equivalent or a 3.0 to a 6.4 grade equivalent with scores clustered at the late 4th to early 5th grade level. Dr. Kemper concluded that the Student has a language based learning

4

disability which includes a specific disorder of reading and written expression. He testified that because of the significant gap between her current language skill levels and the language expectations of the regular ninth grade curriculum, the Student would be unable to access ninth grade content classes, even with significant modifications and accommodations. Moreover, he stated, an inclusion program would not provide the direct, remedial instruction the Student needs to address her disabilities in foundational language skills. Dr. Kemper recommended that the Student be placed in a substantially separate, multisensory, language-intensive program with a small student-teacher ratio (no more than eight to one). He stated that the program should be based on direct instruction by teachers who are trained to provide multisensory, language based instruction to students with significant language learning needs. He emphasized that in addition to the overall intensive program the Student would need a "daily, individual tutorial in which a multisensory, code emphasis program is provided for reading, spelling, and written language instruction." (Kemper; P-15; P-4, S-S)

8. The Team reconvened on June 17, 2003, to discuss the evaluations of Ms. Manello and Dr. Kemper, and to plan the Student's 2003-2004 9th grade program. The Student's father testified that the Team accepted Dr. Kemper's evaluation results as they were similar to the findings of Ms. Manello. The Parents received the report of Ms. Manello's April 2003 testing for the first time at the Team meeting. (Stolar, Father) The Team did not explain how Dr. Kemper's recommendations would be implemented in the 9th grade. Instead Chicopee discussed the new, computer-based, reading program called READ 180 that would be available to the Student. (Father) Andrea Stolar, supervisor of special education at Chicopee High School, testified that her role at the Team meeting was to explain the 9th grade program to the Parents. She described the "Academy" program at the high school as a supportive, geographically separate stream having smaller classes and more intensive instruction than had been available in the middle school inclusion program. The Academy program uses a co-teaching model, in which special education teachers teach classes alongside content-area certified regular education teachers. All students also take a learning skills class which focuses on developing the students' note-taking, study and organizational skills. Ms. Stolar told the Parents that the reading program to be used at Chicopee High School starting in September 2003, was READ 180. The Team did not discuss any other systematic reading instruction for this Student. Ms. Stolar offered to have the Student participate in a course designed to introduce students to the READ 180 system over the summer, 2003. She did not give the Parents any documents about the "Academy" program or about the summer READ 180 class. (Stolar)

9. At the Team meeting on June 17, 2003, Chicopee proposed an IEP calling for the Student's placement in the 9th grade "Academy" program for the

5

2003-2004 school year. According to the proposed IEP, the Student would attend daily special education classes of 45 minutes each in reading, learning skills and math. She would attend the regular 9th Grade "Academy" program for English, Science and Social Studies. She would see the speech-language therapist once per week. The proposed IEP does not provide any counseling or therapeutic services. The proposed IEP does not contain any tutorial services. It does not identify any specific, systematic reading program that will be used with the Student. (P-3, S-1) The Parents rejected the proposed plan on June 18, 2003. (S-2)

10. On June 19, 2003, the Parents received a letter from Denise Freisberg, FVMMS summer school facilitator, placing the Student on a waiting list for summer services. (P-20) The father testified that he understood this letter to concern Ms. Stolar's offer of summer READ 180 services and made no further inquiries of the school. I credit his testimony. (Father) No other written information concerning summer services was sent to the Parents by Chicopee.

11. At the time of the Team meeting, June 2003, the READ 180 program was not being used by Chicopee. None of the Chicopee staff had been trained in its use or supervision. The Parents could not have observed a READ 180 program in use, nor talked to any staff, parents or students with experience with READ 180 in operation. (Father, Stolar, Schreierer, Walsh)

12. Dan Schreirer, the Director of Special Education for Chicopee, described the READ 180 program. READ 180 is a comprehensive, systematic reading skill development program developed by Scholastics. It is designed for struggling and/or disadvantaged readers. Although it has been used with "special education" populations, READ 180 was not developed specifically for students who have a primary language or reading disability. Using student-driven, computer based instruction the program identifies individual student weaknesses and responds with instruction and practice drills that are engaging, multisensory and effective. The program also has a teacher component that proposes lessons and strategies building upon the weaknesses identified through the Student's computer use, a literature component that allows students to read or listen to good, mainstream literature at their own reading level and a written language component. It is designed to be delivered in daily 90 minute blocks. The students rotate through 3 time blocks: a whole group direct instruction period of 20 minutes; a sixty minute block divided evenly among use of READ 180 software, independent reading of READ 180 audio books and literature, and small group instruction using READ 180 provided materials; and a final ten minutes of whole group direct instruction. (Schreirer; S-3, 4, 7, 15, 27, 29, 31; P-14; See also testimony of Drake; Souweine)

