March 12, 2004

# COMMONWEALTH OF MASSACHUSETTS

Bureau of Special Education Appeals

---

## Malik[1]
### vs.
### Gateway Regional SchoolS

### BSEA # 04-0314

---

BEFORE

LINDSAY BYRNE, HEARING OFFICER

MARILYN SCHMIDT, ATTORNEY FOR PARENTS
CLAIRE THOMPSON, ATTORNEY FOR GATEWAY REGIONAL SCHOOLS

---

[1] "Malik" is pseudonym chosen by the Hearing Officer to protect the privacy of the Student in publicly available documents.

COMMONWEALTH OF MASSACHUSETTS
SPECIAL EDUCATION APPEALS

In Re: Malik[1] and Gateway Regional Schools                    BSEA#04-0314

## DECISION

This decision is issued pursuant to M.G.L. ch. 71B and 30A, 20 U.S.C. § 1401 et seq. and 29 U.S.C. § 794, and the regulations promulgated thereunder. A hearing was held in the above-entitled matter on November 17, 18, and 19, 2003, at the offices of Catuogno Court Reporting Services in Springfield, Ma. Those present for all or parts of the hearing were:

| | |
|---|---|
| Parents | Parents |
| Cathy Mason | Educational Specialist, CCSN, New England Medical Center |
| Lois Carra | Neuropsychologist, CCSN, New England Medical Center |
| Linda Lafontaine | Speech Language Pathologist, Curtis Blake Day School |
| Margery Gerard | Director of Special Education, Gateway Regional Schools |
| Susan Everett | 5th Grade Teacher, Gateway Regional Schools |
| Catherine Poudrier | Special Education Tutor, Gateway Regional Schools |
| Susan Fino | Educational Consultant |
| Judith Souweine | Psychologist |
| Buffy Dewey | Advocate for Parents |
| Marilyn Schmidt | Attorney for Parents |
| Claire Thompson | Attorney for Gateway Regional Schools |
| Lindsay Byrne | Hearing Officer, BSEA |

The official record of the Hearing consists of documents submitted by the Parents labeled P-1 through P.33, documents submitted by the School labeled S-1 through S-37, and approximately 18 hours of recorded oral testimony and argument. Counsel for both parties made oral closing arguments at the conclusion of testimony, and the record closed on November 19, 2003.

---

[1] "Malik" is a pseudonym chosen by the Hearing Officer to protect the privacy of the Student in publicly available documents.

Issues:

1) Whether the 2003-2004 Individualized Education Plan developed by the Gateway Public Schools is reasonably calculated to provide a free, appropriate public education to the Student in the least restrictive setting?

2) If not, are the Parents entitled to reimbursement for expenses associated with their unilateral placement of the Student at the Curtis Blake Day School?

Summary of the Facts

There is substantial agreement between the parties on many of the operative facts. Therefore they may be briefly summarized:

1) Malik is a twelve year old sixth grade student currently attending the Curtis Blake Day School. He has average cognitive potential, a language-learning disability, dyslexia and attention deficit hyperactivity disorder. He has had difficulty learning to read and to write, particularly with phonemic and phonological memory. He is impulsive, at times, during language based tasks, but does not present any behavioral difficulties in the classroom. (P-1, 3, 4; S-5; P-8; P-1; S-12; P-11; P-15; S-10; P-20; P-16; P-14; S-13)

2) Gateway has offered special education services to the Student since he was three years old. When he reached school age the Student attended a local parochial school. Gateway provided after school and summer tutorial services in the areas of reading and writing. In January 2001, Gateway proposed either an inclusion class in the public school or continued tutoring for the balance of the Student's 3rd grade year. The Parents chose to continue the tutoring model. (P-2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12; S-1, 2) For the Student's 4th grade year, 2001-2002, however, the Parents transferred the Student to the proposed inclusion classroom at the Russell Elementary School. He received tutoring within the classroom and continued after school services. The transition was difficult, academically, socially and emotionally. (P-14; Gerard)[2] In August 2002, the Parents checked all response boxes on the proposed IEP, thereby accepting the Student's placement in the 5th grade inclusion class, and also rejecting that placement and requesting placement in a more intensive program.

