UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **CITY OF CHICOPEE acting through CHICOPEE PUBLIC SCHOOLS,** )<br>Plaintiff ) | )<br>)<br>)<br>) CIVIL ACTION NO. 04-30087-KPN |
| v. | ) |
| **DAVID T. As parent and next friend of KAITLYN T. and MASSACHUSETTS DEPARTMENT OF EDUCATION**<br>Defendants | )<br>)<br>)<br>)<br>) |

### DEFENDANT'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR LEAVE TO OFFER ADDITIONAL EVIDENCE

The Defendants hereby move the Court to deny the Plaintiff's Motion for Leave to Offer Additional Evidence. As grounds therefore the Defendant's state that the record is clear and that the Court does not need additional evidence to understand the underlying record and how the Hearing Officer arrived at her decision.

### LEGAL STANDARD

The First Circuit Court of Appeals has expressly stated in *Town of Burlington v. Department of Education* that:

> "We construe "additional" in the ordinary sense of the word, Perrin v. United States, 444 U.S. 37, 42, 62 L. Ed. 2d 199, 100 S. Ct. 311 (1980), to mean supplemental. Thus construed, this clause does not authorize witnesses at trial to repeat or embellish their prior administrative hearing testimony; this would be entirely inconsistent with the usual meaning of "additional." We are fortified in this interpretation because it structurally assists in giving due weight to the administrative proceeding, as Rowley requires. Rowley at 206." *Town of Burlington v. Department of Education, 736 F.2d 773, 790 (1st Cir. 1984).*

The First Circuit Court of Appeals also stated in *Burlington* that:

> "A trial court must make an independent ruling based on the preponderance of the evidence, but the Act contemplates that the source of the evidence generally will be the administrative hearing record, with some supplementation at trial. The reasons for supplementation will vary; they might include gaps in the administrative transcript owing to mechanical failure, unavailability of a witness, an improper exclusion of evidence by the administrative agency, and evidence concerning relevant events occurring subsequent to the administrative hearing. The starting point for determining what additional evidence should be received, however, is the record of the administrative proceeding." *Burlington, at 790.*

Finally, the First Circuit Court of Appeals also stated in *Burlington* held that:

> "The determination of what is "additional" evidence must be left to the trial court which must be careful not to allow such evidence to change the character of the hearing from one of review to a trial de novo. A practicable approach, we believe, is than an administrative hearing witness is rebuttably presumed to be foreclosed from testifying at trial. A motion may then be made to allow such a witness to testify within specified limits stating the justification for the testimony. In ruling on the motion, a court should weigh heavily the important concerns of not allowing a party to undercut the statutory role of administrative expertise, the unfairness involved in one party's reserving its best evidence for trial, the reason the witness did not testify at the administrative hearing, and the conservation of judicial resources. The court should look with a critical eye on a claim, such as made here, that the credibility of a witness is a central issue. The claim of credibility should not be an "open sesame" for additional evidence. Such an approach followed by a pretrial order that identifies who may testify and limits the scope of the testimony will enable the court to avoid a trial de novo." *Burlington, at 791.*

I. THE PLAINTIFF'S ARGUMENT THAT DR. SOUWEINE'S TESTIMONY IS MATERIAL TO THE COURT'S REVIEW OF THE UNDERLYING HEARING BECAUSE SHE IS THE ONLY EXPERT WITNESS WHO OBSERVED THE TWO PROGRAMS IN QUESTION AND BECAUSE SHE REVIEWED THE PROPOSED IEP IS UNFOUNDED.

This court should not allow Dr. Souweine to testify again. As stated above "this clause does not authorize witnesses at trial to repeat or embellish their prior administrative hearing testimony; this would be entirely inconsistent with the usual meaning of "additional." *Town of Burlington v. Department of Education,* 736 F.2d 773, 790 (1st Cir. 1984).

The main thrust of the Plaintiff's first argument is that Judith Souweine's testimony is material to this Court's review of the underlying administrative decision, because she was the only expert witness who observed both the White Oak School and the proposed program at Chicopee High School and she observed the IEP proposed by the School District. The Defendants remind the Plaintiff that they stipulated to the fact that Kaitlyn was a the White Oak School, that she was receiving rule based language intensive methodologies, that White Oak is a Massachusetts Approved School and that it was delivering the services it was purporting to. Quite frankly, her testimony regarding her observations at White Oak were superfluous.

