IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

WESTERN DIVISION

| | |
|---|---|
| CITY OF CHICOPEE, Acting through the Chicopee Public Schools,<br>　　Plaintiff<br><br>v.<br><br>DAVID T. As Parent and next friend of Kaitlyn T. and MASSACHUSETTS DEPARTMENT OF EDUCATION,<br>　　Defendants | **Case No: 04-30087-MAP** |

## <u>MEMORANDUM OF THE PLAINTIFF IN SUPPORT OF<br>MOTION FOR SUMMARY JUDGMENT</u>

An intermediate standard of review is applied on motions for summary judgment challenging decisions of the Massachusetts Bureau of Special Education Appeals under the Individuals with Disabilities Education Act.  IDEA §615(i)(2)(B) as amended, 20 U.S.C. §1415(i)(2)(b); F.R.C.P. Rule 56, 28 U.S.C.A.  The First Circuit has described the review process as "something short of a trial de novo". *G.D. v. Westmoreland School District*, 930 F.2d 942, 945 (1st Cir. 1991).  The Court must carefully consider the findings of the hearing officer and endeavor to respond to the hearing officer's resolution of each material issue.  "After such consideration, the Court is free to accept or reject the findings in whole or in part." *Burlington v. Department of Education,* 736 F.2d 773, 790 (1st Cir. 1984) *affirmed 471 U.S. 359, 105 S.Ct. 1996.*

After carefully considering the hearing officer's findings and conclusions relative to the 2003-2004 I.E.P., the decision should be set aside based on the following reasons: (1) The hearing officer based her decision on irrelevant background testimony unrelated to the central issue in the case regarding the appropriateness of the 2003-2004 I.E.P. developed by Chicopee for the student;

(2) The Parents failed to prove that Chicopee's 2003-2004 I.E.P. for the Student was inappropriate;

(3) Chicopee met its burden of establishing that the 9th Grade Academy Program was reasonably

calculated to provide the Student with a free appropriate public education in the least restrictive

environment; and (4) The hearing officer's findings and conclusions were not supported by the

evidence.

I.    The Hearing Officer Based Her Decision on Irrelevant Background Testimony Unrelated to
      the Central Issue in the Case Regarding the Appropriateness of the 2003-2004 I.E.P.
      Developed by Chicopee for the Student.

        The underlying BSEA Hearing began on January 29, 2004.  At that time the Parents and

Chicopee stipulated to the issues to be adjudicated by the hearing officer: (1) whether the 2003-

2004 Individualized Education Plan ("I.E.P.") developed by Chicopee was reasonably calculated to

provide a free, appropriate public education to Student in the least restrictive setting?[1] and (2) If not,

whether the Parents are entitled to retroactive reimbursement of expenses associated with the

unilateral placement of the Student at the White Oak School  for the 2003-2004 school year?  (TR.

Vol. I at 5, 6; A.R. Vol. I at 91). The hearing officer defined a free appropriate public education

(FAPE) "as one reasonably calculated to assure personalized instruction and support services

tailored to meet a student's unique needs and to permit the student to make meaningful educational

progress in the least restrictive environment".  (TR. Vol. I at 5, 6).  "The Parents [had] the burden of

proving that the proposed I.E.P. was inappropriate. Similarly, the school [had] a burden of proving

that the I.E.P. it was proposing was appropriate". (TR. Vol. I at 6).

        Chicopee objected to the admissibility and relevance of previously accepted I.E.P.s which

were never contested by the parents and not the subject of the hearing.  (TR. Vol. I at 15, 16).  The

2003-2004 I.E.P. that was the subject of the hearing was the first I.E.P. ever rejected by the Parents

(TR. Vol. I at 79).  As such, all prior I.E.P.s were not irrelevant to the decision before the hearing

officer. (TR. Vol. I at 16). The hearing officer overruled Chicopee's objection to the irrelevant I.E.P.s but admitted the 6th and 7th grade I.E.P.s as *background information only.* (TR. Vol. I at 17-18). The hearing officer stated that she would not "allow a good deal of questioning" regarding the early I.E.P.s since:

> *"They're not probative of the appropriateness of the proposed plan, except to indicate that the school and the parents have, in fact, worked together in (the Student's) interests . . . historically. So depending how the evidence comes out about the proposed plan, they may also be helpful in determining whether there is a similarity in programs such that one could expect the same reasonable amount of progress under the proposed I.E.P. as had been achieved under prior I.E.P.s. That is one use for them if they are similar." (TR. Vol. I at 18).*

Even the Parents acknowledged that some of the documents offered by them into evidence were "very old" and stated "*We are here to talk about this year [meaning 2003-2004]. We are not resting in the past. Our evidence is going to be focused on this coming school year [2003-2004] and the I.E.P. that was offered by the Chicopee Public Schools." (TR. Vol. I at 25).* Despite the stipulation of both parties and acknowledgement of the hearing officer relative to the lack of probative value of prior accepted I.E.P.s, the hearing officer's decision of April 7, 2004 focused heavily on the previously accepted 6th, 7th, and 8th grade I.E.P.s (See A.R. Vol. I at 91-94.) Indeed, the hearing officer placed undue weight on the prior I.E.P.s in determining the appropriateness of the 9th grade 2003-2004 I.E.P.. She devoted four pages of her decision to testimony admitted for background purposes only: the I.E.P.s which were accepted prior to the June 17, 2003 TEAM meeting to develop the 9th grade I.E.P. which was the subject of the hearing. (A.R. Vol. I at 91-94). The Findings and Conclusions made by the hearing officer relative to the prior accepted I.E.P.s are patently irrelevant and should not in any way have been determinative of the appropriateness of the 2003-2004 I.E.P..

---

[1] The 2003-2004 I.E.P. in question is contained in Volume II of the Administrative Record at 429-456.

The hearing officer indicated that the previously accepted I.E.P. s lacked probative value. The only factor to be considered relative to the prior accepted I.E.P. s would be their programmatic similarities, if any, to the proposed 2003-2004 I.E.P., such that the Parents could expect the same or similar progress under the proposed I.E.P. as had been achieved in prior years.  (TR. Vol. I at 18). It is obvious from a review of the prior I.E.P. s that the 2003-2004  9th Grade Academy Program proposed for the Student was significantly different from the 6th, 7th, and 8th grade I.E.P.s previously accepted by the Parents.  Compare A.R. Vol. II at 404-413 (7th grade I.E.P.) and A.R. Vol. I at 111-128 (8th grade I.E.P) with A.R. Vol. II at 429-456 (9th grade 2003-2004 I.E.P.).  The Student received a "modified curriculum" in 7th grade, (A.R. Vol. II at 408), and a similar "modified curriculum in 8th grade (A.R. Vol. I at 122).  The 9th grade I.E.P., on the other hand, called for a dramatically more intensive and comprehensive language-based program within a small learning community at Chicopee High School with direct services in Reading, Learning Skills, Math, Speech/Language and Academic Support in the Content Areas, plus several consultations and counseling services (A.R. Vol. II at 443, 450; TR. Vol. III at 46-58; TR. Vol. IV at 130-158).

Equally important, the hearing officer made no factual findings regarding any alleged similarities between the 2003-2004  I.E.P. and all previously accepted I.E.P.s to support her consideration of the prior accepted I.E.P.s in formulating her decision in this case.  By the hearing officer's own acknowledgement, all prior accepted I.E.P.s "lacked probative value, <u>unless they were similar such that the Parents could expect the same amount of progress under the 2003-2004 I.E.P. as had been achieved under prior I.E.P.s</u> (TR. Vol. I at 18), (emphasis supplied). The hearing officer discussed the prior accepted I.E.P.s at length and obviously considered those I.E.P. s without meeting her own relevance standard.  Without any findings of similarities, the previous I.E.P.s lack all probative value.  Any consideration of those I.E.P.s by the hearing officer was prejudicial to Chicopee which did not consent to participate in a hearing relative to the appropriateness of the

prior accepted I.E.P.s.  Given the hearing officer's rather passionate discussion of alleged procedural violations arising from the irrelevant I.E.P.s, the underlying BSEA decision should be set aside.

Further, the hearing officer acknowledges on page 9 of the decision that the alleged procedural issues were not even raised by the parents but claims that "they are central to the resolution of this matter".  (A.R. Vol. I at 98).  Chicopee will address the issue of the Parents' role in planning and implementing the Student's educational plan in another portion of this memorandum. Chicopee directs the Court's attention to page 9 of the hearing officer's decision merely to illustrate the hearing officer's improper consideration of I.E.P.s that were not the subject of the hearing and the extent to which Chicopee has been prejudiced by the hearing officer's emphasis on prior I.E.P.s.  Clearly, the hearing officer used the outdated I.E.P.s as more than "background information" without any factual foundation or findings of similarities with the 2003-2004 I.E.P..  As such, Chicopee did not receive the fair and impartial hearing to which it was entitled by law.

Moreover, the Individuals with Disabilities Education Act set forth at 20 U.S.C. §1400 et. seq., and state special education regulations at 603 CMR 28.00 et. seq., provide parents with an opportunity to obtain a fair and impartial hearing before the Bureau of Special Education Appeals in the event that they believe that a student is entitled to compensatory services for a school district's past failures to provide the student with a free appropriate public education in the least restrictive environment.  The Parents in this case certainly could have exercised that option relative to the 6th, 7th and 8th grade I.E.P.s but failed to do so. Since the Parents presented no claim to compensatory services, Chicopee was justified in understanding that the hearing would be limited to the appropriateness of the 2003-2004 I.E.P. as was stipulated by the parties.  Once again, Chicopee has

been severely prejudiced by the hearing officer's improper consideration of the previously accepted, dissimilar I.E.P. s and the underlying decision should be set aside by this Court.

II.    The Parents Failed To Prove That Chicopee's 2003-2004 I.E.P. For The Student Was Inappropriate.

The Massachusetts legislature changed the standard relevant to the provision of special education and related services to children with disabilities effective January 1, 2002 from "maximum feasible benefit" to "free appropriate public education" or FAPE.  M.G.L. Chapter 71B §1, 2 & 3.  The term FAPE is defined by state statute (1) to be "consistent with" the federal standards under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §1400 et. seq.; and (2) to "meet" state education standards. M.G.L. Chapter 71B §1.  The federal courts have explained that the FAPE standard found within the IDEA is intended to "open the door of public education to handicapped children" rather than to require the best special education services for the student or services that would maximize the student's potential.  *Board of Education of Hendrick Hudson Central School District v. Rowley*, 458 U.S. 176, 192, 102 S.Ct. 3034, 3043 (1982); *Lenn v. Portland School Committee*, 998 F.2d 1083 (1st Cir. (1993) ("benefit conferred need not reach the highest attainable level or even the level needed to maximize the child's potential".); *G.D. v. West Moreland School District*, 930 F.2d 942 (1st Cir. 1991) ("FAPE may not be the only appropriate choice, or the choice of certain selected experts, or the child's parents' first choice, or even the best choice but may still pass legal muster".)  An automotive analogy has sometimes been used to make this point: "The [IDEA] requires . . . the educational equivalent of a serviceable Chevrolet to every handicapped student" rather than "a Cadillac solely for [student's] use."  *Doe v. Board of Education of Tullahoma City Schools*, 9 F.3d 455 (6th Cir. 1993).

The United States Supreme Court has ruled that FAPE requires "personalized instruction with sufficient support services to permit the child to benefit educationally".  *Board of Education of Hendrick Hudson Central School District v. Rowley*, 458 U.S. 176, 203, 102 S.Ct. 3034, 3049

(1982).  The lower federal courts have further articulated that FAPE requires the opportunity for meaningful educational benefit.  *Weisel v. Board of Education of the City of New York*, 287 F.3d 138 (2nd Cir. 2002).  Similarly, the Massachusetts special education statute defines "special education" to mean "educational programs . . . designed to develop the educational potential of children with disabilities . . .." M.G.L. Chapter 71B §1.  The purpose of the state special education regulations is "to ensure that eligible Massachusetts students receive special education services designed to develop the student's individual educational potential."  603 CMR 28.01(3).