6

Mr. Schreirer testified that he chose the READ 180 system for use in the Chicopee Public Schools based on its impressive results in improving reading levels across the board when newly introduced in school systems. He was also impressed with the enthusiasm of the students for the system and their willingness to persevere in what is at times a tedious learning task, particularly for older students. He stated that the READ 180 program would be appropriate for this Student and would provide the tools, the interesting material, and the daily practice she needed to improve her reading level. When combined with the supportive atmosphere, strong teachers, and flexibility of the 9th grade Academy, Mr. Schreirer stated that Chicopee High School could appropriately meet the Student's special education needs. (Schreirer)

13. At a prehearing conference held in August 2003, Chicopee offered to expand the Student's reading instruction from the 45 minutes listed on the IEP to the full 90 minutes recommended by the READ 180 program. In addition, Chicopee offered to provide an Orton-Gillingham tutorial after school. (Schreirer, Father) This offer was not reduced to writing and no Amendment to the IEP was ever proposed to the Parents. (Father; Administrative Record) The only written information the Parents received from Chicopee subsequent to the proposed IEP concerning the 9th grade Academy program was a mid term progress report which listed the Student as "well organized and prepared" despite 3 class absences[5]. (P-12)

14. Janice Walsh, special education teacher at Chicopee High School, described the 9th grade "Academy" program proposed for Nelida. The 9th grade "Academy" program at Chicopee High School is the entire 9th grade of approximately 300 students. The students are divided into 4 teams. One team is the "inclusion team". It has 16 students with special learning needs. Those students are split into two groups of eight and assigned to one special education teacher who follows the students through their regular classes and teaches a daily learning skills class to them separately. Ms. Walsh would have been Nelida's special education teacher. She stated that the inclusion classes typically have twenty students, five to eight of those being students with IEPs. The daily schedule proposed for this Student consists of: reading; social studies (inclusion); learning skills (separate); English (inclusion); math (inclusion); science (inclusion) and gym. The Student's reading class would take place in the READ 180 computer classroom. Ms. Walsh would have been the special educator in the Student's inclusion English, social studies and science classes. A different special educator would have been present in the Student's inclusion math class. In the learning skills class Ms. Walsh would provide academic support and learning strategies instruction such as vocabulary preparation, highlighting, paraphrasing and test preparation. Ms. Walsh stated that she has not been trained in READ 180 and has not

---

[5] At this time the Student was attending the White Oak School.

observed the program. She has not met the speech/language pathologist or the learning styles consultant, both listed on the IEP proposed for this Student. Ms. Walsh does not provide Orton-Gillingham or other similar systematic, rule-based reading instruction to any student. Ms. Walsh never provided any information about the 9th grade program to the Student's parents. (Walsh) Ms. Stolar, the special education supervisor, did not observe the inclusion classrooms, nor the READ 180 computer classroom, until she accompanied Dr. Souweine on her observation in November 2003. (Stolar)

15. The Parents enrolled the Student at the White Oak School beginning in September 2003. White Oak is a ch. 766 approved private school which provides special education to a homogeneous population of students in grades 4 through 12 with learning disabilities. David Drake, the Headmaster, testified that the academic program, which parallels the Massachusetts Curriculum Frameworks, is language intensive multi-sensory, and self-reinforcing. The maximum number of students in any class is eight, though most classes have fewer. Students are grouped by age, reading level and remediation need. All teachers use the same language based approach. All students participate in a daily 50 minute one-to-one tutorial which focuses on providing a rule based, systematic, progressive program of reading development and extends skills into spelling and written language skills. In addition students take daily classes in: language arts, oral expression, science, social studies, math, physical education, computers/art/shop. (Drake; Souweine, P-10, 16)

In placement testing administered by White Oak when the Student began the 9th grade in September 2003, the Student's reading scores fell between the mid-third and beginning 6th grade levels. Her math scores ranged from mid-4th to late 5th grade level. Mr. Drake testified that the Student was appropriately placed at White Oak and was making progress in the program. The father testified that, for the first time in years, the Student appeared happy and engaged in school and reported learning new things at White Oak. (Drake; Father; S-19)

16. Judith Souweine, an independent psychologist, reviewed the Student's evaluation records, visited the White Oak School and observed the learning skills class and the READ 180 program in operation at Chicopee High School in the fall, 2003. She testified that she was impressed with the READ 180 program because it was engaging and mulitsensory. She also stated her opinion that the proposed IEP would be appropriate for the Student because she had prior success in the mainstream environment, the 9th grade inclusion program was carefully designed and there was a strong remedial component. (Souweine) I give Dr. Souweine's opinion in this matter little weight because she did not personally evaluate the Student and found the testing results in the record "confusing". Furthermore Dr. Souweine's knowledge of the READ 180 program came

8

solely. through the materials presented to her by Chicopee and her observation of Chicopee's use of the program.