3) The Student attended the 5th grade inclusion class at Russell Elementary School for the entire 2002-2003 school year. Susan Everett (S-33; B.A. Ed. Ed., M.S.W., certified in regular and special education) was the lead teacher in the classroom. She testified that there were 43 students in the class, 14 of whom had IEPs. There were 2 full time regular education teachers, one full time special educator and one full time aide. In addition an itinerant reading teacher and a speech/language pathologist were in the class regularly. The students were administratively divided into two homerooms, but instructional groupings were based on academic level and need. The entire class had a

---

[2] The parties agree, however, that there are no procedural or historical issues which would justify a compensatory education claim or present a bar to the Parents' request for reimbursement.

2

daily one hour, twenty minute language arts period, as well as a twenty minute silent reading period. For reading, the class was divided into four groups. The largest group read at or above grade level. Malik was in the lowest functioning reading group with seven other students. Ms. Everett taught this group with the assistance of an aide. They used the "phonographics" program and read a variety of books on the 2nd-4th grade level. At times the students worked with 8th grade mentors who timed and scored worksheets and tests. During the silent reading time, Malik received 1:1 instruction or attended a reading fluency training with regular education students. (Everett)

Math class was divided into 2 sections. The Student was in a group of 21 with 2 teachers and an aide. Science and social studies were whole class presentations, followed by discussions, testing and report writing. Ms. Everett taught written language to the entire class, focussing on writing strategies that supported content instruction. She followed the Gateway Writing Curriculum and state curricular guidelines. These provide a structured scope and sequence to writing instruction, but do not use packaged materials or content. The fifth grade also attended classes in art, physical education, health, computers, languages, industrial tech. and band. (Everett) Ms. Everett described the 5th grade curriculum as language-based, but not small group.

Ms. Everett also provided some after-school and summer tutoring to the Student. During those tutoring sessions she concentrated on phonographics "Great Leaps" instruction (a non-rule based reading fluency program), vocabulary development at the 5th grade level and preteaching/reinforcement for math, science, social studies reading and language. She testified that the Student appeared to have intact comprehension and inferential abilities, as well as many useful, foundational phonological skills. He had difficulty decoding words, and had an impulsive approach to language tasks. His oral reading was not fluent. Yet, Ms. Everett testified, the Student made "excellent, effective" progress over the course of the fifth grade year. He entered the year as a reluctant writer whose work was characterized by incomplete sentences and progressed to independent completion of an ocean animal project. He began the school year by haltingly reading low-level text and ended the school year haltingly reading grade level text. He started the school year at the 2nd grade level in the "Great Leaps" fluency training program and ended the school year at the 4th grade level. He was always motivated, eager, cheerful, engaged and participatory. He was organized and readily shared his good fund of general knowledge. He volunteered to read aloud to the entire class. (Everett)

4) In November of his 5th grade year (2002) the Student was evaluated by Cathy Mason of the Center for Children with Special Needs at New England Medical Center. (P-30, P-16) Ms. Mason found that the Student's functional reading skills were at a late 2nd grade to early 3rd grade level, with unstable and labored phonetic decoding skills. Written language and math skills fell in the broadly average range. She reported that the Student's IEP provided for a daily 45 minute period of reading/writing support in the regular classroom and three hours of reading-tutoring after school. Ms. Mason recommended that the Student receive:

> "at least 2 hours per day of substantially separate language arts instruction using highly structured, rule based approaches designed for dyslexic students. Instruction should be delivered in small groups (3-4) students with similar learning needs/levels, by a

3

trained, experienced special educator. He will require substantial reading/writing accommodations in content area classes."

Ms. Mason also recommended consideration of a "full time learning disabilities placement." (P-16)

5) On January 15, 2003, the Team reconvened to consider the results of Ms. Mason's evaluation. Ms. Everett testified that although she was not surprised by the test scores reported by Ms. Mason, she was disturbed that the examiner apparently did not know about all the services in place in the 5th grade for the Student. The IEP in effect, developed for the 4th grade, did not set out with specificity the 5th grade program. Ms. Everett offered to write an Amendment to the IEP which would accurately reflect the special education services the Student was receiving in the 5th grade. (Compare the IEPs set out at S-3 and P-18). The January 2003 IEP Amendment did not alter the goals, methods or placement listed on the prior accepted IEP. According to Ms. Everett the Amendment added MCAS results, progress notes, and an accurate service delivery grid:

Small group reading (special education) daily 50 minutes; individual reading (special education) daily 20 minutes; writing instruction (special education and regular) 3x wk 45 minutes; individual writing (special education and regular) daily 20 minutes; tutoring special education-after school 3x 60 minutes. The Parents took no action on the Amendment (Everett; S-3, P-18)