Furthermore, the Plaintiff never attacked Dr. Kemper, the parent's expert witness, regarding his diagnosis or recommendations. The main component of Dr. Kemper's evaluation and recommendations was that Kaitlyn receive intensive rule based language methodologies derived from Orton-Gillingham principles. It was Dr. Kemper's position that he did not need to review the proposed program or IEP after being informed that READ 180 was the sole methodology being used by the School District in its program. The issue at hearing then became whether the program at Chicopee High School was delivering the services as described by Dr. Kemper in his evaluation and whether READ 180 was an intensive language based program that could remediate Dyslexia. Please note that there was never any assertion by the Plaintiff that READ 180 was a rule based methodology. Dr. Souweine's testimony at hearing was to assert that READ 180 was an intensive language based methodology that could be used to remediate Kaitlyin's dyslexia in accordance with Dr. Kemper's recommendations. However, as the record reflects, and this memorandum will later discuss more fully, her testimony was lacking expert and personal knowledge of the READ 180 program. Moreover, her observations of the Chicopee Academy program were immaterial in that she had no prior knowledge of READ 180 program.

Therefore, this court should preclude any additional testimony from Judith Souweine on the basis that her testimony below needs no further supplementation, it is what it is.

II. THE ADMINISTRATIVE RECORD IS CLEAR AND THE COURT SHOULD DETERMINE THAT IT IS CLEAR AND THAT NO ADDITIONAL EVIDENCE IS THUS WARRANTED.

As stated by the First Circuit Court of appeals in *Burlington*, "the starting point for determining what additional evidence should be received, however, is the record of the administrative proceeding." *Town of Burlington v. Department of Education, 736 F.2d 773, 790 (1st Cir. 1984).*

This case was unlike any other case prior to it in that it involved READ 180. This case focused on the School District's proposed IEP, which offered READ 180, a Scholastic Inc. program, as its sole form of remediation. The parents request for hearing asserted as early as June 30, 2003 stated:

> "The IEP offered for the 2003-2004 School Year seeks to place Kaitlyn in a program that will offer some reading pullout. The School District will be using the program READ 180 to remediate Kaitlyn's disability. The parents assert that the program offered by the School District is not intensive enough. The parents also assert that READ 180 is not a program that is designed to effectively remediate the type of disability Kaitlyn has. Moreover, the School District's program and IEP fail to provide real services, methodologies and the intensity Kaitlyn needs in order for her to achieve FAPE." *Administrative Record Volume I, p.5.*

The hearing officer noted in her Decision that the Plaintiff never disputed Dr. Kemper's findings that Kaitlyn had dyslexia and that she needed an intensive language based services specifically designed to remediate her disability.[1] Instead the School District's case considered

---

[1] Please note that Dr. Kemper actually states that Kaitlyn required an intensive rule based language program derived from Orton-Gillingham principles. Orton-Gillingham methodologies are rule based programs from which most programs currently in use derived from. The rule based methodologies are research based and time tested and are well known to special education providers and the BSEA.

4

of trying to persuade the hearing officer that READ 180 met the criteria for FAPE as described in Dr. Kemper's Psycholinguistic Evaluation. The hearing officer held:

> "Chicopee argued that its reading class, using READ 180 program, met Dr. Kemper's recommendations for direct, systematic reading instruction. I disagree. …The evidence in this hearing established that READ 180 is a new, exciting, engaging computer assisted tool for developing reading fluency in disadvantaged students attending large public school systems. There is no evidence, however, that it is a targeted, rule based, phonetic system designed to remediate individual reading disabilities. Without showing of effectiveness with the language disabled population, the Parents were entitled to maintain a reasonable degree of skepticism about the READ 180 program"[2]

Obviously, Dr. Souweine was put forth by the Plaintiff to show that READ 180 was an effective methodology that could remediate Kaitlyn's dyslexia in the manner described by Dr. Kemper. However, as the Decision clearly states Dr. Souweine had no previous personal or expert knowledge of READ 180. The Plaintiff omits that reasoning from her argument. Dr. Souweine testified "I had no prior knowledge of this program except for having read about it in Sally Shaywitz's book…but this was my first introduction to this program was when I saw it in Chicopee." Administrative Record (hereinafter referred to as "AR") vol. IV p.115. As pointed out by the Plaintiff, Dr. Souweine tried out the program herself. She testified " And I tried it out myself because that's the best way to learn about something." AR vol. IV p. 115. If she is learning about it she can hardly be an expert. The Defendant's assert that this testimony disqualifies Dr. Souweine from being considered as an expert witness regarding READ 180.