In summary, FAPE requires that school districts such as Chicopee provide special education and related services that are reasonably calculated to permit a student to make meaningful educational progress.  Meaningful progress is evaluated in the context of the student's educational potential.  603 CMR 28.01(3); M.G.L. Chapter 69 §1 ("It is hereby declared to be a paramount goal of the Commonwealth to provide a public education system of sufficient quality to extend to all children the opportunity to reach their full potential . . ..")

Consistent with state and federal law, and the agreement and understanding of Chicopee and the Parents, the hearing officer was to have applied the aforementioned FAPE standard to the evidence in this case to determine whether Chicopee's 9th Grade Academy Program  for the 2003-2004 school year was reasonably calculated to permit the student to make meaningful educational progress.  As stated by the hearing officer "the Parents have the burden of proving that the proposed I.E.P. is inappropriate".  (TR. Vol. I at 6).

In addition to meeting the FAPE standard, special education and related services must be provided in the least restrictive environment, meaning that student's with disabilities must be educated with students who do not have disabilities to whatever extent appropriate.  See 20 U.S.C. §1412(5)(a).  Programs and services can only be implemented in separate settings when the nature and severity of the child's special needs is such that the student cannot make meaningful progress in

a regular education setting even with the use of accommodations and specialized services. *Id.* In Massachusetts, the I.E.P. must also enable the student to progress effectively in the content areas of the general curriculum, with or without accommodations, consistent with the learning standards of the Massachusetts curriculum frameworks and the curriculum of the particular school district. 603 CMR 28.02 (18).

To meet their burden of proof regarding the alleged inappropriateness of the 2003-2004 I.E.P., the Parents offered the testimony of the Student's father ("the Parent"), therapist, Jodi Rosol, independent speech and language pathologist, Dr. Robert Kemper, and White Oak School headmaster David Drake. The Parents also offered documentary evidence labeled P1 through P23 (A.R. Vol. I at 111-219 and Vol. II at 220-425).

Testimony of Parent

The Parent testified that he contacted a private day placement known as the White Oak School in Westfield to arrange for an interview of the Student in the spring of 2003 prior to Chicopee's June 2003 TEAM meeting to develop the 2003-2004 I.E.P. that was the subject of the hearing. (TR. Vol. I at 112). The Parents unilaterally explored the potential for enrolling the Student at the White Oak School at the behest of an educational advocate without notification to Chicopee or involvement of the school district. (*Id. at 111-112).* By the time the TEAM convened to develop the 2003-2004 I.E.P. in June 2003, the Student had already spent a day at the White Oak School . *Id.*

The Parent received a TEAM meeting notice from Chicopee to develop a 2003-2004 I.E.P. and transition into Chicopee High School. (A.R. Vol. II at 454). The TEAM, including the Parents and their advocate, met with Student's 8th grade special education teacher, Andrea Picard-Cameron, and the Student's 8th grade service providers and special education administrators to discuss the results of the testing performed by Dr. Robert Kemper, whether the school district agreed with all or

a portion of Dr. Kemper's recommendations, and how the agreed-upon recommendations would be implemented in the Student's 9th grade program.  The TEAM developed and drafted the 2003-2004 I.E.P. labeled School's Exhibit 1 and included within the Administrative Record, Vol. II at 429-456.

The Parent acknowledged receiving the district's I.E.P. in June 2003, including page N1 stating that the school district staff was available to speak to the Parents about the I.E.P. if they had questions.  Page N1 strongly encouraged the Parents to contact Chicopee representatives.  (TR. Vol. I at 114-116; A.R. Vol. II at 429).  The Parent had no questions about the services offered on the I.E.P. and acknowledged that the description of the Chicopee High School program contained under the Additional Information portion of the I.E.P. was consistent with that offered at the TEAM meeting in June 2003 (TR. Vol. I at 118-121; A.R. Vol. II at 446).  The Parent agreed that the services proposed in the I.E.P. were recommended by the TEAM at the June 2003 meeting.  (TR. Vol. I at 121).

The Parents received the 2003-2004 I.E.P. on or about June 16, 2003 and rejected it on June 18, 2003 (TR. Vol. I at 112-113, 126; A.R. Vol. II at 450, 451, 452).  The Parent based his decision to reject the I.E.P. on the recommendations of his advocate but acknowledged that he never reviewed the proposed I.E.P. nor did he send the proposed I.E.P. to his expert, Dr. Robert Kemper prior to Dr. Kemper's testimony at hearing.  (TR. Vol. I at 116, 122).  The individuals upon whom the Parent relied in rejecting the I.E.P. never reviewed the I.E.P. and never observed the 9th Grade Academy Program  proposed by Chicopee. (TR. Vol. I at 122).  Despite the Parent's rejection of the 2003-2004 I.E.P., the Parent acknowledged that the 2003-2004 I.E.P. had the flexibility to individualize services for the student.  (TR. Vol. I at 128).

Chicopee recommended that the Student participate in the READ 180 Program during the summer to permit her to become acclimated to the program in preparation for grade 9 at Chicopee High School. (TR. Vol. I at 98).  The Parent knew that Chicopee was offering special education

services for the summer of 2003 but stated that he did not know the location of the services.  (*Id.*)
The Parent acknowledged that he was provided with a packet of materials which described the
READ 180 Program at the June 2003 TEAM meeting.  The Student never actually attended the
READ 180 Program during the summer of 2003 and the Parent never contacted Chicopee to
determine the location for those services.  (TR. Vol. I at 103*).*  The information about the summer
high school program was provided to the Parent by Special Education Supervisor Dr. Andrea Stolar.
Dr. Stolar later left a telephone message for the Parents regarding the Student's lack of attendance at
the summer 2003 program.  The Parent acknowledged that he understood that the READ 180
Program was being offered by Chicopee for the Student during the summer of 2003 but may have
misunderstood the availability of the program based on correspondence that he received from the
middle school relative to MCAS training.  (TR. Vol. I at 160-162).

The Parent further acknowledged participating in a prehearing conference before the Bureau
of Special Education Appeals in August of 2003 before hearing officer Reece Erlichman.  He stated
that, in addition to the 9th Grade Academy Program set forth in the 2003-2004 I.E.P.,  Chicopee also
proposed to provide the Student with a one-to-one after school tutorial in Orton Gillingham reading
as requested by the Parents in their BSEA request for hearing.  (TR. Vol. I at 104-110).  The Parent
was shown a copy of Chicopee's status report to the hearing officer dated September 4, 2003
summarizing the outcome of the parties' August 22, 2003 prehearing conference and Chicopee's
efforts to agree on an expert observation of the 9th Grade Academy Program (A.R. Vol. I at 19, 20).
The hearing officer at the prehearing conference, Reece Erlichman, indicated that additional data
was needed to establish the Student's educational needs before the Bureau could determine whether
the proposed I.E.P. did in fact address her needs and suggested that the school district and the
Parents agree on an expert to perform a record review, meet with the Student, her Parents and
service providers, in addition to observing the Student at the 9th Grade Academy Program, and the

after school tutorial.  It was anticipated that the expert would then summarize her observations and programming recommendations for the parties. (A.R. Vol. I at 19).  Rather than agree with the recommendations of the hearing officer at the prehearing conference, the Parents unilaterally placed the student at the White Oak School.

Clearly, the Parents' rejection of the 2003-2004 I.E.P. and unilateral placement were made without ever considering the intensity and appropriateness of the proposed program upon full implementation of the I.E.P..  In the case of *Douglas v. Greenfield Public Schools*, 164 F.Supp. 2d 157, 166 (D. Mass. 2001), this Court explained the standard for review of the appropriateness of an I.E.P. and emphasized the need to focus on "the educational program which finally emerges from the administrative process, not the I.E.P. as originally proposed." *Id.* citing *Roland M.*, 910 F.2d at 988.  Accord *Kathleen H.* 154 F. 3d at 13.   Neither the Parents nor the hearing officer in this case considered the I.E.P. as it emerged from the August 2003 administrative prehearing conference as required by federal precedent.  The Parent acknowledged in his testimony (TR. Vol. I at 109) that he was informed of Chicopee's offer to extend the Student's reading services further and that  the offer was included within a written status report to the hearing officer (A.R. Vol. I at 19).  Despite the Parents' acknowledgement of the increased services, however, the hearing officer still claimed in her decision (A.R. Vol. I at 99) that Chicopee's alleged failure to formalize the offer led to the Parents' unilateral placement (*Id.*).

Even if the Parent or the hearing officer believed that the 2003-2004 I.E.P. was inadequate, which was not the case, they were obligated to consider the I.E.P. as it emerged following the August 2003 prehearing conference with the additional one hour and 45 minutes of daily reading instruction.  See, *Douglas v. Greenfield Public Schools*, 164 F. Supp. 2d at 166.  The Parent testified that he rejected the 2003-2004 I.E.P. without having it reviewed by his own expert, Dr. Robert Kemper.  Had the Parents not "rushed to judgment" and permitted the I.E.P. to emerge

through the administrative process, the Student would not only have received a highly appropriate

education, but her program would have also satisfied the second prong of the legal standard-that of

the least restrictive environment in a public high school.

Testimony of Dr. Robert Kemper

Dr. Kemper is a certified speech and language pathologist; he is not a neuropsychologist nor

an expert in reading. (TR. Vol. II at 150, 156). Dr. Kemper spent approximately six hours[2] with the

Student in April 2003 prior to formulating his opinions about her needs for the 2003-2004 school

year. (*Id. at 150-152.*). Dr. Kemper was not aware that the Student was treating with therapist Jodi

Rosol due to emotional problems and anxiety. See report of licensed social worker Jodi Rosol of

the Mount Tom Mental Health Center admitted as School's Exhibit 6 and attached as Exhibit A.[3]

As noted in Exhibit A and testified to by Ms. Rosol, the school district recommended academic

support for the student in 8th grade to assist her with her learning issues. Ms. Rosol recommended

against the Student receiving the support services because the Student would find it to be

"emotionally overwhelming" which may "result in further emotional instability". Exhibit A. Ms.

Rosol stated:

> "The Student's anxiety remains irrational and uncontrollable for her. This will in turn
> contribute to [the Student's] inability to perform academically, as has been her pattern. Her
> anxiety is to such a significant degree that it interferes with her daily emotional, behavioral,
> and academic functioning. Until she learns to better manage her anxiety, the environment
> created for her should be as nonthreatening (emotionally speaking) as possible." (See
> school district's Exhibit 6 attached as Exhibit A and testimony of Jodi Rosol in (TR. Vol. I
> at 90-93).

---

[2] In comparison, Chicopee's special educator, Andrea Cameron, worked with the Student several hours per day, 5 days
per week.
[3] The Administrative Record is inaccurate in this case since it fails to include Exhibit S6 which is the correspondence
dated February 10, 2003 from Jodi Rosol, LICSW. It appears from A.R. Vol. 1 at 5 that the Bureau accorded a TEAM
meeting attendance sheet as a separate exhibit and mislabeled it S3 which then caused the remainder of the school
district's exhibits to be misnumbered.

Dr. Kemper never discussed any of the Student's emotional issues with the Parents. The Student's emotional functioning was beyond the scope of his evaluation. (TR. Vol. II at 153 & 154). Dr. Kemper is neither a licensed special educator nor a reading specialist. Unlike the district's expert, Dr. Judith Souweine, Dr. Kemper never observed the Student in any classroom setting. He also never observed the 9th Grade Academy Program proposed for the Student at Chicopee High School nor did he speak with any of the Student's teachers, or service providers prior to rendering his opinions at hearing. (TR. Vol. II at 155-158). *Dr. Kemper acknowledged that he never reviewed the 2003-2004 I.E.P. that was the subject of the hearing prior to testifying that the program was allegedly inappropriate. He also was unaware of the nature of the program, the services proposed for the Student, the training and credentials of the staff or the efficacy of the studies on which the student's proposed reading/language/spelling program was developed.* (TR. Vol. II at 220-252).