## Findings and Conclusions

There is no dispute that this Student has special learning needs as defined by 20 U.S.C. § 1401 et seq. and is entitled to receive a free, appropriate public education. The issue presented here is whether the 2003-2004 IEP proposed by Chicopee is reasonably calculated to provide that appropriate public education. Answering that question involves a multilayered analysis tailored to the specific facts of the matter. In the instant appeal the analysis has both a procedural and a substantive component.

### A. Procedural Issues

Though not raised separately by the Parents, I discuss these issues apart from the substantive analysis as I find they are central to the resolution of this matter.

The parental role in planning and implementing an educational program for a student with a disability is fundamental to both the federal and state special education scheme.[6] To assert that role intelligently parents must, at a minimum, be provided with all relevant information the school generates or relies upon concerning the student and the student's educational program, be able to express their perspectives to the school, receive reasonable responses from the school, and be able to rely upon the school to follow through on its commitments. In this case the Parents have shown that Chicopee failed to include them meaningfully in the educational planning process. The result was an inappropriate IEP.

Beginning in the winter of 2003, during the Student's eighth grade year, the Parents asked Chicopee for additional academic assistance. Although Chicopee's own testing revealed academic achievement scores 4 to 6 years below her 8th grade placement, Chicopee asserted that the Student's school difficulties were social/emotional in nature. The documentary record shows, however, that Chicopee did not offer any therapeutic services to the family, an offer which would have been a logical result of its position. Nor did it offer any additional academic special education, as requested by the Parents. Chicopee's only documented response to the Student's poor academic performance and markedly changed appearance was the proposal for further academic testing. This response alone was not reasonable under the circumstances, and served to buttress the Parents' perception that Chicopee could not, or would not, address their concerns.

---

[6] 34 CFR 300.501(c) and 300.552(a)(1); 603 CMR 28.05(6) and 28.06(2); 48 Fed. Reg. 12473 (first column) (March 12, 1999) ("parents of a child with a disability are expected to be equal participants...in deciding...what services the agency will provide to the child and in what setting")

9

At the June 2003 Team meeting Chicopee provided the results of its extended evaluation to the Parents for the first time two months after it had been conducted, with no intervening Team meeting. This unexplained delay particularly when Chicopee was on notice of the Parents' dissatisfaction with the Student's current program, further contributed to the marginalization of the Parents. (603 CMR 28.05(l); 603 CMR 28.05(2)(b)

The Team's response to the new information it had about the Student is equally curious. The Team had the results of two recently conducted psychological evaluations with consistent findings. Both called for direct instruction in basic decoding skills. The IEP developed at that meeting includes no such service.

The Team discussed summer services to prepare the Student to enter the 9th grade, but despite the Parents' ready acceptance of those services, Chicopee failed to provide the Parents with any information necessary to access supposedly available summer services for the Student.

Finally at a prehearing conference held in August 2003, Chicopee orally offered to provide a direct, decoding tutorial and to double the READ 180 class sessions to conform to the publisher's recommended 90 minutes per day. Yet Chicopee failed to formalize this offer in a form the Parents could accept. This failure led directly to the unilateral placement of the Student just a few weeks later. This pattern of inaction continued throughout the fall, 2003. Though it had noted the importance to these Parents of ongoing communication on the proposed IEP, Chicopee did not communicate with the Parents, did not provide any materials used by the proposed Academy program (S-16, 17), and in fact did not fully explain the proposed program to them until the hearing in February 2004. While each of these lapses, considered alone, would not constitute the type of serious procedural irregularity contemplated by the court in Roland M. v. Concord School Committee, 910 F.2d 983 (1st Cir. 1990) cert. den. 499 U.S. 912 (1991), when it determined that procedural violations could form the basis of an equitable award under the IDEA, the pattern of nonresponsiveness established by this evidence provides support for the Parents' belief that Chicopee could not develop an appropriate educational program for their daughter and the resulting unilateral placement.