6) At the January meeting the Team also discussed the Student's progress. Ms. Everett, as his classroom special educator and one of his after school tutors reported that the Student was making "excellent" progress in all areas of school functioning. In particular she noted progress toward the goals in his IEP addressing reading, writing, and confidence. (Everett, S-18) Catherine Poudrier tutored the Student three times a week during the summer before 5th grade. Ms. Poudrier used the "Phonographics" program, a structured reading instruction program. The student began the program at the 2nd grade instructional/frustration level. By January 2003, the Student had progressed to the 4th grade instructional level. (Paudrier; S-22, P-17) I place great weight on the testimony of Ms. Everett and Ms. Poudrier as I found them both to be thoughtful and candid witnesses and there is no contrary evidence in the record.

7) On January 15, 2003, the Parents wrote to the Curtis Blake School inquiring about the appropriateness of its program for the Student. (P-19)

8) On March 4, 2003, Lois Carra of the Center for Children with Special Needs conducted a neuropsychological evaluation of the Student. (P-13) Her testing showed that all his cognitive and executive functioning skills fell in the broadly average range. All conclusions concerning the Student's diagnosis of dyslexia and "ADD" as well as his emotional functioning were based on parental report and/or Ms. Mason's evaluation. Dr. Carra did not speak to any school based personnel, nor did she observe the Student or his program. Dr. Carra recommended that the Student receive language based instruction and programming directed by a speech-language pathologist. She wrote that the teacher directed class of similar peers should be highly structured and include an intensive, rule based phonics program such Orton-Gillingham, Wilson or Project Read. (Carra, P-20) I

4

find the foundation for Dr. Carra's recommendations to be weak, and therefore accord them little weight.

9) Ms. Mason visited the 5th grade class at Gateway on March 25, 2003. She observed the Student's 50 minute reading class: a group of eight students with special educator, Everett, and an aide. The activity that day involved a spelling/listening lesson on the short e. All students were operating at a 3rd-4th grade reading level. Ms. Mason also observed the whole class science lesson taught by the regular education teacher. She described the classroom as highly structured, orderly, and efficient; the students as quiet, well-behaved, engaged; and the teachers as organized, positive and warm. She noted that the instructional methodologies and curriculum adaptations in place were appropriate for the Student. However, Ms. Mason concluded that in order to progress effectively the Student needed longer, more intensive instruction in reading, spelling, and written language than was available at Gateway. She reiterated her November 2002, recommendation that the Student receive a minimum of two hours per day of language arts instruction using a systematic, rule-based approach. Ms. Mason also found the "Phonographics" decoding program inappropriate for the Student. She recommended the use of a decoding program more phonetic-patterns based. (P-21, Mason)

10) The Team reconvened on June 17, 2003, to develop an IEP for the Student's 6th grade year. Ms. Everett reported that the Student had made good progress throughout the 5th grade year and had met his IEP goals. By the end of the year the Student's reading skills as measured on standardized tests fell within the average range. (See also testimony of Fino, Souweine, Gerard.) The Student could read 5th grade classroom textbooks aloud, albeit haltingly, with comprehension. Ms. Everett noted that the Student still needed reminders to use appropriate decoding strategies, to slow down, and to pay attention to punctuation. She recommended that he continue to receive direct special education in reading, writing and learning strategies, along with classroom accommodations and support. (Everett, S-18, S-19) Ms. Everett testified that the Student functioned well in, and benefited from, the integrated 5th grade class. The individualized instruction met his special education needs while the placement allowed him to participate in discussions and activities at his cognitive level and with his peers. Since he made progress during the 5th grade Ms. Everett recommended that he continue in the 6th grade with a similar model. (Everett) Ms. Poudrier reported that the Student continued to make progress in reading fluency using the Phonographics program. On post-testing conducted in May 2003, the Student had progressed to the 5th grade instructional level. He still was inconsistent in applying decoding strategies, blending sounds, and maintaining a reading rate. Ms. Poudrier recommended that he continue to participate in reading fluency training to improve his reading rate. (Poudrier; S-22) The Parents requested placement at the Curtis-Blake School. (S-21; Gerard)

11) The following is compilation of standardized test results available to the Team on June 17, 2003:

5

| TEST | Ex. S-11<br>DA – 12/99<br>8 yrs. Gr. 2 | P-11<br>Ex S-11<br>DA –<br>12/00 | P-14<br>S-13<br>DA – 4/01<br>9 yrs. Gr.3 | P-14<br>S-13<br>DA 7/01<br>9 yr. Gr. 3 | P-14<br>S-13<br>DA 2/02<br>10 yr. Gr. 4 | P-16<br>11/02*<br>11-3 | S-19<br>DA – 1/03<br>11 yr. Gr. 5 | S-19<br>DA – 6/03<br>11 yr. Gr. 5 |
|---|---|---|---|---|---|---|---|---|
| **WJ-R**<br>Letter-Word ID<br>Passage Comp | 1.7<br>2.0 | 2.4<br>2.2 | | | | | | |
| **Woodcock Reading Mastery**<br>Word Attack<br>Word ID | | | 1.2<br>2.2 | 3.0<br>2.5 | | | | |
| **WIAT II**<br>Word Reading<br>Pseudo Word | | | | | | 3.7<br>2.0 | | |
| **WJ-III**<br>Broad Reading<br>Letter Word ID<br>Fluency<br>Passage Comp<br>Word Attack<br>Basic Reading<br>Reading Comp | | | | | 2.5<br>2.7<br>3.2<br>3.1<br>3.9<br>3.0<br>3.1 | | 4.6<br>3.4<br>4.3<br>4.5 | 5.1<br>4.2<br>5.1<br>5.1 |

\* Standard scores were reported to be within one standard deviation of the mean
  (See also S-14)

6

12) Gateway developed an IEP for the 2003-2004 school year calling for the Student's placement in the 6th grade inclusion classroom. That classroom follows a model substantially similar to the one the Student participated in during the 5th grade. There would be approximately 50 students spread over three classrooms. The staff would consist of two regular education teachers, one special education teacher, one classroom aide, and on 1-1 aide for another student. The class would follow a regular 6th grade curriculum with specialized instruction and accommodation for the students on IEPs. As in the 5th grade this Student would receive:

specialized reading instruction seventy minutes per day from special education staff; daily written language instruction for up to 65 minutes, and after school tutoring for an hour three times a week. The reading program in the tutoring session would shift from Phonographics to Mega Words, a rule-based, phonetic, systematic decoding program as recommended by Ms. Mason. The IEP provides for academic consultation once per month. It also provides for summer tutoring during 2003 to prevent regression in learned reading strategies. According to Ms. Gerard, the Special Education Director, the proposed IEP was intended to continue a program in which the Student had been successful. (P-22, S-4; S-37; Gerard; Everett)

On July 10, 2003, the Parents accepted the summer tutoring, but rejected the 2003-2004 school year program and placement offered by Gateway under the proposed IEP. (P-22, S-4)

13) The Parents enrolled the Student in the Curtis-Blake School in September 2003. Curtis Blake is a ch. 766 approved private day school which provides small group language based instruction to students of at least average cognitive potential with a diagnosis of language learning disability, specific learning disability or reading disability without a primary emotional disorder. According to Linda Fontaine, speech language supervisor at Curtis-Blake (P-32), Curtis-Blake uses a variety of specialized instruction programs to remediate students' foundational language impairment: Lindamood, Benchmark, visualizing/verbalizing, story grammar marker, among others. All instruction is provided in small groups or individually, using highly structured, sequential, competency-based methods, by speech-language pathologists, special educators or reading teachers.

Placement testing performed by Curtis-Blake determined the Student to be functioning at approximately a second grade reading level. (P-24) He receives daily, one to one reading instruction for 35 minutes. He then has a language and literature class with 4 other students; a Benchmark class with 2 other students and, a phonemic awareness class with three other students. He also participates in a pragmatics class; a visualizing/verbalizing group; a science/social studies class in a group of 8 with a teacher and an aide, and a math class. (Fontaine; P-26, 33)

Ms. Fontaine testified that the Student has settled in well, is motivated and eager to learn. She emphasized that his foundational language and reading skills clustered at the second grade level and did not approach the grade equivalent scores he achieved on the standardized testing administered by Gateway. She estimated that the Student needed at least two years of intensive language based instruction at Curtis-Blake before he would be ready to return to a mainstream setting. (Fontaine)

14) Judith Souweine, a neuropsychologist, was engaged to review the Student's records, evaluate the 6th grade program at Gateway and the Curtis-Blake placement, and render an opinion on the appropriateness of each proposed placement. She testified that this Student has at least average intellectual abilities with moderately severe language learning disabilities/dyslexia. To evaluate such a student's progress one must look at her/his functioning in the regular environment to determine whether he/she can access the regular curriculum, participate meaningfully and comfortably in the educational experience, and still acquire skills that tilt the student toward the average.