---

[2] The parents would also assert that Decision and record show that despite the volumes of brochures and hundreds of pages of literature regarding READ 180 that was placed into evidence, along with the testimony of every witness for or against the School District, that no where could anyone find any language that READ 180 is a program designed for Dyslexic or language based learning disabled students. Moreover, the literature from READ 180 referring to special education students, pertained to how fonts on the computer screen could be enlarged to accommodate students who were visually impaired and how other adaptive equipment such as head phones could be provided to students who were hearing impaired.

Whereas she had no knowledge of the READ 180 program below, her testimony at trial before this court is unwarranted.

The hearing officer states in the Decision that in addition to Dr. Souweine not personally evaluating the student that: "Dr. Souweine's knowledge of the READ 180 program came solely through the materials presented to her by Chicopee and her observation of Chicopee's use of the program." The Plaintiff argues that the materials Dr. Souweine reviewed were not all from the School District. The Plaintiff is splicing words, the research studies were done by READ180's maker Scholastic, but given to Dr. Souweine for her review by the Plaintiff. Furthermore, the READ 180 promotional documents and the READ 180 research studies are in the administrative record and are available for the courts review. Once again, the record will show that no one who testified could show in any of these documents that this program is for children who suffer from language based learning disabilities such as Dyslexia.

Dr. Souweine's testimony with respect to her personal knowledge of READ 180 did not do much to bolster READ 180 either. She states "so my impression of the program both based on the research that – again, albeit it's new, there isn't that much research that accompanies it, but they did use it on large scale populations, and the fact that I saw it in operation with kids who you would not traditionally assume would be excited about doing this, and I saw them doing it." AR vol. IV pp. 116-117. Her opinions were based on statements such as this "I saw it in operation, and I was totally impressed with how this group of youngsters, who are of a similar age – and I don't know their exact level of functioning, but I could see what they were reading, so they weren't reading at the highest level, they were engaged in this process and making progress." AR vol. IV pp. 117-118. "Those children in that class I saw were all children who

struggled with reading, writing, spelling. So it certainly was a group of – I'm not going to opine about the similarity of their IEPs or of their diagnosis, because I didn't read those things particularly." AR vol. IV p. 118. She also did not even know if the children were special education students. It was asked of her "Where all the children in the Read 180 program on IEPs?" She answered: "I believe so. I don't know to a child, but my recollection of my conversation with the teacher was that they were on – all on IEPs. And my understanding again, I think the SPED director would be a better person to ask this question to – is that the licenses, the way they purchased the program from Scholastic was specifically for children with learning disabilities, and therefore I would imagine those would be people on IEPs." AR vol. IV p. 123.

    On direct examination Dr. Souweine was asked "Can you learn it (referring to Dyslexic children) without the rules?" (meaning without rule based methodologies) She testified "I believe they can, and there is some research that supports that approach." AR vol. IV p. 38. This research was never produced. This line of questioning was followed up on cross examination. When asked about the research based, non-rule programs, Dr. Souweine stated that she was aware of some programs being developed at UMASS and possibly being used in Gilmontague Schools. AR vol. IV p. 93. Ultimately, when questioned about this program and how it is utilized by school districts, she testified, "I can't really tell you how school districts are using it, that goes beyond my knowledge of how it is used, but I have seen it used in [UMASS] lab in the absence of rule based programming." AR vol. IV p. 93.

    In essence, Dr. Souweine is a psychologist and not a speech and language pathologist. She even testified "I wouldn't call myself a reading specialist, meaning a reading teacher, but I do consider myself a specialist in terms of diagnosing reading disorders." It should be noted again that the diagnosis was never in dispute. The issue was whether READ 180 could remediate

dyslexia. To this matter Dr. Souweine had no expert or relevant personal knowledge of the READ 180 program.