Dr. Kemper did not know that the Student's TEAM had reconvened at the end of 8th grade to develop the new I.E.P. admitted as Exhibit S1 and included within Volume II of Administrative Record at 429-456. Neither the Parents nor their counsel ever shared the 2003-2004 I.E.P. with Dr. Kemper. Despite his complete lack of knowledge regarding the 2003-2004 I.E.P., Dr. Kemper alleged on January 30, 2004 that Chicopee was neither able nor willing to provide an appropriate education for the Student. (TR. Vol. II at 224 & 225). In a letter dated July 2, 2003 to the Division of Professional Licensure in response to a complaint by Chicopee, Dr. Kemper stated that: ". . . it was my professional opinion and a clinical judgment that the Chicopee School District was neither able nor willing to provide an appropriate education to the two children in question", one of whom was the Student who is the subject of this hearing. Dr. Kemper made that statement without ever reviewing the 2003-2004 I.E.P. developed for the Student. (TR. Vol. II at 223, 224).

Given Dr. Kemper's patently unsupported opinions regarding the 2003-2004 I.E.P., it is difficulty to comprehend how the hearing officer could have, in any way, credited Dr. Kemper's testimony on behalf of the Parents. It is obvious that Dr. Kemper had a preconceived bias against the public school placement and, by his own acknowledgement, was employed to consult to the White Oak School. Dr. Kemper knew when he tested the Student in April 2003 at the request of the Student's advocate, that the advocate had already recommended that the Student visit the White Oak School. Dr. Kemper's bias prior to conducting his evaluation and testifying at hearing should have been readily apparent to the hearing officer. Accordingly, neither Dr. Kemper's testimony nor his evaluative findings and recommendations should have been credited.

Dr. Kemper's false assumptions and misunderstanding relative to Chicopee's program is apparent by a review of his April 22, 2003 Psycholinguistic Evaluation Report (See A.R. Vol. I at 150-168). When he prepared the report, he failed to communicate with the Student's teachers or Chicopee's psychologist and relied exclusively on the Parent and her advocate to garner information about the Student's program. He quoted the parent as saying that the Student "does not receive any specialized reading assistance." (A.R. Vol. I at 152). Had he contacted special educator, Andrea Cameron, he would have learned that the Student was working one-to-one with Ms. Cameron. (TR. Vol. III at 171, 172). Dr. Kemper further ignored the fact that the Student was reading material at her grade level in a modified format. (A.R. Vol. II at 165); (TR. Vol. III at 188-199). Dr. Kemper ignored the opinions of the 8th grade TEAM that the Student demonstrated improvement in reading across the curriculum. (*Id.*) He chose only certain low grade equivalency and subtest scores to report within his own evaluation rather than comprehensively discuss the Student's academic functioning as observed by the 8th grade team who worked with the student on a daily basis. (A.R. Vol. II at 161-167; TR. Vol. III at 188-199). Dr. Kemper also ignored the fact that the 8th grade team found the Student's progress to be sufficient to enable her to achieve the annual goals and

objectives in her I.E.P. (TR. Vol. III at 188-199).  (Compare testimony of Dr. Kemper located in

(TR. Vol. II at 165 & 165) with report of Chicopee School Psychologist Melissa Mannello admitted

as Exhibit S18 and included within Complement to Administrative Record at 73-97).  Dr. Kemper

ignored Ms. Mannello's description of the Student's progress in 8th grade wherein she states:

> Progress reports, completed in January 2003 state that Student continues to make progress in
> written language skills.  She is able to write simple and compound sentences correctly and
> can proofread her writing for errors and capitalization and spelling.  In addition, she has
> shown improvement in her oral reading and silent reading skills across the curriculum.  . . .
> progress is sufficient to enable her to achieve the annual goals by the end of the I.E.P.
> period" (C.A.R. at 74).

Dr. Kemper did not believe that the observations of the 8th grade team were relevant in formulating

his opinions. (TR. Vol. II at 162).

Dr. Kemper also ignored the opinions of the 8th grade teachers that the Student had made

progress similar to her peers.  (C.A.R. at 74 & 75 & TR Vol. II at 165 & 166).  Dr. Kemper failed to

address Chicopee's offer of an additional academic support class and homework club for the

Student which the Parents rejected for "personal reasons".  (C.A.R. at 74 & 75) (TR. Vol. III at 188-

199).  Dr. Kemper further ignored the fact that Ms. Picard-Cameron was working one-to-one with

the Student to assist her in improving her grades.  (C.A.R. at 75; TR. Vol. II at 165 & 166; TR. Vol.

III at 188-199).

Dr. Kemper also failed to include in his report or consider in his opinions the results of the

Woodcock Johnson Reading Test III administered by Chicopee in April 2003.  He did, however,

acknowledge that standard scores, rather than grade equivalents, are a more accurate measure of a

student's functioning.  (TR. Vol. II at 167).  The Student achieved standard scores ranging from 92

to 98 (average range 90-110 in five subtest areas in reading, a broad reading cluster, and basic

reading skills.  (C.A.R. at 80).  Dr. Kemper agreed that, according to the Woodcock Johnson Test

administered by Ms. Manello in April 2003, the Student received an average standard score in every

subtest. (TR. Vol. II at 168).

Dr. Kemper was asked to compare the Student's Woodcock Reading Mastery Test results from 5th grade (TR. Vol. II at 390) with that of April 2003 when the Student was in 8th grade (C.A.R. at 80). Dr. Kemper acknowledged that the Student's standard score in letter identification went from a 67 in 5th grade to a 94 in 8th grade. Word attack progressed from an 81 standard score in 5th grade to a 91 standard score in 8th grade; and passage comprehension improved from a standard score of 50 in 5th grade to a standard score of 94 in 8th grade (T.R. Vol. II at 169-170); (A.R. Vol. II at 390) and (C.A.R. at 80).

Dr. Kemper was also compelled to acknowledge the Student's average standard scores on his own testing in April 2003 when the Student was in 8th grade. The Student obtained all average scores on Dr. Kemper's oral and written language scales discussed in A.R. Vol. I at 154, as well as average standard scores in listening/grammar and speaking/vocabulary (A.R. Vol. I at 155).

Both Chicopee school psychologist Melissa Mannello and Dr. Kemper concluded that the Student had a specific learning disability and would benefit from special education in the areas of reading, writing and language arts (C.A.R. at 85, 86 & A.R. Vol. I at 162). Chicopee and Dr. Kemper differed, however, regarding the recommended setting for the delivery of services to the Student. *Id.* Without any input from the Student's 8th grade teachers and knowledge of the least restrictive public school programs, Dr. Kemper recommended "alternative educational programming" for the Student in the form of a "substantially separate" out-of-district program. (A.R. Vol. I at 162).

Once again, Dr. Kemper's recommendation was made without having any knowledge relative to the language based programming available to the Student in the least restrictive public school setting. He assumed that the Student's program would be regular, rather than special education, and that she would be asked to do regular 9th grade work and read 9th grade texts. (TR. Vol. II at 245, 246). Dr. Kemper also assumed that the type of accommodations proposed such as

scaffolding, repetition, paraphrasing, redundancy, etc. could not be implemented as instructional methods in the 9th grade program. *Id at 246-247.* He understood that the Student would be asked to perform 9th grade level tasks commensurate with typical peers who function on a 9th grade level. *Id. at 252.* Had Dr. Kemper reviewed Chicopee's I.E.P. for the Student, he would have realized the falsity of his assumptions (See A.R. Vol. II at 429-456).

Given Dr. Kemper's acknowledgement that he never discussed the Student's functioning with the 8th grade teachers nor did he ever review Chicopee's proposed I.E.P. for the Student, none of his testimony regarding the alleged inappropriateness of Chicopee's program and his recommendation for a substantially separate out-of-district program should have been credited by the hearing officer. Dr. Kemper's opinions are devoid of any factual foundation and, as such, are patently unreliable.

Testimony of Jodi Rosol, LICSW

Ms. Rosol is a licensed social worker who provided counseling to the Student in 2003 and 2004. The Student continued to access Ms. Rosol's services even while attending the White Oak School. (TR. Vol. I at 94 & 95). On or about February 10, 2003, Ms. Rosol suggested that the Student forego attending academic support classes based on her "irrational and uncontrollable anxiety". See Exhibit A and testimony of Ms. Rosol in Vol. 1 of the Transcript at 92 & 93. Ms. Rosol wrote that "the Student's irrational anxiety contributed to her inability to perform academically". "The anxiety was to such a significant degree that it interfered with her daily emotional, behavioral and academic functioning". (TR. Vol. I at 93 and Exhibit A). Even after leaving Chicopee, the Student continued to need Ms. Rosol's services because of ongoing mental health and emotional issues. (TR. Vol. I at 94 & 95).

The issue of the Student's emotional and therapeutic needs was addressed by Chicopee's staff and the Parents in 8th grade and again at the June 2003 TEAM meeting. Based on those

discussions, the TEAM referenced the Student's high anxiety in the I.E.P., (TR. Vol. II at 434, 435) and indicated that the Student "would benefit from contact with the school counselor at her discretion".  (A.R. Vol. II at 446).  In contrast, Dr. Kemper made no recommendations regarding the Student's emotional well-being and need for counseling (A.R. Vol. I at 162).

Testimony of David Drake

The Parents completed their portion of the evidence with the testimony of White Oak's headmaster, David Drake.  The mission of the White Oak School  is to educate students with severe or significant language-based learning disabilities who typically cannot be educated in a public school setting.  White Oak School  does not attempt to serve the needs of students with mental health issues.  The school does not provide any counseling services for the students nor does the school employ a certified speech and language pathologist, the services of whom were recommended by the Student's TEAM in June 2003. (TR. Vol. III at 60, 61).  Mr. Drake acknowledged that his basis of knowledge regarding the Student is limited to her functioning at the White Oak School  beginning in September 2003.  He could not offer any opinions regarding the appropriateness of Chicopee's proposed 2003-2004 program which is the subject of the hearing. (TR. Vol. III at 63-65).  Mr. Drake acknowledged that not all of the Student's providers at the White Oak School  are certified special education teachers. (TR. Vol. III at 66 & 67).

From the analysis of the aforementioned evidence presented by the Parents, it is clear that they failed to meet their burden of proof relative to the alleged inappropriateness of the 2003-2004 I.E.P..  Moreover, the  hearing officer failed to make factual findings in her decision to support her arbitrary and conclusory statement that the I.E.P. was allegedly inappropriate.  No individual who testified on behalf of the Parents conducted a thoughtful analysis of the proposed I.E.P.

III.    Chicopee Met Its Burden of Establishing that the 9th Grade Academy Program  was Reasonably Calculated to Provide the Student with a Free Appropriate Public Education in the Least Restrictive Environment.

Perhaps the most inconsistent part of the hearing officer's decision in this case was her failure to give weight to the testimony of  Dr. Judith Souweine ("Dr. Souweine"), an independent neuropsychologist initially hired to observe the district's proposed program for the Student and make recommendations to both parties.  In contrast to Dr. Kemper, Dr. Souweine  actually analyzed the 2003-2004 I.E.P. that was the subject of the hearing.  Clearly the foundation for Dr. Souweine's expert opinions significantly surpassed those of Dr. Kemper.

Dr. Souweine holds a Masters Degree in Education from Boston University, a Doctorate in Education from the University of Massachusetts, and post-doctoral training in neurospychology at the Children's Hospital in Boston.  (TR. Vol. III at 129 & 130). Dr. Souweine  also worked in a variety of settings, including many public school settings as a special education teacher and administrator.  *Id.*  She has served as a neuropsychologist for the last 16 years at Baystate Medical Center and the Children's Clinic in Northampton where she evaluates children with learning disorders and works with families and children in a therapeutic context, in addition to serving as a consultant to school districts.  *Id. at 131;*  see also Dr. Souweine's resume.  (C.A.R. at 23-26).