B. Substantive Issue

The only comprehensive set of recommendations available to the Team for this Student's 9th grade special education program are found in the evaluation report of Dr. Kemper. His findings were consistent with the findings of the school psychologist, and were not seriously challenged by other Team members. (P-4, S-5) He recommended that the Student be placed in a substantially separate, language based, multisensory program geared to meeting the learning needs of students with specific language learning disabilities, including dyslexia. He wrote that the Student needed small class sizes, of no more than eight students, with direct and consistent instruction by teachers trained to remediate language

10

learning disabilities. Dr. Kemper also found that the Student required a daily tutorial that focussed on instruction in a rule based, systematic reading program. (See ¶ 7) There are no contrary or alternate recommendations in the record.

Chicopee did not incorporate any of these uncontradicted recommendations into the IEP it developed for the Student. Instead Chicopee proposed an IEP that called for the Student's academic instruction in mainstream 9th grade classes with modifications provided by a special educator. First I note that the is no showing in this record that the Student had made effective progress commensurate with her potential in previous "inclusion" placements with similar services. I further note that there is no information in this record which could support a finding that any of the proposed teachers, apart from Ms. Walsh, have training or experience in teaching students with language learning disabilities, including dyslexia. The proposed class sizes would range from 12 to 20 students. The IEP did not include a reading tutorial. (P-3, S-1)

Chicopee argued that its reading class, using the READ 180 program, met Dr. Kemper's recommendations for direct, systematic reading instruction. I disagree. A school is free to choose its own remediation methods, techniques and programs to address a student's documented need for service, so long as there is a reasonable basis for such a choice. The evidence in this hearing established that READ 180 is a new, exciting, engaging computer assisted tool for developing reading fluency in disadvantaged students attending large public school systems. (P-14, 15; S-3, 4, 7, 29, 27, 31; Schreirer; Souweine; Drake) There is no evidence, however, that it is a targeted, rule-based, phonetic system designed to remediate individual reading disabilities. Without showing of effectiveness with the language learning disabled population, the Parents were entitled to maintain a reasonable degree of skepticism about the READ 180 program. That skepticism grew into a reasonable objection when the proposed IEP failed to provide the full 90 minutes daily of READ 180 instruction recommended by the program's developers, and again when Chicopee failed to follow through on its offer to introduce the Student and her Parents to the READ 180 system during the summer, 2003.

Considering the proposed 2003-2004 IEP as a totality I find that neither the setting, nor the services, proposed by Chicopee meet the recommendations outlined in Dr. Kemper's report. While a school is not bound to accept all, or even any, of the findings and recommendations of an outside evaluator, there must be some alternate credible information to support its choice of a different educational model. Here there is none. It appears that Chicopee offered the Student an IEP for the program it had already in place, rather than one tailored specifically to the unique needs of this Student. This approach is not permissible under state and federal law.[7] I conclude, based on a preponderance of the credible evidence in the hearing record, that Chicopee failed to develop a special education program for the 2003-2004 school year tailored to meet this Student's

---

[7] For a helpful discussion of FAPE requirements please see Arlington Public Schools, 8 MSER 187, 195 Fn. 23.

11

needs, as identified by Dr. Kemper and Ms. Manello, and therefore that Chicopee did not propose an IEP that was reasonably calculated to provide the Student with a free, appropriate public education.

## C. Reimbursement

Parents may be reimbursed for the costs of providing special education and related services for their eligible children if they demonstrate that the program and services offered by the school district are inappropriate, <u>and</u> that the program and services that they obtain privately are appropriate. <u>School Committee of Town of Burlington, Mass. v. Dept. of Education of Mass.</u>, 471 U.S. 359 (1985). Here they have done both.

There is no dispute that the program in which the Student is enrolled at the White Oak School provides all the elements recommended by Dr. Kemper. It is an intensive, language based, multisensory educational program specifically geared toward remediating language learning disabilities, including dyslexia. It provides small class sizes, consistent instructional and interventional techniques, and a daily, rule based phonetic reading tutorial. I find therefore that the Parents selected an appropriate alternate educational program for the Student. I further find that they did so only after months of unsatisfactory communication with Chicopee resulted in presentation of an inappropriate IEP for their daughter. Therefore the law and the equities permit an award of full reimbursement for all out of pocket expenses associated with the Student's enrollment at the White Oak School for the 2003-2004 school year.