Dr. Souweine agreed with Ms. Mason and Dr. Carra that, based on the Student's learning profile, he needs at least 2 hours daily of intensive language based instruction including a structured systematic reading program. Dr. Souweine testified, however, that the Student can receive that type of program within the context of a regular school placement. She found that his progress over the course of the 5th grade was "large" particularly given the type and severity of his reading disability which Dr. Souweine described as "resistant to remediation". She also found that the Student's reading decoding and comprehension levels were sufficient to function in the regular classroom environment and that he benefited from the "richness" of the regular curriculum. Had he been resistant to specialized instruction, grossly unhappy, or not participating appropriately in classroom life she might have reached the same conclusions as Ms. Mason, but Dr. Souweine emphasized that she heard no such evidence.

Dr. Souweine found that Gateway's inclusion support services, with the small group reading and language arts, the emphasis on organizational skills and writing instruction throughout the day, and the individualized reading tutoring, would offer the Student an appropriate educational program in the most normalized environment. Dr. Souweine testified that Curtis-Blake is an exemplary language based program, but is too restrictive and too "low level" for the Student. (Souweine) I found Dr. Souweine to be well-informed and forthright and credit her testimony.

15) Ms. Mason observed Malik in the Curtis-Blake program on October 24, 2003. She found that the design/instruction and methodology of the classrooms closely match the school's catalogue and the description given by school personnel. The Student received approximately four hours per day of language arts instruction in groups of 4 to 6 students, or individually. The program includes explicit instruction in decoding, comprehension, phonological awareness and written expression. She testified that although Curtis-Blake provides more than the two hours of "service" she originally recommended, the intensive, integrated curriculum was appropriate for the Student and would be likely to allow him to make effective progress commensurate with his intellectual ability. (Mason; P-27)

8

## Findings and Conclusions

The parties agree that the Student has special learning needs as defined by 20 U.S.C. § 1400 et seq. and M.G.L. c. 71B and is therefore entitled to receive a free, appropriate public education. They disagree about where that education should be delivered. After careful consideration of all the evidence presented at the hearing, and the arguments of counsel for both parties, it is my conclusion that the 2003-2004 IEP developed by Gateway is reasonably calculated to provide a free, appropriate public education to the Student.

A free, appropriate public education (FAPE) is one which is reasonably calculated to assure personalized instruction and support services tailored to meet a student's unique needs and to permit the student to make meaningful educational progress in the least restrictive setting.[3] Evaluating whether a particular IEP meets the FAPE standard is highly fact dependent. The analysis will vary somewhat depending upon the unique circumstances of the student, the procedural history of the parties' interactions, the characteristics of the proposed program(s), and the hearing officer's assessment of the credibility and weight to be assigned to the evidence, among other factors.

In this matter there is no substantial disagreement about the needs of the Student, nor about the characteristics of the public and private programs. In order to address his language learning disability the Student needs intensive, structured, language based programming including a specialized reading program. The Student also requires explicit skills instruction in written expression and modifications/accommodations for written assignments in the mainstream. Specialized instruction should occur for at least two hours per day in small groups.

I turn then to determine whether Gateway has proposed an educational plan for 2003-2004 school year that can provide appropriate services to meet the Student's documented needs. In this matter, since the proposed 6th grade inclusion program is substantially similar to the one in which the Student participated during his 5th grade year, history plays a part in the analysis. Assessing whether Gateway actually delivered the services promised in its 2003-2004 IEP, and whether the Student progressed effectively in that model, is helpful in making predictions about the appropriateness of the 2003-2004 IEP.

The 2002-2003 fifth grade inclusion program provided the Student with approximately two hours of daily language arts instruction including seventy minutes of reading instruction, and sixty five minutes of instruction in written expression, in addition to three hours per week of individual tutoring. While the instructional groups of approximately 8 students were smaller than the large class, they were not "small groups" as contemplated by Ms. Mason. (Everett, Mason) The instruction provided in and out of the classroom was intensive, structured and sequential and concentrated on the area of the Student's most significant need: reading fluency (Poudrier, Souweine) The classroom followed the regular fifth grade curriculum as set out in the Massachusetts Curriculum

---

[3] For a helpful discussion of the FAPE standard in Massachusetts please see: Arlington Public Schools, 8 MSER 187 (2002).