From a casual reading the transcripts, the District Court can determine that the facts support the decision of the hearing officer. The Plaintiff's reasoning for wanting to have Dr. Souweine re-testify is self serving, it rests on choosing to ignore or omit language clearly stated in the Decision and records. As stated in *Burlington*: "The court should look with a critical eye on a claim, such as made here, that the credibility of a witness is a central issue. The claim of credibility should not be an "open sesame" for additional evidence." *Town of Burlington v. Department of Education, 736 F.2d 773, 791 (1st Cir. 1984).*

The Plaintiff's second argument and offer of additional evidence comes in the form of testimony from Judith Souweine regarding her use of the word "confusing.[3]" Once again, with respect to Dr. Souweine's expert testimony regarding her review of the previous testing, the record is clear. The hearing officer's findings were well supported and thus this Court should not allow additional testimony to be admitted.

On Direct examination Dr. Souweine testified that she was confused regarding her review of a portion the testing administered by Melissa Mannello. First, it is important to note that the Melissa Mannello evaluation is an evaluation performed by the School District. It is a Speech and Language evaluation. This is the same type of evaluation administered by Dr. Kemper. This type of evaluation is different from intelligence testing and/or psychological testing. Also, Dr. Souweine is not a speech and language pathologist, but rather a psychologist. Moreover, the

---

[3] "I give Dr. Souweine's opinion in this matter little weight because she did not personally evaluate the student and found the testing results in the record 'confusing.' Furthermore, Dr. Souweine's knowledge of READ 180 program came solely through the materials presented to her by Chicopee and her observation of Chicopee's use of the program."

8

Plaintiff chose to have Dr. Souweine review the testing of Melissa Mannello rather than have Melissa Mannello testify about the tests she administered.

On direct examination, when asked by the Plaintiff's attorney whether she considered the Melissa Mannello evaluation, Dr. Souweine answered "In the two test dates reported in this evaluation, 12/4 and 4/9, there are results that are somewhat discrepant from each other, which I can't totally explain in this – because I didn't administer the tests, and I certainly didn't look at the protocol. So it's a little hard for me to totally understand them." AR vol. IV p.8. She then adds later "the part that is confusing to me is that part on the similar test, in terms of its description and what its purporting to measure, the Woodcock–Johnson Test of Achievement letter/word identification, (the student's) score is solidly within the average range, a standard score of 95-94, whereas the standard score on word reading is 74. The difference in those scores is tremendous. It's two standard deviations, which doesn't – that's what I'm saying, it doesn't make a lot of sense to me. All of these tests are really administered in the same way. …So a standard score of 74 or 79 on the WIAT and then a standard score of 94 on the letter/word identification really just doesn't make a lot of sense to me in the sense of, how could these be so different? You know we could all spin out some hypothesis about, you know, one day she was, you know, in a better mood or, you know, more cooperative or something like that, but it just doesn't make sense to me…So when I say I am a little confused, I'm being really honest; I don't understand how she could score in the average range on one test and so differently on another test" AR vol. IV pp. 15-17. Dr. Souweine was asked "as someone with a clinical background, do you have any theories?" AR vol. IV p.17. She answered "Well, it's possible it's related to the test itself. It's possible the norming of the test is quite different between the two tests or the – it's possible that the method of presentation, could be the length of the test, the way the test is laid

9

out, might have created some differences. It's possible, looking more from a more psychological point of view, attention and concentration could impact someone's performance on a test like this. It's possible that anxiety could influence a youngster's performance, and it's also possible that motivation could influence the performance. I really think it's beyond my knowledge to know which of any of those were present here. But I want to highlight that it isn't a clear picture that (the student's) skills are so discrepant from her peers. That's really the point I'm trying to make." AR vol. IV p. 17-18. Dr. Souweine's testimony on direct examination clearly showed that because she did not administer the test herself she was unsure of many conditions which went into determining where Kaitlyn was functioning.

On cross examination Dr, Souweine also testified that she was confused by the Melissa Mannello speech and language evaluation. On cross examination the Melissa Mannello's evaluation was placed in front of Dr. Souweine. When asked about her comments on direct examination that it was confusing, she stated, "I found some of it confusing." This was her testimony and it should stand.