Dr. Souweine  is a licensed psychologist in Massachusetts who has done considerable post-doctoral training in learning disabilities, attention disorders and other disabilities.  She has also taught a course in learning disabilities at Mount Holyoke College.  Within her role as a consultant, she observes many special education programs and consults with staff and parents.  She has also conducted in-service workshops related to learning disabilities and taught a semester-long course at American International College in language-based learning disabilities.  Approximately 50% of her work in the area of learning disabilities is done on behalf of school districts and the other 50% on

behalf of parents and children.  She regularly works with students whom she has not formally evaluated.  (TR. Vol. III at 132-134).

Dr. Souweine  observes special education programs in public schools at least once a week, particularly programs for students diagnosed with language-based learning disabilities and dyslexia.  She also functions as a clinical psychologist and treats students with similar anxiety diagnoses to the Student who was the subject of the BSEA hearing.  *Id. at 134-136.*

The foundation for Dr. Souweine's expert opinion at hearing was based in part on her analysis of all of the Student's evaluations prior to testifying at hearing, including the April 2003 report of Dr. Kemper, the neuropsychological evaluation completed by Baystate Medical Center, various speech and language and psychological evaluations. *Id. at 136.*  More importantly, Dr. Souweine  reviewed all of the Student's I.E.P. s beginning with 2nd grade and continuing through the 2003-2004 I.E.P. that was the subject of the hearing, and analyzed the intake testing conducted by the White Oak School  in September 2003, contrary to the Parent's expert Dr. Kemper.  *Id. at 136 & 137.;* Compare TR. Vol. II at 220-222.

The hearing officer minimized the weight of Dr. Souweine's opinions because she indicated that some of the testing results were inconsistent or "confusing".  (A.R. Vol. I at 97).  One of the primary differences between Dr. Kemper's and Dr. Souweine's analysis of the Student's records, however, was the more detailed review and insight offered by Dr. Souweine  relative to the Student's inconsistent functioning.  As a psychologist with a vast amount of experience in diagnosing language-based learning disabilities and dyslexia, Dr. Souweine, unlike Dr. Kemper, was able to opine relative to the impact of the Student's impaired emotional functioning and anxiety on her day to day academic functioning and testing.  Unlike Dr. Kemper, Dr. Souweine  reviewed the February 10, 2003 report of Mt. Tom Mental Health Center clinician, Jodi Rosol, attached as Exhibit A.  (TR. Vol. III at 150-152).  Dr. Souweine met with the Student's 8th grade teachers and

learned about concerns relative to social interactions with other students and some attitudinal

changes that occurred in 8th grade.  (TR. Vol. III at 149).  She noted the inconsistency in the

Student's testing dating as far back as 5th grade and stated that, based on her training and experience

as a clinical psychologist, the Student's anxiety may have had a "huge impact on how well [she] did

in a testing situation".  *Id. at 151.*  Dr. Souweine  also raised concerns regarding the Student's

attentional issues which may have impacted on her day to day functioning as well as her level of

comfort and motivation.  *Id. at 151-152.*

        Dr. Souweine discussed evaluations conducted by the Chicopee Public Schools, particularly

the evaluation of Ms. Mannello included within C.A.R. at 73-97, indicating effective progress,

particularly in reading and language arts.  Dr. Souweine  does not "put much stock" in grade

equivalencies as an indication of a student's functioning.  She views standard scores and percentiles

as more reliable.  (TR. Vol. IV at 14-25).  Dr. Souweine reiterated that attention and concentration

may have impacted on the Student's performance on these various tests.  It is also possible that

anxiety and motivation could have influenced her performance.  *Id. at 17 & 18.*

        Dr. Souweine  emphasized that there is not a clear picture from the Student's testing that her

skills are discrepant from her peers.  "It would be hard for her to do consistently this well on every

one of the subtests, all within the average range, if her skills were that discrepant from her peers."

*Id. at 18.*  The Student was able to utilize materials presented by a mainstream teacher with the

support of a special education teacher and modifications and accommodations within the 8th grade

program to comprehend grade level material.  *Id. at 20.*  The Student could understand and process

the information presented orally in a typical classroom environment.  *Id.*

        Again, unlike Dr. Kemper, Dr. Souweine  testified that she thoroughly analyzed, not only

Dr. Kemper's testing, but the 8th grade evaluation report completed by Chicopee's school

psychologist Ms. Mannello, the White Oak School testing, material summarizing the READ 180

Program recommended for the Student in the 9th Grade Academy Program (See i.e. a Summary of Efficacy Studies using READ 180, Scholastics READ 180 a Heritage of Research, Features of the READ Excel Assessment Book, READ 180 Middle School Study from Iowa, READ 180 correlation with Massachusetts Curriculum Frameworks, READ 180 course description, California Reading Initiative, and When Older Students Can't Read, an Evaluation of READ 180 with Special Education Students (A.R. Vol. II at 458-486, C.A.R. at 48-59, 172-245); (TR. Vol. III at 138). Dr. Souweine quoted the studies from Orange County and other school districts as well as the article addressing the use of READ 180 with special education students (*Id. at 138.*)  (See C.A.R. at 48-59).

Dr. Souweine also analyzed the school district's 9th Grade Academy materials to be used with the Student, including the Study Skills outline, how to take two column notes and other skill outlines, as well as the Learning Skills Course Description and summary included within C.A.R at 60-72.  Finally, Dr. Souweine  analyzed an excerpt from a text entitled <u>Overcoming Dyslexia</u> by Dr. Sally Shaywitz in which Dr. Shaywitz recommends use of the READ 180 Program for students diagnosed with dyslexia and the READ 180 Course Description included within C.A.R. at 162-170 and 215-218.  (TR. Vol. III at 138-140).

Based on Dr. Souweine's professional training and experience, her analysis of the Student's evaluations and her observations of the Student at the White Oak School, Dr. Souweine  concluded that the Student does have a learning disability related to reading or dyslexia.  The Student also has a language-based learning disability. (TR. Vol. III at 143-144).  Dr. Souweine  estimates that she has diagnosed approximately 500 students with learning based disabilities and/or dyslexia in her career.  She classifies the Student who is the subject of this hearing as moderately, rather than severely disabled.  In explaining her rationale, Dr. Souweine  looked at the discrepancy between the Student's functioning and her chronological or grade placement.  She also considered the Student's

ability to be in the mainstream and to access the curriculum either through oral presentations, visual presentations of the curriculum or the use of a text.  (*Id. at 146*).  The Student's most recent entry level testing for White Oak in September 2003 confirmed for Dr. Souweine the moderate, rather than severe nature of the Student's language-based learning disability.  (*Id. at 147*).  She also based her opinion on her discussions with the Student's previous teachers who indicated that the Student accessed the curriculum and made effective progress in the regular classroom.  (*Id. at 148*).  The Student was maintained within the regular classroom environment with a minimum of services in 6th, 7th, and 8th grade.  (*Id. at 148*).  The Student also had a peer group within the Chicopee Public School system and was not singled out or teased.  (*Id. at 149 & 150*).

Based on Dr. Souweine's analysis of the Student's 8th grade evaluations, the exhibits offered at hearing, and her discussions with 8th grade staff, Dr. Souweine  opined that the Student was able to successfully access the regular education curriculum with support throughout her 8th grade year. The Student passed all subjects and was working within a regular classroom framework.  (*Id. at 28*). Dr. Souweine  also noted that, during 8th grade, Chicopee offered additional supportive services to augment the Student's program but the family decided to withdraw her from those services.  (*Id. at 29*).  With the addition of more supportive services, the Student may have succeeded further.  (*Id. at 29*).  The Student received one-to-one services from certified special education  teacher Andrea Picard-Cameron.  Those services assisted the Student in improving her grades during the third term. (*Id. at 29 & 30*).

> "So, again, certainly, this is a Student who requires additional services as well as modification, but there seems to be evidence that with those additional services, she was able to maintain herself in the regular environment."  (*Id. at 30*).

Dr. Souweine testified that she observed the Student in the White Oak School  program and then observed the 9th Grade Academy Program  proposed for the Student at Chicopee High School. (*Id. at 31*).  Dr. Souweine  met with headmaster, David Drake with whom she discussed the

program. She then observed the Student in algebra and social studies with Mr. Clark and Ms. Kimball respectively.  Finally, Dr. Souweine observed the student in a one-to-one tutorial with Ms. Drumm. (*Id. at 31*).

Dr. Souweine found the algebra class to be very slow and labored.  The Student looked a little bored and wasn't enthusiastic about math.  (*Id. at 32*). The algebra class that she observed was "on a really low level . . .."  It involved a very simple equation similar to elementary level math.  "It was called algebra but it really wasn't at a 9th grade level of algebra . . . it was very, very simple . . .."  (*Id. at 35*).  From her observation of the Student in social studies class, Dr. Souweine noted that, while the Student was listening, she was not a dominant member of the discussion.  (*Id. at 32 & 33*).

Dr. Souweine  observed the Student in a tutorial session where she was learning reading terminology and the vocabulary of the reading program.  Dr. Souweine  expressed concern about starting a youngster at the high school level with reading rules.  She described it as "tedious".  (*Id. at 37*).  Dr. Souweine  believes that the same skills can be taught without insisting that the child learn the reading rules.  The rule can be learned more inferentially rather than making it a part of the instruction.  (*Id. at 38*).  Even students diagnosed with language-based learning disabilities or dyslexia can learn to read without memorizing the rules.  (*Id. at 38*).

Dr. Souweine  was concerned when she observed the Student engaged in the White Oak School  tutorial since she was working at a very low level of reading involving the pronunciation of syllables and vowel combinations.  The White Oak instruction went back further than the Student was actually operating based on the results of the testing that Dr. Souweine  had analyzed.  (*Id. at 38 & 39*).  The Student was not being instructed at an 8th or 9th grade level, the discussion was "certainly not at a 9th grade level", and significantly less than that to which the Student would be exposed in an environment such as  public school setting.  (*Id. at 45*).

Dr. Souweine  observed the 9th Grade Academy Program  at Chicopee High School on November 3, 2003 for "the better part of the morning and into the early afternoon" and met with middle school staff after seeing a variety of classes at the high school.  (*Id. at 46*).  Dr. Souweine found the components of the Chicopee program to be particularly appropriate for the Student: remedial instruction in reading, spelling, and writing using the READ 180 Program; a one-to-one tutorial; and an inclusion component to the program where the special educator worked very closely with the mainstream teachers to incorporate the special needs students within a "school within a school".  (*Id. at 46 & 47*).  "There was an instructional period devoted entirely to learning skills, organizational skills, study skills, homework skills; not just doing the homework, which is what I see all to often in schools . . .."  "The program that I observed with Ms. Walsh was really about teaching the students skills that would enable them to be independent and successful in their mainstream environment.  I was really impressed to see the level of sophistication of that class." (*Id. at 47*).  Because the staff members are familiar with what is being  presented in all classes, they help the students in the learning skills class complete whatever tasks are assigned in the mainstream.  (*Id. at 48*).  Dr. Souweine  described the combination of both the remedial approach and the inclusion services as a "unique and powerful model".

In contrast to the White Oak program, the materials that were used in the Chicopee High English inclusion classes were at a 9th grade level.  The skills that were being taught could be used across grade levels but they were keyed to the tasks of 9th graders in particular, including the organizational skills required for 9th grade in terms of note taking, highlighting text, study skills, using webs and outlining for writing skills.  "All of those would certainly be consistent with the 9th grade curriculum and could obviously be used up and down the curriculum."  (*Id. at 49*).

*The READ 180 Program was individualized and geared to the level on which the Student was functioning.*  (*Id. at 49*). There were nine students in the class divided into three groups.  Part of

the time the students were working on the computer, part of the time reading in books and part of the time receiving instruction from the teacher who was guiding them in their progress through the program. (*Id. at 50*).