## Order

The 2003-2004 IEP proposed by Chicopee is not reasonably calculated to provide a free, appropriate public education to Nelida. The White Oak School meets the recommendations of the evaluators in the record, and the Parents' unilateral placement of the Student there in September 2003, was appropriate and justified. The Parents are entitled to reimbursement of all out-of-pocket expenses associated with the Student's placement at the White Oak School for the 2003-2004 school year.

April 7, 2004
Date

Lindsay Byrne, Hearing Officer

12

COMMONWEALTH OF MASSACHUSETTS
BUREAU OF SPECIAL EDUCATION APPEALS

## EFFECT OF BUREAU DECISION AND RIGHTS OF APPEAL

### Effect of the Decision

20 U.S.C. s. 1415(i)(1)(B) requires that a decision of the Bureau of Special Education Appeals be final and subject to no further agency review. Accordingly, the Bureau cannot permit motions to reconsider or to re-open a Bureau decision once it is issued. Bureau decisions are final decisions subject only to judicial review.

Except as set forth below, the final decision of the Bureau must be implemented immediately. Pursuant to M.G.L. c. 30A, s. 14(3), appeal of the decision does not operate as a stay. Rather, a party seeking to stay the decision of the Bureau must seek such stay from the court having jurisdiction over the party's appeal.

Under the provisions of 20 U.S.C. s. 1415(j), "unless the State or local education agency and the parents otherwise agree, the child shall remain in the then-current educational placement," during the pendency of any judicial appeal of the Bureau decision, unless the child is seeking initial admission to a public school, in which case "with the consent of the parents, the child shall be placed in the public school program". Therefore, where the Bureau has ordered the public school to place the child in a new placement, and the parents or guardian agree with that order, the public school shall immediately implement the placement ordered by the Bureau. *School Committee of Burlington, v. Massachusetts Department of Education*, 471 U.S. 359 (1985). Otherwise, a party seeking to change the child's placement during the pendency of judicial proceedings must seek a preliminary injunction ordering such a change in placement from the court having jurisdiction over the appeal. *Honig v. Doe*, 484 U.S. 305 (1988); *Doe v. Brookline*, 722 F.2d 910 (1st Cir. 1983).

### Compliance

A party contending that a Bureau of Special Education Appeals decision is not being implemented may file a motion with the Bureau of Special Education Appeals contending that the decision is not being implemented and setting out the areas of non-compliance. The Hearing Officer may convene a hearing at which the scope of the inquiry shall be limited to the facts on the issue of compliance, facts of such a nature as to excuse performance, and facts bearing on a remedy. Upon a finding of non-compliance, the Hearing Officer may fashion appropriate relief, including referral of the matter to the Legal Office of the Department of Education or other office for appropriate enforcement action. 603 CMR 28.08(6)(b).

### Rights of Appeal

Any party aggrieved by a decision of the Bureau of Special Education Appeals may file a complaint in the state superior court of competent jurisdiction or in the District Court of the United States for Massachusetts, for review of the Bureau decision. 20 U.S.C. s. 1415(i)(2).

Under Massachusetts General Laws, Chapter 30A, Section 14(1), appeal of a final Bureau decision to state superior court must be filed within thirty (30) days of receipt of the decision. The federal courts have ruled that the time period for filing a judicial appeal of a Bureau decision in federal district court is also thirty (30) days of receipt of the decision, as provided in the Massachusetts Administrative Procedures Act, M.G.L. c.30A. *Amann v. Town of Stow*, 991 F.2d 929 (1st Cir. 1993); *Gertel v. School Committee of Brookline*, 783 F. Supp. 701 (D. Mass. 1992).

Therefore, an appeal of a Bureau decision to state superior court or to federal district court must be filed within thirty (30) days of receipt of the Bureau decision by the appealing party.

### Confidentiality

In order to preserve the confidentiality of the student involved in these proceedings, when an appeal is taken to superior court or to federal district court, the parties are strongly urged to file the complaint without identifying the true name of the parents or the child, and to move that all exhibits, including the transcript of the hearing before the Bureau of Special Education Appeals, be impounded by the court. See *Webster Grove School District v. Pulitzer Publishing Company*, 898 F.2d 1371 (8th Cir. 1990). If the appealing party does not seek to impound the documents, the Bureau of Special Education Appeals, through the Attorney General's Office, may move to impound the documents.

### Record of the Hearing

The Bureau of Special Education Appeals will provide an electronic verbatim record of the hearing to any party, free of charge, upon receipt of a written request. Pursuant to federal law, upon receipt of a written request from any party, the Bureau of Special Education Appeals will arrange for and provide a certified written transcription of the entire proceedings by a certified court reporter, free of charge.