9

Frameworks, thus allowing the Student to learn and progress along with his age peers in the general curriculum.

I found the testimony of Ms. Everett and Ms. Poudrier concerning the Student's progress during his fifth grade year convincing and heartfelt. They were able to point to measurable gains in standardized testing averaging about a year's growth in approximately six months of school. Ms. Poudrier pointed to significant achievement in the area of reading fluency from the second grade level during the summer before 5th grade, to the fifth grade level at the end of 5th grade. Ms. Everett testified that the Student had met all his IEP goals by the end of 5th grade indicating "demonstrable improvement" See: County of San Diego v. California Special Education Hearing Office, 93 F 3d 458 (9th Cir. 1996); Len v. Portland School Committee, 998 F.2d 1083 (1st Cir. 1993). Equally important, according to Dr. Souweine, is the Student's engagement in his learning. Ms. Mason noted during her March 2003, observation of the Student in the classroom that he participated eagerly, stayed on task and seemed happy. (Mason) Ms. Everett testified that throughtout 2002-2003 the Student was motivated, contributed to the general class discussions, and even read a fifth grade level text aloud to the entire class. I find therefore that the preponderance of the evidence supports the conclusion that the Student made demonstrable and effective progress toward his IEP goals, toward acquisition of grade level academic skills, and toward full participation in the mainstream environment during his fifth grade inclusion experience. The Parents introduced no evidence that would persuade me that the Student could not continue to make similar educational progress given a similar educational program.

The Parents point to the results of the Houghton Mifflin Placement Test administered by the Curtis-Blake School in September 2003, to support their argument that the Student did not progress effectively at Gateway. (P-25) Those results suggest that the Student's overall reading level in September 2003 was approximately second grade. (LaFontaine) I place only minimal weight on those scores as they were administered for placement, not diagnostic purposes, there is no comparable test in the record with which to compare the results achieved in September 2003, and the "test" was administered shortly after the Student had been in a serious car accident and changed schools.

More important are the academic and behavioral observations available to the Team members in June 2003. Uniformly that information supported the conclusion that the Student had made significant progress during the fifth grade, but still required an intensive structured, language based special education program for the sixth grade. (Everett, Poudrier, Mason, Gerard) It is reasonable then for Gateway to propose continuing a model of service delivery that had proven effective in the immediate past for this Student. I note also that the proposed inclusion model at Gateway is less restrictive than the Parents' unilateral placement at Curtis-Blake. While not outcome determinative in this matter, the relative restrictiveness of proposed special education placements is an important factor in determining the availability of a "free, appropriate public education" to a student. The Parents also argue that the Gateway program lacks the "small group" instruction Ms. Mason determined to be necessary for effective remediation of the Student's learning disabilities. Ms. Everett acknowledged that although the Student received language and reading instruction in "smaller" groups, it is not the type of "small group" instruction envisioned by Ms. Mason. In evaluating whether this is a critical

service I again turn to the Student's functioning in the 5th grade. It appears that he was able to concentrate, participate and build upon his learning experiences in a group of eight to ten students. Could he have learned more, or more swiftly, in a group of four students? Perhaps. Nevertheless he did demonstrate progress in all areas in the larger "small group". And that larger group allowed him to access and to participate in the mainstream environment and the general educational curriculum. These are not small benefits. They are in fact the premise of and integral to the entire special education process.

Finally, the parties agree that there are no procedural deficiencies with regard to the proposed 2003-2004 IEP. (P-22; S-4) I note, however, that the service delivery grid on the proposed IEP does not contain explicit language concerning "small group" special education in the regular classroom, nor "individual" tutoring after school. Both these elements were discussed at the June 2003 Team meeting held to develop the IEP and are not in dispute. The IEP also does not reference a "rule based, phonetic reading program", though the parties agreed that one would in fact be used with the Student in both classroom and tutorial instruction. I find that these discrepancies between the actual program contemplated for the Student and the IEP language are capable of revision without difficulty or delay, and because all parties understood the actual services proposed for the Student do not rise to the level of a procedural deficiency.