In addition to Dr. Souweine not having personal knowledge of the testing conditions, she also had no personal or expert knowledge of many of the tests used by Dr. Kemper and Melissa Mannello. Dr. Souweine was asked on direct examination to comment on the Slosson Oral Reading Test. She was unable to comment because she was not familiar with that test. She was then asked to comment on the Grey Oral Reading Test performed at the White Oak School. On direct exam she stated that she was unable to comment on the results in that the test results were incomplete, missing certain rate and accuracy scores. She states "I don't know exactly what it reflects…" AR vol. IV p. 22. She was then asked to compare the reading comprehension section of the Grey Oral Test, in general, to the Woodcock-Johnson or the WIAT tests, in general. With

regards to the WIAT test, Dr. Souweine testified "I can't give you a very good answer about that, because I don't give the WIAT enough to really have a strong opinion about how they compare." AR vol. IV p. 26. She was then asked "How, if at all, would you anticipate that that level of anxiety would impact on her academic functioning and her testing performance? She answers "Again, without first hand knowledge or a lot of information from the testing, in general, I would say that anxiety can have a tremendous impact on how children perform in a testing situation…" AR vol. IV p. 27.

On cross examination she was again asked to look at one of the tests performed by both Dr. Kemper and Melissa Mannello, an evaluation called the CTOPP. When asked if she administered the CTOPP she testified "no." AR vol. IV p. 71. She was asked to comment on language in the evaluation regarding the fact the Melissa Mannello deviated from the standard administration of the test allowing the child to take additional time and the test was read to her rather than having to read it for her self. Dr. Souweine acknowledged "Well, certainly it wasn't the standard administration of the test, because as the examiner says, she deviated from the prescribed practice by not using the tape, and so she did it orally, which would certainly change the results of the test." AR vol. IV p. 72. Asked about the next test on the evaluation, the WIAT, when asked if she administers that test, she answered, "I don't use the WIAT." AR vol. IV p. 73. She then had some familiarity with the Woodcock-Johnson, however, when asked "is it fair to say that with the Woodcock-Johnson, once again, this is another diagnostic test?" to which she testified "Yes." AR vol. IV p. 75. The she was asked again about the Grey Oral. She previously testified based on White Oak's administration of the Grey Oral that she couldn't extrapolate anything from those results because of missing numbers. On cross she was made aware that Dr. Kemper had also done the Grey Oral Evaluation and clearly provided all the relevant numbers.

She then concurred when asked if his findings found Kaitlyn to be functioning in the below average range. She was asked, "But essentially, these [scores] are all below average, correct? She responded "They are all below average." AR vol. IV p. 80. She was then asked about the Slosson Evaluation to which she responded "Yeah, I don't – I don't really know the Slosson." She was then asked about the TOWRE and TORC-3 evaluations given by Dr. Kemper. She stated "Again, I am not familiar – I haven't ever given the TORC-3, so I don't – I wouldn't have a lot to say about it." AR vol. IV p. 89. She was then asked about the TOWL-3 Dr. Kemper administered. She again testified "I don't administer, but I know this test a little bit better." AR vol. IV p. 89. The she was asked about the Test of Written Spelling. She testified she did not administer that test either. AR vol. IV p. 89.

She was also asked about Kaitlyn's grades from her eighth grade year in Chicopee. The question posed was "is it fair to say, then, that she was getting Ds?" She responded "I think some of her grades were in the C range."

As stated above the School District stipulated that White Oak was appropriate, it was its argument that its program was more appropriate because it could offer intensive language based services in the least restrictive environment. However, despite the stipulation, Dr. Souweine did testify about her observation at the White Oak School. First, Dr. Souweine testified that she performed her observation of White Oak on Halloween day 2003. As a clinician she should have realized that that day was less than ideal. According to her testimony there had been a party in the morning and several students were wearing costumes. Nonetheless, she testified that the White Oak School was appropriate. She testified "I would say that the student appeared comfortable in the environment. She appeared to have peers that she was friendly with. I don't – I didn't see any evidence of difficulty in terms of her participation in the program at all" AR vol.