Dr. Souweine observed special education teacher Ms. Walsh and her teaching assistant with the learning skills class containing four students. The students worked on two column notes which is a typical strategy to teach students how to take notes in a classroom environment. Ms. Walsh taught the students about the main idea and recording the main idea on the left side of the column with the details on the right. Ms. Walsh modeled the lesson using social studies texts and worked with students on highlighting the text. One student remarked "This is going to help us a lot when it comes to the test." (*Id. at 52*). Ms. Walsh instructed the students relative to highlighting the main idea and moving back and forth between the text and the outline. Dr. Souweine opined that the level of skills being taught at Chicopee High School was at a higher level than what she observed in the social studies class at White Oak. Ms. Walsh was using grade level materials from the World Culture book. Less was expected from the White Oak students. (*Id. at 53*).

The level of communication between the special educators and the regular educators at Chicopee High School was "impressive". There was at least one planning period per day where the six teachers who were involved in the mainstream inclusion program worked together with the learning skills teachers to ensure continuity of instruction. (*Id. at 54*). "To do that on a daily basis, . . . it is an impressive piece of the program." There was time put aside in the teacher's day to meet as a team which Dr. Souweine viewed as a "critical feature in making a program successful".

In Dr. Souweine's opinion, the 9th Grade Academy Program at Chicopee High was definitely a language-based program as recommended by Dr. Kemper in his evaluation of April 2003. (*Id. at 56*). A careful approach was implemented to present information in a logical, sequential way with visual models, clear vocabulary, redundancy to ensure understanding, feedback

and checking in with the students to ensure comprehension. Tasks were explained and reiterated in enough modes that the students were able to understand the information and to practice it. "The approach was a careful one and one that incorporated language-based strategies." (*Id. at 56 & 57*).

Dr. Souweine also described the program as "comprehensive" as had been recommended by Dr. Kemper. "The material was presented in a variety of ways both verbal and visual, and utilized multisensory approaches for students including visual maps, more verbal outline formats, finding ways that would meet each of the students particular learning styles." (*Id. at 57*).

> ". . . the READ 180 Program utilizes a variety of formats, it is enticing visually, it also utilized all of the senses. One of the things I was impressed with was, . . . they used. . . verbal information but they also used music and graphics and rhythm. So it was . . . definitely a multisensory approach."

The instructional formats were comprehensive including use of the computer, written text and audio books. (*Id. at 58*). The 9th Grade Academy Program appeared to Dr. Souweine to be highly motivational. In contrast, Dr. Souweine did not see anything at the White Oak program that was particularly motivational. (*Id. at 58*).

Dr. Souweine was shown Dr. Kemper's report (A.R. Vol. I at 151-168) and asked to review his recommendations on page 12 of the report (A.R. Vol. I at 162). In April 2003, Dr. Kemper recommended that the Student be educated in a separate, multisensory, language intensive program. (*Id*). Dr. Souweine testified that the 9th Grade Academy Program at Chicopee High School was indeed multisensory and language intensive as well as highly structured. (TR. Vol. IV at 61). The program provided direct remedial instruction and methodologies which allowed students with language disorders to learn effectively and efficiently as recommended by Dr. Kemper. (A.R. Vol. I at 162; TR. Vol. IV at 61). The information in the Chicopee High program was presented in a way that stimulated all sensory modalities. Instruction was taught through a small student/teacher ratio which Dr. Souweine viewed as appropriate for the Student. (*Id. at 61*). The READ 180 Program and the learning skills program in particular had a very small student/teacher ratio.

The direct teaching was performed in a systematic manner with continuous review of previously learned information and the teaching of skills across various contexts. (*Id. at 63*). The teachers appeared to be well trained to implement a multisensory structured language program. An individual tutorial was also provided.

Dr. Souweine observed both the substantially separate out-of-district placement which was White Oak and the 9th Grade Academy "school within a school" model. (*Id. at 63 & 64*) Based on her professional training and experience, her observations of the 9th Grade Academy Program, the White Oak School program, her analysis of the Student's test results, her interviews with the staff and discussions with the teachers who worked with the Student on a regular basis, Dr. Souweine opined that the 9th Grade Academy Program would have been appropriate to meet the Student's special education needs. (p. 64) Dr. Souweine based her opinion on the evaluation reports which suggested a variety of services as well as the Student's performance in previous academic years. (*Id. at 64*). The 9th Grade Academy Program included a strong remedial component in the language arts area combined with the careful inclusion model, utilizing a very experienced special educator with careful and consistent programming across the curriculum in content area subjects, in the least restrictive alternative. (*Id. at 65*). The White Oak School program, on the other hand, is appropriate but does not meet the criteria of the least restrictive alternative. (*Id. at 65-66*). Dr. Souweine also questioned the appropriateness of the level of instruction for the Student at White Oak School. She believes that the Student functioned higher than the instructional level at White Oak. (*Id. at 66*).

Testimony of Janice Walsh

The 9th Grade Academy Program proposed for the Student was described in detail by certified special education teacher Janice Walsh. (TR. Vol. IV at 125-188). Ms. Walsh has a Bachelors degree in psychology and education from Mount Holyoke College and a Masters degree in education, moderate special needs, from American International College. She graduated Phi Beta

Kappa and Magna Cum Laude from Mount Holyoke. She is licensed through the Commonwealth to teach students diagnosed with moderate special needs from kindergarten through 12th grade. (*Id. at 125)*. She has extensive experience working in both public and private special education programming including the Curtis Blake Day School for students diagnosed with language-based learning disabilities. (*Id. at 126)*.

Ms. Walsh worked within the Springfield Public Schools as a special education teacher from 1993 through 1996 and began a "school within a school" program such as the 9th Grade Academy Program at Chicopee High School for "at risk" students. (*Id. at 127)*. The "school within a school" concept consists of a "smaller learning community within the larger high school". *(Id. at 128)*. Ms. Walsh and special education teacher Vaya Mangafas (*Id. at 169)*, travel to the major subject areas with the students on I.E.P. s and provide direct services in English, math, social studies and science. (*Id. at 130)*. The components of the program also include a daily consultation among the special education teachers and the regular education teachers to discuss any concerns presented by the students and to develop interventions to address those concerns. Ms. Walsh agreed with Dr. Souweine's statement that the consultations among the teachers are the "glue that holds the program together". It was one of the reasons that Ms. Walsh accepted the position because she new that such consultations would lead to a successful program for the students. (*Id. at 130-131)*.

Ms. Walsh and Ms. Mangafas also meet with the students on I.E.P.s an additional period for learning skills at which time they provide remedial training for the students and reinforce academics that the students are receiving in their mainstream classes. (*Id. at 130)*. The consultation time permits Ms. Walsh and Ms. Mangafas to work with the entire team of teachers at the end of each day to discuss the next day's lessons and brainstorm regarding anticipated problems for their students and how to best address the student's needs in "a more cohesive, positive experience in the 9th Grade Academy. (*Id. at 131)*.

Clearly the 9th Grade Academy Program is not a regular education mainstream program as understood by Dr. Kemper when he testified. It is a co-teaching, inclusion program with a low student/teacher ratio ranging from a one-to-one reading tutorial, to a science class with 12 students and two teachers. Language-based teaching strategies and instruction occur across all curriculum areas at a pace consistent with the student's needs. The teachers have volunteered to participate in the 9th Grade Academy Program and are very enthusiastic in their approach to the students. (*Id. at 132)*. In the event that one of the 9th Grade Academy students presents with a social/emotional problem, Ms. Walsh contacts the parents and brings in the school adjustment counselors to work with the student and the family. (*Id. at 133)*.

The 9th Grade Academy curriculum is "interdisciplinary". For example, the science teacher did a unit on diabetes. The social studies teacher had the students research the history of diabetes and how the disease affected people over the past several hundred years within a World Culture class. The English teacher handled the subject from a different angle and the math teacher introduced calculations that would help diabetics in calculating blood sugar levels. Such an interdisciplinary approach made the instruction meaningful for the students who have been diagnosed with language based learning disabilities and is an effective teaching tool. (*Id. at 134)*. A common language or format is used by all teachers in the program to make the teaching predictable. The instruction is multisensory and presented visual, auditorily, and motorically using a variety of techniques and materials "from every angle". (*Id. at 134-135)*. In other words, language-based teaching strategies and instruction occur across all curriculum areas at a pace consistent with the student's needs.

All of the students with whom Ms. Walsh works have a similar profile to the Student who was the subject of the hearing: they have specific learning disabilities with average intellectual functioning. (*Id. at 136)*. Ms. Walsh's entire caseload consisted of 8 students. (*Id. at 136)*.

Ms. Walsh described the typical student schedule within the 9th Grade Academy to include a reading class, World Culture, study skills, learning skills, English, math, science, physical education or health. There is considerable flexibility within the program to accommodate the needs of any particular student. (*Id. at 137).* There are opportunities for before and after school programming. If parents have questions, they can access the teachers via the school's website. (*Id. at 138).* One-to-one instruction, as was recommended for the Student in this case, is available and frequently provided within the 9th Grade Academy Program in addition to small group instruction. (*Id. at 138-139).*

Ms. Walsh preteaches the textural material and vocabulary in the content area classes such as World Culture and science through her study skills classes and close consultation with the other members of the 9th Grade Academy team. She instructs the students relative to determining the main idea of a selection through highlighting techniques. (*Id. at 140).* Ms. Walsh also prepares study guides to assist students in preparing for exams. Written language is emphasized in all subjects across the curriculum to address the needs of students with language-based learning disabilities. (*Id. at 141-142).* The students are taught how to effectively answer an open response question as anticipated on MCAS testing. (*Id. at 142-143).*

Ms. Walsh also uses reciprocal teaching, a method implemented at the Curtis Blake Day Center, a private out-of-district placement for students diagnosed with language-based learning disabilities. (*Id. at 143-145).* The reciprocal teaching method assists the students in developing the ability to identify main ideas and supporting details as well as to work on their oral expression. *Id. at 144-145.*

Written language skills are taught through a "writing process" through the structure of graphic organizers in all classes to generalize skills across the curriculum. The process includes prewriting, brainstorming, mapping, revising, peer editing, and further revisions. (*Id. at 145-149).*

The curriculum emphasizes development of organizational skills and strategies to complete homework. (*Id. at 150, 151*).

Ms. Walsh described how the needs of the Student who is the subject of the hearing would have been addressed in the 9th Grade Academy Program consistent with the 2003-2004 proposed I.E.P. for the Student. *Id. at 152-159.* The READ 180 component to the program would have been provided by READ 180 trained teacher, Karen Hardy-Woolridge (See resume included in C.A.R. at 21, 22; *Id. at 153).* The Student's proposed program also included the services of a speech and language pathologist and a outside consultant in learning disabilities in addition to the aforementioned elements of the 9th Grade Academy Program. (See A.R. Vol. II at 429-456 and Testimony of Janice Walsh, TR.: Vol. IV at 153-154 & 160-161).

Ms. Walsh testified that the 9th Grade Academy Program is "language based" as was recommended by Dr. Robert Kemper. In addition to the development of written language skills in all classes discussed above, Ms. Walsh provides a variety of accommodations including word banks, study guides, revised tests, etc. . . . "We try to give them as many opportunities to see the material, hear the material, taste the material, and express it orally and in writing." (*Id. at 155).*

Contrary to Dr. Kemper's understanding, the Student would not have been faced with attempting to read and understand material in 9th grade texts on her own without any intervention. The books were "handpicked". Literature such as Shakespeare's Romeo and Juliet is taught by using a colloquial version of the play and having students act out the parts. Ms. Walsh also has the students engage in journal writing. (*Id. at 156-158).*

Ms. Walsh analyzed the Student's testing including that of Melissa Mannello, Dr. Kemper and Curtis Blake and the testimony at hearing for which she was present. Based on her professional experience and training, she opined that the students in the 9th Grade Academy Program have a similar profile to that of the Student in question in this case. (*Id. at 161-164).* Ms. Walsh believes

that the Student's academic weaknesses could have been appropriately addressed in the 9th Grade

Academy Program  during the 2003-2004 school year.  (*Id. at 65-165*).  Chicopee High School also

has a similar teaching model for 10th grade to provide the same level of intensity while beginning to

"wean" the students from this level of structure.  (*Id. at 168-169*).