Based on a careful review of the hearing record, and in particular all the information available to the June, 2003, Team, I find that the 2003-2004 IEP developed by Gateway Regional Schools is tailored to meet the Student's unique needs as identified by his teachers, tutor, and independent evaluator, and is reasonably calculated to permit the Student to make meaningful educational progress in the least restrictive setting. Given this conclusion I do not reach a discussion of the appropriateness of the Curtis-Blake Day School.

Order

1) The 2003-2004 Individualized Education Plan developed by the Gateway Public Schools for this Student is reasonably calculated to provide a free, appropriate public education to him in the least restrictive setting.

2) Gateway Public Schools shall make technical modifications to the proposed 2003-2004 IEP so that it clearly sets out staff-student ratios and instructional group sizes and includes a reference to the systematic, phonetic reading program to be used with the Student.

3) The Parents are not entitled to public funding of the 2003-2004 unilateral placement of the Student at the Curtis-Blake School.

Date: March 12, 2004

Lindsay Byrne, Hearing Officer

## COMMONWEALTH OF MASSACHUSETTS
## BUREAU OF SPECIAL EDUCATION APPEALS

## EFFECT OF BUREAU DECISION AND RIGHTS OF APPEAL

### Effect of the Decision

20 U.S.C. s. 1415(i)(1)(B) requires that a decision of the Bureau of Special Education Appeals be final and subject to no further agency review. Accordingly, the Bureau cannot permit motions to reconsider or to re-open a Bureau decision once it is issued. Bureau decisions are final decisions subject only to judicial review.

Except as set forth below, the final decision of the Bureau must be implemented immediately. Pursuant to M.G.L. c. 30A, s. 14(3), appeal of the decision does not operate as a stay. Rather, a party seeking to stay the decision of the Bureau must seek such stay from the court having jurisdiction over the party's appeal.

Under the provisions of 20 U.S.C. s. 1415(j), "unless the State or local education agency and the parents otherwise agree, the child shall remain in the then-current educational placement," during the pendency of any judicial appeal of the Bureau decision, unless the child is seeking initial admission to a public school, in which case "with the consent of the parents, the child shall be placed in the public school program". Therefore, where the Bureau has ordered the public school to place the child in a new placement, and the parents or guardian agree with that order, the public school shall immediately implement the placement ordered by the Bureau. *School Committee of Burlington, v. Massachusetts Department of Education*, 471 U.S. 359 (1985). Otherwise, a party seeking to change the child's placement during the pendency of judicial proceedings must seek a preliminary injunction ordering such a change in placement from the court having jurisdiction over the appeal. *Honig v. Doe*, 484 U.S. 305 (1988); *Doe v. Brookline*, 722 F.2d 910 (1st Cir. 1983).

### Compliance

A party contending that a Bureau of Special Education Appeals decision is not being implemented may file a motion with the Bureau of Special Education Appeals contending that the decision is not being implemented and setting out the areas of non-compliance. The Hearing Officer may convene a hearing at which the scope of the inquiry shall be limited to the facts on the issue of compliance, facts of such a nature as to excuse performance, and facts bearing on a remedy. Upon a finding of non-compliance, the Hearing Officer may fashion appropriate relief, including referral of the matter to the Legal Office of the Department of Education or other office for appropriate enforcement action. 603 CMR 28.08(6)(b).

## Rights of Appeal

Any party aggrieved by a decision of the Bureau of Special Education Appeals may file a complaint in the state superior court of competent jurisdiction or in the District Court of the United States for Massachusetts, for review of the Bureau decision. 20 U.S.C. s. 1415(i)(2).

Under Massachusetts General Laws, Chapter 30A, Section 14(1), appeal of a final Bureau decision to state superior court must be filed within thirty (30) days of receipt of the decision. The federal courts have ruled that the time period for filing a judicial appeal of a Bureau decision in federal district court is also thirty (30) days of receipt of the decision, as provided in the Massachusetts Administrative Procedures Act, M.G.L. c.30A. *Amann v. Town of Stow*, 991 F.2d 929 (1st Cir. 1993); *Gertel v. School Committee of Brookline*, 783 F. Supp. 701 (D. Mass. 1992).

Therefore, an appeal of a Bureau decision to state superior court or to federal district court must be filed within thirty (30) days of receipt of the Bureau decision by the appealing party.