IV p. 45. She later stated "I would say the White Oak Program is an appropriate educational environment for her, but it does not meet the criteria of the least restrictive alternative[4] where she could be educated appropriately." AR vol. IV p. 65.

Dr. Souweine also testified that she observed the proposed 9th Grade Academy at Chicopee High School. Once again her testimony about the program was not based on personal knowledge, but relied heavily on information provided to her from the School District. For example, Dr. Souweine testified that she was impressed with the communication aspect of Chicopee's program described as the 9th Grade Academy. She testified, "As it was explained to me, there was time put aside in the teacher's day to meet as a team, and I think that's critical feature in making a program successful." AR vol. IV p.54. Ms. Janis Walsh, a teacher of the learning skills classroom, later testified "at the end of the day, every single day of the week, we meet as an entire team and discuss how the students in the program are doing. And I must say that's an element that was absent when I did similar work at Central High School, and I completely agree with Dr. Souweine's opinion that that is the glue that holds a program together." AR vol. IV p. 130. At the time of this testimony it appeared that the 9th Grade Academy was made up of sixteen special education children. It was later exposed by the Hearing Officer by questioning Ms. Walsh directly that, as Ms. Walsh testified, "the 9th grade academy at Chicopee High School is all of the 9th Grade." AR vol. IV p. 184. The Hearing Officer asked "so the common planning time is not only for the 16 special ed. students? … It's also for other students, the mainstream students?" Ms. Walsh answered "Right." AR vol. IV p. 184. Moreover, the meeting time that Dr. Souweine testified about, that was impressed upon her as part of the program, that was so important in her opinion, was erroneous or overstated. It was really time

---

[4] Please note that Dr. Souweine misquotes the legal term as defined by the IDEA 20 USC §1400 the term is not the

put aside at the end of the day for the teachers of all classes to meet and discuss all the students at Chicopee High School. Like the Defendants, Dr. Souweine also testified that she had a difficult time understanding what the 9th Grade Academy was. She testified "Well I'm not really sure what's the 9th grade academy, whether that's a separate idea." AR vol. IV p. 60. She was asked whether the program proposed had an individual tutorial. She answered "It was my understanding that the program as planned included an individual tutorial. I didn't observe." AR vol. IV p. 63. The impressive communication that Dr. Souweine was informed about later evaporated. After Dr. Souweine's testimony Ms Walsh testified that she had not been trained in READ 180, (AR vol. IV p. 188); she testified "I don't give direct reading instruction." (AR vol. IV p. 183); and that she had not met the speech and language pathologist. (AR vol. IV p. 178).

Eventually, on direct examination Dr. Souweine was asked, in her expert opinion, whether the program proposed by Chicopee was appropriate, she answered. "It's my opinion that the program as described in the proposed IEP would have been appropriate to meet her special education needs." AR vol. IV p. 64. When asked what was the basis for her opinion, she testified "based on all the evaluation reports, which suggest a variety of services, as well as her performance in previous years, I feel that the program as proposed, which included a strong remedial component in language arts area, combined with careful inclusion model, utilizing very experienced special educator, with careful and consistent programming across the curriculum in content area subjects, would have provided an appropriate education in the least restrictive alternative." AR vol. IV p. 65

Dr. Souweine's expert opinion, as discussed in great detail above, was based on other's evaluations where she was either unsure of the results, either because she did not administer them

---

least restrictive alternative it is the "least restrictive environment."

herself, or because she had no knowledge of the tests. She also stated that her opinion was based on the fact that the program had a strong remedial component, namely READ 180, but she had no prior experience with it, and thus, she had no personal or expert experience with it to justify its short term or long term use. She mentioned the use of experienced educator. The testimony revealed that the learning skills teacher had no training in READ 180 and that she had no idea who the speech and language pathologist was. On cross examination Dr. Souweine testified that she was aware that only one teacher had been trained by the School District in READ 180 Program, and that she had only one year of relevant teaching experience, which came after working at Mass Mutual for twenty years. AR vol. IV p. 95.