Testimony of Daniel Schreier

Daniel Schreier ("Mr. Schreier") assumed the position of Director of Special Education for

the Chicopee Public Schools in January 2003.  Mr. Schreier has a Bachelors degree in English with

a concentration in education from the University of Connecticut and a Masters degree in student

personnel administration from Teacher's College of Columbia University.  Mr. Schreier is a

licensed attorney in the Commonwealth with a law degree from the University of Maryland School

of Law.  Prior to his current position, Mr. Schreier was a compliance officer within the Program

Quality Assurance Department of the Massachusetts Department of Education where one of his

major responsibilities was to oversee and review public school districts for compliance with

M.G.L.. Chapter 71B and the Individuals with Disabilities Education Act.  (TR.: Vol. IV at 189-

190).

Prior to working for the Department of Education, Mr. Schreier advocated on behalf of

special education students and provided direct services to special education students with a wide

variety of disabilities.  He also is an acting professor at the University of Massachusetts where he

teaches education and the law.  (*Id. at 190-19)1*.

Within his role as Director of Special Education, Mr. Schreier is responsible for supervising

the "school within a school" learning community known as the 9th Grade Academy at Chicopee

High School.  Mr. Schreier explained the concept of the small learning community to the hearing

officer and summarized the theory and some of the research behind the concept.  (*Id. at 192-194*).

Some students, particularly special needs students, have difficulty finding their identity in a large

public high school. Mr. Schreier cited the theorist Chickering who discussed "mattering v. marginality": if a student feels as if she belongs and is important to the school community, she is more likely to be successful; on the other hand, if the student feels "marginalized" going from room to room in a large public high school without much continuity of programming, she is less likely to realize success. (*Id. at 192-193*). By creating a community where teachers work together to serve the needs of the students in a team format, the students are more likely to succeed. The students have virtually the same interactions in the same manner with the same teachers throughout their high school program. (*Id. at 193*).

As Director of Special Education, Mr. Schreier supervises and assists in the ongoing development of the 9th Grade Academy small learning community with his special education supervisor Dr. Andrea Stolar. Mr. Schreier and Dr. Stolar make modifications and accommodations to the students' programming according to the students' needs. (*Id. at 194-195*). Mr. Schreier cited specific examples of the customizing and individualizing of specific programs at Chicopee High School to illustrate for the hearing officer the flexibility afforded by the program to meet the Student's unique needs. (*Id. at 195-196*). Mr. Schreier also explained the flexibility of programming available at Chicopee High School for the Student. If the student were successful in the 9th grade smaller learning community model, she could continue into the 10th Grade Academy with a similar team of teachers continuing to instruct the student through a similar model with common planning time and a common format throughout the curriculum. (*Id. at 200*).

Mr. Schreier discussed for the hearing officer the wide variety of special education services available for the Student within the 9th Grade Academy. In addition to the services of Ms. Walsh and Ms. Hardy-Woolridge previously discussed, the Student has the services of a speech and language pathologist. The proposed I.E.P. for the Student included the services of a speech and language pathologist Risa Teall. (*Id. at 201-202*). Ms. Teall was to have provided the Student with

direct services in speech and language and a consult to her team of teachers as set forth in the
Special Service Delivery Grid included within the I.E.P.. (A.R. Vol. II at 443).

Karen Hardy- Woolridge would have provided the Student with READ 180 instruction. Ms.
Hardy-Woolridge is certified as a secondary level special education teacher and also has extensive
training in READ 180. (*Id. at 203-204).* The READ 180 system is a data driven reading program
that permits teachers to pretest students, collect data, and objectively determine whether the goals
and objectives for the student have been met. Every student has a reading inventory to provide a
baseline. The student's program is developed consistent with the strengths and weakness revealed
from the initial reading inventory. The teacher then tracks the student's progress relative to each
aspect of language arts, including decoding, phonemic awareness, comprehension, spelling, and
written language. (*Id. at 204-206).* Ms. Hardy-Woolridge was trained to synthesize the data and
use it in development of instruction for each student. (*Id. at 205).* It was not necessary for Janice
Walsh to be trained in READ 180 since she would not have been instructing the Student in the area
of reading. Ms. Walsh had extensive reading training in a wide variety of methods successful with
language-based learning disabled youngsters, including her work at the Curtis Blake Day School.
(*Id. at 207-208).*

Mr. Schreier indicated that the Student received the majority of her instruction in 8th grade in
a different, less restrictive setting at the middle school based on the Parents' desire that the Student
not be pulled out of regular education programming. (*Id. at 211-212).* At the end of 8th grade, the
TEAM wrote an I.E.P. for a more restrictive environment that would permit the Student to receive
more special education services with other identified special education students moving along the
continuum of services from less restrictive to more restrictive as required by law. (*Id. at 212).* The
students within the 9th Grade Academy, do not have severe disabilities. Some students may require
more services in math while others may need more intensive programming in reading. (*Id. at 213-*

*214).*  The program is structured to address the individual needs of each student. (*Id. at 214).*  When

the TEAM developed the I.E.P. in June 2003, Mr. Schreier viewed it as an opportunity for the

Student to interact with her peers and have increased special education support because of the need

to remediate some of her skills rather than just provide modifications or accommodations.  (*Id. at*

*214).*

      With respect to the Student's emotional anxiety issues, Mr. Schreier opined that the smaller

learning community of the 9th Grade Academy would be a positive experience since the staff meets

on a daily basis to discuss each student's functioning and the best manner in which to address any

concerns.  (*Id. at 214-215).*  If an intervention is needed, the special education staff would consult

with the school adjustment counselors who may provide direct services to the Student or

consultation to the TEAM.  (*Id. at 215-216).*  Likewise modifications would be made to the

Student's academic programming on an as needed basis given the team approach and flexibility

within the 9th Grade Academy Program.

      Mr. Schreier described the I.E.P. admitted as Exhibit S1 as a "living, breathing document",

even though it's . . . signed by one person at a date and time, we should be able to sit down with the

parents and say . . . maybe you're not seeing this at home, but we're seeing this at school. Can we

make [her] services less restrictive, or more restrictive, "depending on the Student's needs."  (*Id. at*

*216-217).*  Teachers such as Janice Walsh spend a lot of time with the students, track their progress

and make recommendations to the other members of the team whenever needed.  *Id. at 217.*

      The TEAM initially proposed 45 minutes of READ 180 but had the flexibility, if permitted

by the parents, to increase that amount of time.  Mr. Schreier indicated that the school district did

offer a full 90 minutes of READ 180 to the parents at the August 2003 prehearing conference to

alleviate any concerns that the parents may have had relative to the new program.  *Id. at 218-223.*

The READ 180 Program allows for considerable flexibility in the amount of time devoted to instruction in the areas of reading, spelling and language arts.  (*Id. at 219-222*).

Mr. Schreier also summarized for the hearing officer data compiled by the Chicopee Public Schools measuring the success of the READ 180 Program up to the date of hearing, both for students receiving the service 45 minutes a day, and those receiving 90 minutes a day. (*Id. at 229*). He reiterated the district's August 2003 proposal to the parents to provide the Student with 90 minutes a day of READ 180.  Mr. Schreier felt confident that the Student would achieve positive results using READ 180.  (*Id. at 229*).

Mr. Schreier also spoke about the after school programming that was offered to the parents for the Student to remediate her skills.  In the case of this Student, Chicopee offered an additional 45 minutes of rule based instruction through the Orton Gillingham program as recommended by Dr. Kemper and requested by the parents in the August 2003 prehearing.  (*Id. at  232-235*).  Even though Mr. Schreier and the school-based members of the team believe that READ 180 would be preferable, they respected the parents' request and offered to provide the additional 45 minutes of reading through the Orton Gillingham program after school.  (*Id. at 234*).

Mr. Schreier discussed at length the READ 180 teaching methodologies and how READ 180 best addresses the needs of an older student at the high school level who is struggling and needs to keep motivated and interested in reading.  (*Id. at 236*).  He reiterated the reading interventions that were proposed for the Student in 8th grade including Lexia and Read XL.  Unfortunately, the parents rejected one or more of the options, preferring that the Student not be removed from the regular classroom.  (*Id. at 244-245*).

Mr. Schreier discussed the efficacy of READ 180 and summarized the research that he did prior to choosing the READ 180 for the 9th Grade Academy Program.  He specifically mentioned the studies that had been done with special education students with specific learning disabilities

including the Des Moines Public Schools studies, the Iowa Study, the California Study and the

materials admitted into evidence as Exhibits S27, S29, S30, S31, S32, and S33.  Mr. Schreier

directed the hearing officer's attention to Exhibit S30 which detailed how the READ 180 correlates

to the Massachusetts English Language arts frameworks for grades 9 & 10.  (C.A.R. at 179-214; *Id.*

*at 251-252).*  He chose the READ 180 Program in part because it is aligned with the Massachusetts

Curriculum Frameworks and is a comprehensive reading program.  (*Id. at 252).*

Mr. Schreier also summarized for the hearing officer the full panoply of services to be

provided to the Student, if needed, including the services of River Valley Counseling Center and

Lindamood Bell (C.A.R. at 99-107 and 132-139; *Id. at 253-258).*

Given the aforementioned detailed description of the services to be provided to the Student

in the 9th Grade Academy program, and the district's documentary evidence, Chicopee undoubtedly

met its burden of proof. Chicopee presented evidence on which the hearing officer could have found

that the Student would have received "personalized instruction with sufficient support services to

permit [her] to benefit educationally from the 2003-2004 I.E.P. in the 9th Grade Academy Program.

IV.     The Hearing Officer's Decision is Arbitrary and Unsupported by the Evidence.

The hearing officer summarized her findings and conclusions relative to the evidence in the

underlying BSEA hearing on pages 9-11 of her decision.  A review and analysis of those findings

and conclusions reveals, once again, a significant emphasis on the irrelevant background testimony

that was unrelated to the central issue to be decided by the hearing officer regarding the

appropriateness of the 2003-2004 I.E.P. developed by Chicopee for the Student.  As discussed

above, the prior accepted I.E.P.s should not have formed the basis for the hearing officer's decision

in this case since they are dissimilar to the 2003-2004 I.E.P. that was the subject of the hearing.

Procedural Issues

The hearing officer concluded that Chicopee allegedly failed to include the Parents

meaningfully in the educational planning process, resulting in an allegedly inappropriate I.E.P..

The hearing officer fails, however, to support her conclusory statement relative to parental

involvement with accurate testimony or documentary evidence from the record. The hearing officer

writes:

> "Beginning in the winter of 2003, during the Student's 8th grade year, the Parents asked
> Chicopee for additional academic assistance. Although Chicopee's own testing revealed
> academic achievement scores 4-6 years below her 8th grade placement, Chicopee asserted
> that the Student's school difficulties were social/emotional in nature. The documentary
> record shows that Chicopee did not offer any therapeutic services to the family, an offer
> which would have been a logical result of its position. Nor did it offer any additional
> academic special education as requested by the Parents. Chicopee's only documented
> response to the Student's poor academic performance and markedly changed appearance
> was the proposal of further academic testing. This response alone was not reasonable under
> the circumstances, and served to buttress the Parent's perception that Chicopee could not, or
> would not, address their concerns."

A review of the testimony of the father, that of 8th grade teacher Andrea Picard-Cameron,

and Dr. Judith Souweine reveals Chicopee's significant attempts to enlist the cooperation of the

Parents in addressing the Student's academic and social/emotional concerns and repeated

recommendations for counseling services. With the exception of permitting the Student to

occasionally participate in before school and lunchtime support, the Parents and the Student rejected

all other services and counseling recommended by Chicopee. Chicopee's position is supported by

the testimony of the father who acknowledged that special education teacher Andrea Picard-

Cameron and other members of the TEAM  offered to provide the Student with additional reading

services in the 8th grade but the parents rejected those services because they did not want the

Student pulled out of class. (TR. Vol. I at 82-83). There were no occasions when the parents asked

for additional services and the school district refused.  (TR. Vol. I at 79).  The Parent further

acknowledged that Chicopee offered an additional academic support class for the Student in 8th

grade but the Parent refused.  (*Id. at 83-85).*   The Parent also acknowledged that the Student was absent from 54 classes in 8th grade.(*Id. at 85-89).*

Relative to 8th grade, the father acknowledged that the Student was receiving therapeutic services from Mt. Tom Health clinician Jodi Rosol for "a high level of intrusive anxiety that manifests in several different impairing symptoms."  The Parents clearly had concerns about the Student's emotional functioning in 8th grade as did Ms. Rosol.  See Exhibit A and TR. Vol. II at 90-96).  Ms. Rosol expressly requested that Chicopee remove the Student from the academic support class since she believed that the additional special education services were too anxiety producing.  (See Exhibit A and TR. Vol. I at 92-98).