## Confidentiality

In order to preserve the confidentiality of the student involved in these proceedings, when an appeal is taken to superior court or to federal district court, the parties are strongly urged to file the complaint without identifying the true name of the parents or the child, and to move that all exhibits, including the transcript of the hearing before the Bureau of Special Education Appeals, be impounded by the court. See *Webster Grove School District v. Pulitzer Publishing Company*, 898 F.2d 1371 (8th Cir. 1990). If the appealing party does not seek to impound the documents, the Bureau of Special Education Appeals, through the Attorney General's Office, may move to impound the documents.

## Record of the Hearing

The Bureau of Special Education Appeals will provide an electronic verbatim record of the hearing to any party, free of charge, upon receipt of a written request. Pursuant to federal law, upon receipt of a written request from any party, the Bureau of Special Education Appeals will arrange for and provide a certified written transcription of the entire proceedings by a certified court reporter, free of charge.

C

# The White Oak School

533 North Road
Westfield, MA 01085
Phone: (413) 562-9500
Fax: (413) 562-9010



EXHIBIT
C

# Invoice

| DATE | INVOICE # |
|---|---|
| 4/12/2004 | 962 |

**BILL TO**

Chicopee Public Schools
Ms. Johanne Jacques-Kolodziej
Director of Special Ed.
180 Broadway
Chicopee, MA  01020

| P.O. NO. | TERMS | DUE DATE | BILLING PERIOD: |
|---|---|---|---|
|  | Net 15 | 4/27/2004 | Sept. - June |

| ITEM | DESCRIPTION | RATE | AMOUNT |
|---|---|---|---|
| Tuition |  | 24,898.28 | 24,898.28 |

We appreciate your prompt payment.

**Total** $24,898.28

D

Case 3:04-cv-30087-MAP    Document 1-3    Filed 05/06/2004    Page 17 of 18

EXHIBIT D

## DOHERTY, WALLACE, PILLSBURY AND MURPHY, P.C.

PAUL S. DOHERTY
PHILIP J. CALLAN, JR
GARY P. SHANNON
ROBERT L. LEONARD
A. CRAIG BROWN
L. JEFFREY MEEHAN
JOHN J. MCCARTHY
DAVID J. MARTEL‡
WILLIAM P. HADLEY
BARRY M. RYAN
DEBORAH A. BASILE†
PAUL M. MALECK
CLAIRE L. THOMPSON
W. GARTH JANES**
GREGORY A. SCHMIDT
MICHAEL K. CALLAN*
MICHAEL D. SWEET*‡
BERNADETTE HARRIGAN‡
BRENDA S. DOHERTY
MICHELE A. ROOKE
THOMAS E. DAY
KAREN K. CHADWELL*†
JOHN E. BONINI*
MICHAEL J. BONANNO

ATTORNEYS AT LAW
ONE MONARCH PLACE, SUITE 1900
SPRINGFIELD, MASSACHUSETTS 01144-1900

TELEPHONE (413) 733-3111

TELECOPIER (413) 734-3910

WWW.DWPM.COM
E MAIL: CTHOMPSON@DWPM.COM

SAMUEL A. MARSELLA
MATTHEW J. RYAN, JR.
OF COUNSEL

DUDLEY B. WALLACE
(1900-1987)
LOUIS W. DOHERTY
(1898-1990)
FREDERICK S. PILLSBURY
(1919-1996)
ROBERT E. MURPHY
(1919-2003)

† REGISTERED PATENT ATTORNEY
* ALSO ADMITTED IN CONNECTICUT
‡ ALSO ADMITTED IN NEW YORK
** ALSO ADMITTED IN DISTRICT OF COLUMBIA



April 12, 2004

**VIA TELEFAX AND REGULAR MAIL**

781-338-3398

Jackie Belf-Becker
Bureau of Special Education Appeals
350 Main Street
Malden, MA 02148-5023

Re:   **Kaitlyn T. v. Chicopee Public Schools**
      BSEA #: 04-0093

Dear Ms. Belf-Becker:

On behalf of the Chicopee Public Schools, I am requesting a free, certified written transcription of the entire evidentiary hearing which occurred before hearing officer, Lindsay Byrne, on January 29th and 30th and February 3rd and 4th, 2004. The district will be appealing the Bureau's decision received on April 8, 2004.

Very truly yours,

Claire L. Thompson

CLT/dlb

cc:   Lindsay Byrne
      Derek Beaulieu, Esq.

222060-1