The Plaintiff chose to have a psychologist review the evaluations of speech and language pathologists. She not only was not an expert in READ 180, but she had little personal knowledge regarding the tests administered by the School District's own person Melissa Mannello. Once again because she did not do the testing she could not comment on several aspects of the tests which appeared out of the norm. She relied on the comments of teachers which later proved inaccurate. She relied on the testimony of other teachers regarding her past experience in school and her levels of anxiety. She had no personal knowledge and testified to this effect. Dr. Souweine's testimony was clear and it was unconvincing. She stated that she was confused several times by the Mannello report. Once again the reason she was confused was because she did not administer the test herself. Please note that this was the school district's evaluation and at no time was Melissa Mannello called as a witness to testify as to her evaluation.

Finally, the Plaintiff states in its Request for Additional Evidence that it is perplexed as to how the hearing officer agreed with Dr. Kemper's expert opinion over that of Dr. Souweine. As

15

the record displays the Plaintiff agreed with the findings of Dr. Kemper via Judith Souweine's testimony. Furthermore, there was no discrepancy to the diagnosis, Dr. Souweine's self proclaimed specialty. Everyone was in agreement with the diagnosis of Dyslexia. Moreover, the severity of her dyslexia never came into contention because there was never any credible testimony or documentation, or research to show that READ 180 can remediate even mild dyslexia. The issue was whether READ 180 could provide the same type of services being provided at White Oak, pursuant to Dr. Kemper's recommendations, but in the least restrictive environment, namely her home high school. There was never any evidence presented that READ 180 was a program for children with Dyslexia, let alone special education children. The literature provided by the School District is clear that it is a program designed to help children who were not exposed to language because of poverty or neglect, and that it was designed to help those children to catch up.

Finally, allowing this witness to retestify as to her understanding of the testing would be a waste of time. Bluntly, she had no expert knowledge or past experience with the program READ 180, she did not administer any of the testing herself and thus she had no personal knowledge as to why some of the test results came out the way they did. Even if she were allowed to retestify it would not have any effect on the outcome of this review.

III. THE PLAINTIFF'S ATTEMPT TO INTRODUCE ADDITIONAL EVIDENCE IN THE FORM OF THE MALIK V GATEWAY CASE IS CLEARLY OUTSIDE THE SCOPE OF ADDITIONAL EVIDENCE.

The Plaintiff's would now like this Court to conduct a de novo review wherein it would present new evidence and present evidence again in a different light. As stated by the First Circuit "this process is 'one of involved oversight,' *Roland M., 910 F.2d at 989;* and 'in the course of that oversight, the persuasiveness of a particular administrative finding, or the lack

thereof, is likely to tell the tale.'" *Lenn v. Portland School Committee, 998 F.2d 1083, 1085 (1st Cir. 07/15/1993) citing Burlington, 736 F.2d at 792.* The tale to be told in this case by the record is that the testimony of Dr. Souweine was not compelling because of her lack of personal and expert knowledge. The case being presented by the Plaintiff did not involve READ 180 and thus it is totally irrelevant.

The Plaintiff's argument that Judith Souweine's testimony should have been provided more weight, because it stands in contrast to another decision of the BSEA, wherein the same hearing officer credited her testimony as "well informed and forthright" is absurd. The Plaintiff would like to have Judith Souweine testify that in the other case she never personally evaluated the student either. She would also testify that in the other case she prepared and reviewed in the same manner as the present case.

First, the *Malik v Gateway* case is an entirely separate case with entirely different parties, facts, schools, and more importantly the remedial methodology involved was not READ 180. As stated in great detail above, the case before this court is about READ 180 to which Dr. Souweine was not knowledgeable about. The Defendant's fully admits that Dr. Souweine may have had a tremendous amount of knowledge about the programs used in the *Malik* case, but in this case the record was clear, she did not. This additional case as evidence for purposes of comparison is clearly outside the scope of "additional evidence" within the meaning of 20 U.S.C. §1415(i)(2)(B)(ii), which the Plaintiff is attempting to enter.

17

## CONCLUSION

The Decision and the Administrative Record are clear and as such no supplemental evidence is necessary, this court should therefore deny the Plaintiff's Motion for Leave to Offer Additional Evidence.

Respectfully submitted,
The Defendants
By their attorney

September 2, 2004

**/S/DEREK M. BEAULIEU**
Derek M. Beaulieu, Esq.
1242 Main Street, Suite 306
Springfield, MA 01103
BBO#644185