Contrary to the hearing officer's statement on page 9 of her decision, Chicopee did offer the Student the services of the school adjustment counselor in 8th grade to address her mental health and emotional issues as well as the services of River Valley Clinic.  The father acknowledged the offer of school-based therapeutic services and River Valley Clinic services on the first day of hearing. (TR. Vol. I at 95).

The inaccuracy of the hearing officer's findings relative to Chicopee's 8th grade service recommendations is further seen in the testimony of the Student's 8th grade teacher, Andrea Picard-Cameron who is a licensed teacher of moderate special needs. (TR. Vol. III at 156-157).  Ms. Picard-Cameron summarized for the hearing officer the additional special education services for the Student, including pullout services to remediate reading, and a self-contained class wherein the Student could have received intensive reading instruction.  (*Id. at 165-167).*   The Parents rejected Chicopee's recommendations by indicating that they were "not interested" in the remedial reading class because it would conflict with the Student's art exploratory class which was an elective, rather than required class.  The Parents did not feel that the self-contained class was an option because "it had a group [of students which] . . . they didn't feel the Student would fit in with . . .".  (*Id. at 167-*

*168).*  Since the Student was also taking additional art classes outside of the school setting,
Chicopee did not feel that her art exploratory class was critical to her education.  (*Id. at 168).*

Ms. Picard-Cameron told the hearing officer that she recommended the before and after
school homework club to give the Student one-on-one extra help with an English/language arts
teacher as well as extra help during the lunch hour.  The Student attended the homework club only
sporadically and the Parents rejected all other remedial reading and English/language arts services.
(*Id. at 168-170).*  The Student also rejected an MCAS preparatory class.  (*Id. at 170).*

Regarding the Student's social emotional functioning, Ms. Picard-Cameron told the hearing
officer that she recommended both school based counseling services and the services of River
Valley Counseling an agency with whom Chicopee contracts.  All counseling services were rejected
by the Parents.  (*Id. at 179-181).*  The TEAM also asked for parental permission to confer with the
Student's outside therapist Jodi Rosol but the Parents refused to permit Ms. Picard-Cameron and
other members of the TEAM to speak to Ms. Rosol. (*Id. at 181).*

The hearing officer indicates that the Student's TEAM met in June 2003 to provide the
results of its extended evaluation which was completed on April 18, 2003.  (A.R. Vol. I at 127 &
128).  Chicopee had proposed to reconvene the Student's TEAM in April 2003 to discuss the
Student's progress and the results of further educational testing by school psychologist, Melissa
Mannelo.  (*Id. at 127).*  The hearing officer references a delay in reconvening the TEAM pursuant
to the extended evaluation form and indicates that the delay of approximately five weeks
"contributed to the marginalization of the Parents."  (A.R. Vol. I at 99).

The hearing officer fails to state, however, that the extended evaluation, with the request to
reconvene in April 2003, was never accepted by the Parents and, therefore, could not be legally
implemented.  (See A.R. Vol. I at 128).  It is axiomatic that school districts are not legally obligated
and, in fact, are not authorized to deliver services to a student where the services have not been

agreed upon by the parents. As with many other recommendations made by Chicopee for the Student during 8th grade, the extended evaluation was never accepted. Accordingly, there was no obligation on the part of Chicopee to reconvene the TEAM in April 2003 and no conduct which allegedly contributed to the "marginalization of the Parents".

Even assuming, arguendo, that the Parents wished to convene a TEAM meeting in April 2003, they were free to contact special education supervisor Debra Schneeweis to schedule a meeting at any time. (A.R. Vol. I at 125). Ms. Schneeweis testified that she functioned as the TEAM chairperson at Fairview Middle School when the Student attended 8th grade. (TR. Vol. III at 283). She oversaw the Student's special education program, supervised staff, and worked in conjunction with the Student's teacher to develop special education programming. *(Id. at 283-284).* Ms. Schneeweis testified that the Parents never contacted her or expressed concerns to her about the Student's 8th grade program or the need for a more intensive program in 8th grade. *(Id. at 285).*

Ms. Schneeweis further explained to the hearing officer the full panoply of special education services and programs which were available to the student in 8th grade in Fairview Middle School, including the inclusion model, self-contained classrooms, additional remedial classes, tutoring services, and the services of outside consultants. *(Id. at 286).* Chicopee hired tutors from the Curtis Blake Day School to conduct one-to-one tutorials with particular students if recommended by the TEAM and accepted by the parents. *(Id. at 287-288)* Curtis Blake tutors were working at the middle school during the Student's 8th grade. Had the TEAM recommended such a service for the Student or the Parent requested it, it would have been provided. *(Id. at 288).* As discussed above, the Parents rejected all additional special education services recommended by Andrea Picard-Cameron and other members of the TEAM. They rejected the extended evaluation referenced by the hearing officer on page 10 of her decision and never contacted TEAM chairperson Debra Schneeweis requesting additional services or the reconvening of the TEAM prior to June 2003.

Equally concerning relative to the hearing officer's decision is that she made no factual findings relative to any alleged denial of a free appropriate public education as a result of the TEAM not convening in April 2003.  Even if the hearing officer found that Chicopee engaged in a procedural violation of state and federal law, the violation would be "without consequence" unless the Parents had proved that the Student was denied a free appropriate public education as a result of an alleged procedural violation.  Once again, there are no findings by the hearing officer relative to a denial of a free appropriate public education from April to June 2003.

Next, the hearing officer claims that the 2003-2004 I.E.P. developed for the Student failed to include direct instruction in basic decoding skills.  The hearing officer's statement is directly contradicted by the record in this case.  I.E.P. 2 included as page 436 of Vol. II of Administrative Record describes the Student's general curriculum needs and specifically includes "a phonetic approach to reading".  The Student's performance was to be evaluated with "six month achievement testing in reading-decoding . . .."  (A.R. Vol. II at 436).

Goal number 1 developed by the TEAM was to focus on reading and increasing the Student's word recognition to a grade equivalent of 5.0 (A.R. Vol. II at 438).  The benchmarks/objectives in reading included the recognition of commonly used sight words, the development of individual phonemes, the recognition of root words, the recognition of word endings, the segmenting, manipulating and tracking of phonemes at the single syllable level and numerous other decoding skills.  *(Id. at 438).*  Phonemic decoding and Dr. Robert Kemper's testing and recommendations were also discussed under Goal number 5 for the provision of direct services in speech and language.[4]  *(Id. at 442).*

---

[4] Please note that Chicopee's program proposed to provide the Student with direct services from a certified speech and language pathologist.  David Drake of the White Oak School testified that his program did not include a certified speech and language pathologist.

Likewise, the Service Delivery Grid called for direct services in reading with an emphasis on Goals 1, 2 and 3 in reading comprehension and written language for 45 minutes a day. *(Id. at 443).* There was also testimony from Mr. Schreier that an additional 45 minutes a day of READ 180 services was offered to the Parents at the August 2003 prehearing conference, plus an after school tutorial, for a total of one hour and 90 minutes of reading instruction once the I.E.P. emerged from the administrative process. The I.E.P. developed at the June 2003 meeting obviously included basic decoding skills, contrary to the hearing officer's findings and conclusions on page 10 of her decision located in the Administrative Record Vol. I at 99.

The hearing officer then discussed the August 2003 prehearing conference that occurred between the parties and acknowledges Chicopee's offer to double the READ 180 class sessions and provide the additional tutorial. The hearing officer claims that the offer was never formalized. In fact, the Parent acknowledged that he was aware of the offer when he made the unilateral placement to the White Oak School.

Moreover, the offer was memorialized through counsel's status report to the hearing officer following the prehearing conference. See A.R. Vol. I at 19 & 20, a status report confirming the additional after school tutorial and copied to counsel for the Parents. It is disingenuous for the Parent to claim that anything arising out of the August 2003 prehearing conference led to the unilateral placement of the student when, by the Parents' own acknowledgement, the student visited and spent a day at the White Oak School in the spring of 2003, long before the subject I.E.P. was ever developed in June 2003.

The hearing officer's allegation that Chicopee failed to provide the Parents with any materials to be used by the proposed 9th Grade Academy Program, and/or failed to fully explain the proposed program is equally misplaced. There was testimony from Andrea Picard-Cameron, and special education supervisor Dr. Stolar that the READ 180 materials were discussed at the June

2003 meeting and that a packet of written materials was given to the father at that meeting.  The

father acknowledged receiving a packet of READ 180 materials at the June 2003 meeting.

The alleged procedural lapses referenced in the hearing officer's decision simply did not occur.  To

the extent that the communications between the Parents and the school district were not perfect, that

fact in and of itself, does not constitute a "serious procedural irregularity" as contemplated by the

Court in  *Roland M. v. Concord School Committee*, 910 F. 2d 983 (1st Cir. 1990).  The evidence in

this case does not reflect a "pattern of nonresponsiveness" by the school district but it certainly does

reflect a pattern of recommendations made by the school district that were subsequently rejected by

the Parents.

Substantive Issues

Chicopee acknowledges that there was considerable agreement between the findings and

recommendations of Dr. Kemper and those of Chicopee's evaluators.  Both agreed that the Student

should be placed in a "language-based, multisensory program geared to meeting the learning needs

of students with specific language learning disabilities, including dyslexia".  The parties further

agreed with the need for small class sizes, direct and consistent instruction by teachers trained to

remediate language learning disabilities as well as a daily tutorial to focus on systematic reading

instruction.  The parties disagreed, however, with the location for the recommended services and the

exact nature of the teaching model.

Chicopee proposed a teaching model consistent with its obligation to develop an appropriate

program in the least restrictive environment which it did at Chicopee High School.  Dr. Kemper,

who consulted to the White Oak School, recommended a "substantially separate" program such as

the White Oak School  and limited class sized to no more than 8 students.  It is undisputed that

Chicopee had no legal obligation to accept 100% of Dr. Kemper's recommendations as in this case,

if the majority of the TEAM concluded that the Student's needs could be met in a lesser restrictive environment.

Chicopee developed an I.E.P. which <u>did</u> incorporate all of Dr. Kemper's agreed-upon recommendations for the Student. That I.E.P. is included in Administrative Record Vol. II at 429-456. The hearing officer's description of the 9th Grade Academy Program and the proposed I.E.P. is inaccurate and inconsistent with the record. The aforementioned testimony from Janice Walsh, Daniel Schreier, and Dr. Judith Souweine refutes the hearing officer's claim that the I.E.P. called for the student's instruction in mainstream 9th grade classes with modifications provided by a special educator.

The hearing officer's statements regarding the Student's alleged lack of effective progress in the 8th grade model is equally misplaced. In addition to the aforementioned testimony, Ms. Picard-Cameron testified that the Student displayed improvement in her oral and silent reading skills across the curriculum and that her progress was sufficient to enable her to achieve the annual goals by the end of the I.E.P. period. (TR. Vol. III at 188). Ms. Picard-Cameron also indicated that the Student was better able to read aloud with appropriate phrasing and fluency but was reluctant to do so. She told the hearing officer that the Student had made progress in the regular curriculum that was similar to her peers through material that was at grade level but modified for her needs. (*Id. at 189-190*). The Student was also able to access 8th grade content material through the use of more colloquial English and the paraphrasing of materials. (*Id. at 190-191*). The Student was offered a direct one-to-one tutorial, academic support services, additional remedial reading and/or a self-contained class but all of those options were rejected by the Parents. Ms. Picard-Cameron also observed the Student to be functioning within the average range throughout the 8th grade curriculum. The Student was able to read words such as "achieved, experienced, mustache, ancient, obviously, and sufficient" from the Dolch Word List. (*Id. at 195-196*).

Ms. Picard-Cameron testified that, based on her observations of the Student in 8th grade for several periods per day, she agreed with the proposed I.E.P. that was recommended for 9th grade because it was consistent with her need for small group instruction and would also provide her with individual reading time. (*Id. at 209-210*).

Contrary to the hearing officer's decision, the TEAM, particularly Dr. Stolar, described the proposed 9th Grade Academy Program in detail to the parents and explained the services outlined on the Service Delivery Grid, including consultation and direct services. (*Id. at 201-202*). Many of the recommendations incorporated within the 9th grade I.E.P. came directly from Dr. Kemper's report. (*Id. at 202-203*). Specifically, Dr. Kemper's recommendations were incorporated on Page 5 of 15 of the I.E.P. wherein it states: "The Student needs a program that will address her reading, writing, and math deficits in a way that builds her skills and confidence. . . . Content: a phonetic approach to reading, written expression and math will be taught at the Student's instructional level". (*Id. at 203-204*). "Methodology: delivery of instruction, multimodel, multisensory approach to learning" also came from Dr. Kemper. (*Id. at 204*).

The hearing officer's statement regarding the training and experience of the 9th Grade Academy teachers was unsupported by the record. There was testimony that Ms. Walsh and Ms. Hardy-Woolridge were special education certified teachers. Ms. Walsh formerly taught students identified with language based learning disabilities at the Curtis Blake Day School. Ms. Hardy-Woolridge received extensive training in the READ 180 Series. Certified speech and language pathologist, Risa Teall, was also to provide language-based services in additional to educational consultant Susan Fino. While the I.E.P. did not include the after school reading tutorial, the I.E.P. was amended during the August 2003 prehearing conference to include the service. The Parents and/or their counsel were on notice of the additional tutorial prior to the White Oak placement.

There is no foundation for the hearing officer's statement that the "proposed class sizes would range from 12-20 students. Ms. Walsh testified about her class sizes and the flexibility for small group instruction and one-to-one tutorials. More importantly, the hearing officer made no factual findings relative to any alleged need for a class size of only 8 students. In fact, Ms. Picard-Cameron testified to the Student's effective progress in significantly larger classes.

The hearing officer's statements relative to the READ 180 Program are equally perplexing. She correctly states that the school district is "free to chose its own remediation methods, techniques, and programs to address a student's documented need for service, so long as there is a reasonable basis for such a choice". The school district provided ample evidence about the success of the READ 180 Program through the testimony of Mr. Schreier and Dr. Souweine. The hearing officer's statement that there was no showing of effective use of READ 180 with the language learning disabled population is entirely contradicted by the documentary evidence in this case. Contained within the Complement to the Administrative Record are several articles and studies discussed by Mr. Schreier and admitted into evidence for the hearing officer's review and analysis, including READ 180: Special Education. The article specifically discusses the successful use of the program with special needs students, including dyslexic students. (C.A.R. at 48-59). Dyslexia expert, Dr. Sally Shaywitz, expressly recommended the use of READ 180 for dyslexic students in her book entitled Overcoming Dyslexia, an excerpt of which is included within the Complement to the Administrative Record at 162-170. Dr. Shaywitz describes the essentials of a reading intervention program in a similar way to Dr. Kemper as "systematic and direct instruction in phonemic awareness and phonics among other skills". (*Id. at 262*) Dr. Shaywitz then includes the READ 180 Program within the list of programs that she recommends to target the needs of older students or students who are one or two years behind grade level. (*Id. at 167*).

Mr. Schreier discussed the studies and course descriptions detailed in C.A.R at 171-245 when he testified before the hearing officer. Perhaps the most persuasive document for the Court's consideration is that outlining the correlation between the READ 180 and the Massachusetts curriculum frameworks included within the Complement to the Administrative Record at 179-214. It is difficult to imagine any more persuasive evidence regarding the appropriateness of the READ 180 Program for the Student than that which was presented by Chicopee at the hearing of this matter.

The hearing officer once again raises the issue regarding the appropriateness of Chicopee's initial recommendation for 45 minutes daily of READ 180 instruction. The hearing officer ignores, however, the aforementioned studies and testimony of Mr. Schreier wherein he described the flexibility within READ 180 to use the program from 45 minutes per day to 90 minutes per day. The hearing officer further ignores the testimony and acknowledgement by the Parent that the school district offered to increase the Student's READ 180 services to 90 minutes per day at the August 2003 prehearing conference.

The hearing officer then alleges that Chicopee failed to follow through on its offer to introduce the student and her parents to the READ 180 system during the summer of 2003. That testimony was directly contradicted by Dr. Stolar who stated that she left several messages on the Parents' voice mail to follow up on the student's attendance at the summer 2003 READ 180 Program. The father acknowledged receiving Dr. Stolar's message but never returned the phone call. The hearing officer also ignores the documentary evidence submitted at hearing referencing the Student's name on the special education summer school list indicating that she failed to attend the class. (C.A.R. at 171). Clearly, Chicopee did follow through on its offer to introduce the Student to the READ 180 services in the summer of 2003 but, once again, it was the Parent that either rejected or failed to follow through on the recommended service.

Finally, the hearing officer states that: "Considering the proposed 2003-2004 I.E.P. as a totality, I find that neither the setting, nor the services, proposed by Chicopee meet the recommendations outlined in Dr. Kemper's report." She makes no factual findings to support this conclusory statement and fails to state specifically how the 2003-2004 I.E.P. was not reasonably calculated to provide the student with a free appropriate public education in the least restrictive setting as required by law. The hearing officer does not cite any testimony or documentary evidence to support her conclusion. She does, however, acknowledge the district's lack of obligation to accept any of Dr. Kemper's recommendations.

The hearing officer further alleges that Chicopee offered the Student a program that was "already in place, rather than one tailored specifically to the unique needs of the Student". Once again, the hearing officer's conclusion is not supported by the evidence. A careful review of the 2003-2004 I.E.P. reveals a program uniquely tailored to the Student to comprehensively address her needs in the areas of reading, math, speech and language, organizational and academic support classes as well as her social/emotional needs. Moreover, as stated in the U.S. District Court case of *Douglas v. Greenfield Public Schools*, the hearing officer was obligated to consider the appropriateness of the I.E.P., as it emerged from the administrative process. There was ample testimonial evidence, in addition to a written status report to the hearing officer, that reaffirmed the customized nature of the program offered to the Student, which included an additional daily 45 minutes of READ 180, plus an after-school tutorial in Orton Gillingham type reading instruction.

<u>Conclusion</u>

The record in this case is replete with evidence supporting the need to set aside the underlying decision by the hearing officer. First, the hearing officer based her decision on irrelevant background testimony unrelated to the central issue in the case regarding the appropriateness of the 2003-2004 I.E.P. developed by Chicopee for the Student. The testimony

relative to previous I.E.P.s had no probative value according to the hearing officer, unless there was evidence linking the past I.E.P.s to the proposed 2003-2004 I.E.P..  No such evidence was adduced at hearing.  Without any specific findings regarding similarities, the hearing officer erred in considering any of the prior I.E.P.s, in reaching at her decision.  Not only did the hearing officer consider the previous irrelevant I.E.P.s, but her opinions relative to those I.E.P.s appear to have tainted her reasoning relative to the remaining evidence in the case and severely prejudiced Chicopee.

The hearing officer stated that the Parents had the initial burden of proving that the proposed 2003-2004 I.E.P. was inappropriate to meet the Student's needs in the least restrictive environment. Through no reasonable interpretation of the testimony of the Parents' witnesses and a review of their documentary evidence could that burden have been met. The Parent repeatedly acknowledged his acceptance of all prior I.E.P. s and rejection of Chicopee's attempts to increase the Student's services in 8th grade.  More persuasively, the Parent acknowledged that Chicopee incorporated the TEAM's recommendations in the 2003-2004 I.E.P., that he had no questions or concerns relative to the I.E.P., that he never forwarded the I.E.P. to his expert, Dr. Robert Kemper.  Dr. Kemper, in turn, acknowledged that he never saw the I.E.P. that was the subject of the hearing.  Accordingly, none of the Parents' evidence could have formed the basis for the hearing officer's conclusions in this case.

Chicopee, on the other hand, provided abundant evidence about the appropriateness of the proposed I.E.P. from Dr. Judith Souweine, who actually read the proposed I.E.P., observed the Student at White Oak School  and observed the 9th Grade Academy Program.  The district also presented the testimony of its very learned special education director, Daniel Schreier, its certified special educator Janice Walsh, its special education supervisor, Dr. Andrea Stolar, and two volumes of documentary evidence detailing the elements of the proposed program and efficacy of the READ 180 approach to be implemented with the Student.  The hearing officer's decision is devoid of

factual findings, consistent with the record, to support her conclusion that the 2003-2004 I.E.P. was

inappropriate.  Based on the foregoing reasons, Chicopee respectfully requests that the hearing

officer's decision in the underlying matter be set aside.

>FOR PLAINTIFF, CITY OF CHICOPEE
>ACTING THROUGH THE CHICOPEE
>PUBLIC SCHOOLS
>
>By    */s/Claire L. Thompson*
>Claire L. Thompson, Esq.
>Doherty, Wallace, Pillsbury
> & Murphy, P.C.
>1414 Main Street, 19th Floor
>Springfield, MA  01144
>Phone:  (413) 733-3111
>Fax:    (413) 734-3910
>B.B.O. No:  550262

CERTIFICATE OF SERVICE

I certify that this document has been
served upon all counsel of record in
compliance with F.R.C.P., on
November 19, 2004.

*/s/Claire L. Thompson*
Claire L. Thompson

S6



Meeting complex behavioral health needs.

Corporate Office
tel: 413.747.0705
fax 413.732.7075
sba@bhninc.com

Members

Agawam Counseling Center

Child Guidance Clinic

Community Care Mental Health Center

Forensic Mental Health Services

Mt. Tom Mental Health Center

Pioneer Valley Mental Health Center

Psychiatric Case Services

February 10, 2003

Re:  Kaitlyn Tharaldson
DOB:  3/14/89

To Whom It May Concern:

      Kaitlyn has been participating in outpatient therapy with this clinician since 12/30/02.  She is currently being treated for a high level of intrusive anxiety that manifests in several different impairing symptoms.

      It has come to my attention recently that the school is currently making a decision as to whether or not Kaitlyn should be placed back in academic support to assist with her learning.  With respect for academic planning and for your educational process, it is my present clinical recommendation that Kaitlyn not be placed in the academic support classroom.  The idea of participating in academic support is emotionally overwhelming to Kaitlyn at present and therefore may result in further emotional instability.  As you may already be aware, the primary reason for Kaitlyn's negative response to academic support is ongoing conflict with a peer who is also in the classroom.  While teachers are able to manage conflict in the room, Kaitlyn's anxiety remains irrational and uncontrollable for her.  This will in turn contribute to Kaitlyn's inability to perform academically, as has been her pattern.  Her anxiety is to such a significant degree that it interferes with her daily emotional, behavioral, and academic functioning.  Until she learns to better manage her anxiety, the environment created for her should be as non-threatening (emotionally speaking) as possible.  It is also my recommendation that if Kaitlyn should at some point express that she does feel competent to deal with the situation, a decision could be reconsidered accordingly.

      Please do not hesitate to contact me with any concerns or questions regarding the above information.  I can be reached at 536-5473, ext. 177.  Thank you for taking the time to consider my input.

Sincerely,

Jodi M. Rosol, LICSW
Clinician, Mt. Tom

MT. TOM MENTAL HEALTH CENTER
a member of Behavioral Health Network, Inc.
40 Bobala Road, Holyoke, MA 01040   tel 413.536.5473   fax 413.536.2760