## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| **CITY OF CHICOPEE acting through** | ) |
| **CHICOPEE PUBLIC SCHOOLS,** | ) |
| **Plaintiff** | ) |
|  | ) **CIVIL ACTION NO. 04-30087-KPN** |
| **v.** | ) |
|  | ) |
| **DAVID T. As parent and next friend of** | ) |
| **KAITLYN T. and MASSACHUSETTS** | ) |
| **DEPARTMENT OF EDUCATION** | ) |
| **Defendants** | ) |

**DEFENDANT'S MEMORANDUM IN OPPOSITION TO THE CHICOPEE PUBLIC SCHOOL DISTRICT'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF ITS REQUEST FOR SUMMARY JUDGMENT FOR THE DENDANTS**

### INTRODUCTION

This case is an appeal pursuant to Mass. General Laws Chapter 30A § 14(1)(7) and 20 U.S.C. §1415(i)(2)(A) Individuals with Disability Education Act, (hereinafter referred to as the "IDEA"),  statutorily promulgated at 20 U.S.C. Ch. 33 § 1400 et al, of an underlying decision rendered by the Bureau of Special Education Appeals (hereinafter referred to as the "BSEA"),  on April 7, 2004.

### STANDARD OF REVIEW

It is well settled that the review process of cases on appeals from the BSEA is a limited review.  Legislatively and statutory authority does not provide the reviewing court with the broad latitude to alter the findings of the Hearing Officer.  The First Circuit Court of Appeals states conclusively on this issue:

> "While the IDEA envisions judicial review, the statute "is by no means an invitation to the courts to substitute their own notions of sound educational

policy for those of the school authorities which they review." *Lenn v. Portland School Committee, 998 F.2d 1083, 1084 (1st Cir. 07/15/1993) citing Rowley, 458 U.S. at 206. See Roland M., 910 F.2d at 989; Colin K. v. Schmidt, 715 F.2d 1, 5 (1st Cir. 1983).*

The First Circuit Court of Appeals also has held:

"In the course of this independent review, the administrative proceedings must be accorded "due weight." Although the exact quantum of weight is subject to the district Judge's exercise of informed discretion, the Judge is not at liberty either to turn a blind eye to administrative findings or to discard them without sound reason." *Lenn v. Portland School Committee, 998 F.2d 1083, 1084 (1st Cir. 07/15/1993) See Hampton, 976 F.2d at 52; G.D. v. Westmoreland Sch. Dist., 930 F.2d 942, 946 (1st Cir. 1991).*

The First Circuit Court of Appeals has also held that:

"'The court, in recognition of the expertise of the administrative agency, must consider the findings carefully and endeavor to respond to the Hearing Officer's resolution of each material issue.' In the end, the judicial function at the trial-court level is 'one of involved oversight,' *Roland M., 910 F.2d at 989;* and in the course of that oversight, the persuasiveness of a particular administrative finding, or the lack thereof, is likely to tell the tale. *Lenn v. Portland School Committee, 998 F.2d 1083, 1085 (1st Cir. 07/15/1993) citing Burlington, 736 F.2d at 792*

## ARGUMENTS

I   THE HEARING OFFICER'S DECISION WAS NOT BASED ON IRRELEVANT BACKGROUND TESTIMONY UNRELATED TO THE CENTRAL ISSUE OF THE CASE.

The School District's assertion that the Hearing Officer denied it their right to an impartial Hearing by relying on evidence outside the scope of the appropriateness of the 2003-2004 IEP, is unfounded. No where is there evidence in the Decision or the transcription of the testimony, that the Hearing Officer relied heavily on the 6th and 7th grade IEPs placed into evidence by the parents. Other than brief references to those IEPs the Summary of the Evidence there is no basis for the claim that the Hearing Officer relied on the 6th or 7th grade IEP to form

the basis of her Findings and Conclusions, either substantively or procedurally.  It is incredulous for the School District to assert that the Decision "heavily" resets on that particular evidence.

The parents acknowledge that the 6th and 7th Grade IEP's were admitted into evidence by the parents over the objection of the School District.  The School District's counsel maintained then as they do now, that the admission of such evidence was irrelevant in that the focus of the proceeding before the BSEA was proposed 9th grade IEP rejected by the parents.  Parents countered that objection stating that the 6th and 7th grade IEPs were being offered into evidence not as direct evidence of the appropriateness of the proposed IEP, but to rebut Mr. Shreier's statement at the Pre-Hearing Conference: "that it's a very big burden for a child who's receiving moderate special education services to go from receiving so few services all the way to a private day school."  TR Vol. I at 16.  The Hearing Officer rejected the parent's reasoning but stated there were other reasons to admit this evidence.  The Hearing Officer specifically stated, "This is background information.  It is helpful to me to understand how the student developed over time."  TR Vol. I at 17-18.  She then stated, "They're not probative of the appropriateness of the proposed plan, except to indicate that the school and the parent have, in fact, worked together in the student's interests over – previously, historically.  So depending on how the evidence comes out about the proposed plan, they may be helpful in determining whether there is a similarity in programs such that one could expect the same reasonable amount of progress under the proposed IEPs.  That's one use for them if they are similar." TR Vol. I at 18.

Based on the above language of the Hearing Officer,  nowhere does the she set a standard for herself that she was obligated to compare the similarities of the IEPs or that comparing the similarities was the only purpose for there admission into evidence.  In fact, she was clear that how the proposed IEP was submitted would have a bearing on how she would consider that

evidence.  As stated by the Hearing Officer in her statement "That's one use for them," inferring that there are a number of purposes for which that information could be relevant.    As the Plaintiffs point out, the IEPs from previous years were not similar, and they correctly point out that the Hearing Officer did not compare them, nor should she have.

It must be reiterated again that the language in the Findings and Conclusions of the Decision do not make any reference to the 6th or 7th grade IEPs.  All references in the Findings and Conclusions are in reference to events from the 8th grade school year.  Furthermore, all testimony regarding the 8th grade school year, or any other documents from the 8th grade, were entered into evidence as a direct result of the School District "opening the door" through its submission of that evidence directly or through witnesses.  For example, the School District referenced the prior IEP's and other records from the 8th grade school year through the testimony of Judith Souweine.   The Attorney for the School District asked Ms. Souweine "Now, tell us what you reviewed…."  TR Vol. III at 136.  Ms. Souweine responded "I reviewed several evaluations reports that were completed by the school system, including an evaluation by Miss Simon that was early in the student's school career and another one, a more recent one (in audible) 8th grade by Miss (inaudible)….I also looked at all of the IEPs that were supplied to me that  - I believe I saw IEPs starting in 2nd or 3rd grade all the way through the current IEP." TR Vol. III at 136.  Dr. Souweine then goes into great length talking about the other previous evaluations from earlier school years.

The School District also called as a witness Ms. Andrea Cameron, one of Kaitlyn's eighth grade teachers.  TR Vol. III at 156.  Ms. Cameron was asked by the School District's attorney specifically about her involvement working with Kaitlyn during the eighth grade in the "inclusion

classroom at Fairview Program." TR Vol. III at 158.  Ms. Cameron when into great detail about the service and the execution of the IEP from the School District's perspective.[1]

The parents assert that in the Findings and Conclusions of the Hearing Officer's Decision, properly focused on evidence and facts which led up to the proposed IEP. These procedural violations on behalf of the School District, included not giving the parents meaningful access to the READ 180 Summer School Program, or responding to the parents concerns in a meaningful manner.  Moreover, these and other procedural violations discussed in the decision are in direct relationship and relevant evidence with respect to the process that created the proposed IEP for the 2003-2004 school year, which led to the parents rejecting it.   For example, Ms. Cameron, who was at the TEAM which created the proposed IEP, stated at the Hearing that she felt the 9th grade Academy would be a "good fit" for Kaitlyn, despite never having seen the program, nor having any familiarity with the READ 180 program. TR Vol. III at 212-231,247. It was this type of testimony which caused the parents to second guess the School District's proposed program. The Hearing Officer also pointed out that the School District wasn't even offering READ 180 for the amount of time recommended by Scholastic.

Despite the Plaintiffs assertion to the contrary, the Hearing Officer clearly states in her Decision that the pattern of procedural violation did not rise to the level of rendering the IEP automatically void for lack of FAPE.   The Hearing Officer stated in the Decision, that those procedural violations only factored into her Decision when considering what weight to give the

---

[1] Ms. Cameron went into great detail about the services offered to the parents in the eighth grade IEP.  She stated "We also discussed that we had the Homework Club before and after school that was offered to her to give her any one to one help that she needed with an English teacher that would have been there to do that. We also offered  - there's an after school MCAS prep class that she could have taken that focuses on English language arts that she could have gone to.  And then I also offered extra help class during my lunch half hour, because the student wasn't in the academic support class." TR Vol. III at 169.   Ms Cameron also stated "It was my understanding that she had been successful in the 6th and 7th grade." TR Vol. III at 173. Ms. Cameron then goes into great discussion regarding the programs and specifically Kaitlyn's performance all the way back to 5th grade.

"parent's belief  that Chicopee could not develop an appropriate educational program for their daughter and the resulting unilateral placement."   (Decision p 10).   The Hearing Officer's reasoning and basis for evaluating evidence and determining what weight to give the evidence is clear and well supported by the record.

II   THE PARENTS MET THEIR BURDEN OF PROOF THAT THE IEP AND PROGRAM WERE NOT APPROPRIATE AND THAT PLACEMENT CHOSEN BY THE PARENTS WAS APPROPRIATE

This case was unlike any other case prior to it in that it focused on READ 180 and specifically whether it was a program designed to remediate language based learning disabilities. Again, this case focused on the School District's proposed IEP, which offered READ 180, a Scholastic Inc. program, as its sole form of remediation.   The parent's request for Hearing asserted as early as June 30, 2003 stated:

> "The IEP offered for the 2003-2004 School Year seeks to place Kaitlyn in a program that will offer some reading pullout.  The School District will be using the program READ 180 to remediate Kaitlyn's disability.  The parents assert that the program offered by the School District is not intensive enough. The parents also assert that READ 180 is not a program that is designed to effectively remediate the type of disability Kaitlyn has.  Moreover, the School District's program and IEP fail to provide real services, methodologies and the intensity Kaitlyn needs in order for her to achieve FAPE." AR Vol. I at 5.

At the hearing the parents met their burden through the testimony of the parent, David Tharaldson, Jodi Rosol, Kaitlyn's therapist, Dr. Robert Kemper, and David Drake, the director of the White Oak School.

The father testified generally about Kaitlyn's educational career and his personal observations about her becoming more and more distressed, not as an expert, but as a father who was observing his child go through something very painful and heart wrenching.  TR Vol. I p.

41-159.  David Tharaldson admitted on cross examination that he was not an expert that he is "just the father."  (TR Vol. I p. 157).   In that capacity he testified about becoming alarmed by testing done by the School District during Kaitlyn's eighth grade school year and how that led specifically to his acquiring the services of an advocate to advise him and then Dr. Kemper and his evaluation. TR Vol. I p. 44-65.   David Tharaldson then testified in great detail as to how he relied on the advice and counsel of others who had expert knowledge as to the testing results and programs to help him make many of his decisions, such as rejecting the IEP and unilaterally placing his child. TR Vol. I p. 122.

The Defendants acknowledge that the Plaintiff's assertions in its Motion for Summary Judgment that the David Tharaldson, the father, based his decision to reject the IEP on the recommendations of his advocate, and that he never showed the proposed IEP to Dr. Kemper prior to rejecting it, are true.  However, even if true, there is nothing wrong with these decisions of the parent.   Moreover, the opinions of those who advised the parent were present to provide testimony before the BSEA and thus, the Hearing Officer was able to discern for herself the validity of their advice.

The parent also acknowledges that they visited the White Oak School before the June 2003 TEAM meeting.  There is nothing unlawful about this or any of the above mentioned actions of the parents in exploring alternative avenues.   The parent eloquently testified about why he rejected that IEP and how he made the decision to unilaterally place his child at White Oak School.  He stated at Hearing "We made that decision basically to save our daughter.  At that point in time, you know, the wheels had come off the bus; Kaitlyn was losing – Kaitlyn had lost faith in the school system and she was losing faith in us.  It seems as though she was holding us responsible for not really solving her problems for her, and we just decided that in order to get

our daughter back, that we needed to explore other options." TR Vol. I p. 73. The father's contribution as a witness to this case was in the capacity as a father as to his personal and fatherly observations.

The Hearing Officer appropriately considered the testimony of the father, who after, all has valuable insight into the child from a perspective the experts do not have.  For example, the father testified as to his personal observations of Kaitlyn after being placed at White Oak School for little more that half a year.  He stated "She's a new kid. Totally a new kid. She's really doing well there academically, emotionally, spiritually, the whole bit.  Everything from A to Z.  She actually enjoys going to school, which is something hat is just different from what we've ever heard from Kaitlyn before.  She used to hate school, she used to detest it, and now she can't wait to get back there." TR Vol. I p. 77.

On cross examination the School District attempted to discredit the parent's testimony, but was unsuccessful.  Even now, pursuant to its Motion for Summary Judgment, the School District attempts to keep the possibility alive that the parent "rushed to judgment" and condemned the IEP before it emerged at a final product.  This notion is not only preposterous, but it is not how that IDEA contemplates parental involvement.  The School District states "despite rejecting the IEP the parent acknowledged that the IEP had 'flexibility.'" The father responded, "Yeah, I rejected the IEP, because once you accept, you know, your options are limited.  If you reject it, you still have other options open to you." TR Vol. I p. 128.  The parent properly rejected an IEP he did not believe offered FAPE.   The School District is trying assert that the parents had a different understanding of the IEP, one that extends beyond the four corners of the document.  The School District's use of the word "flexibility" is and always has been an excuse and an attempt not to get pinned down by an IEP because it was lacking specific

services.  The creation of an IEP is governed by strict federal and state regulations. *See 34 CFR 300 and 603 CMR 28.00.*  The regulations seek to ensure that all services are listed in the IEP in there appropriate places.  Therefore, the School District's attempt to suggest that there were services available that were not listed in the IEP; that the parent should have know this, and specifically that they should have known what those services were, is not only ridiculous, but it is a contrary to the federal and state regulations.

At the Hearing the School District's again and again tried to put the onus on the parent. The School District contended that the parents knew that the READ 180 program was being offered over the summer and that the parents were responsible for her failure to attend.  This is not what was reflected by the testimony of the father.  David Tharaldson testified with respect to the READ 180 summer services, that they knew they were being offered, "but we received a note that Kaitlyn had been placed on the waiting list, so, you know, that was it."  TR Vol. I p. 72.  On cross exam the father testified again "the only time that we reviewed anything during the summer was, I believe somebody from the high school sent us -  or actually, no, left a message on our phone saying that the program was going on, but at that point in time, it was either half or three-quarters over." TR Vol. I p. 159.  Again the Decision of the Hearing Officer appropriately put the onus back on the School District for not only offering, but ensuring the execution and delivery of those services. TR Vol. I p. 103.

The Parent's key witness, Dr. Robert Kemper testified that Kaitlyn needed to receive intensive rule based language services derived from Orton-Gillingham principles, in a substantially separate, multisensory classroom, across all academic domains with similarly situated peers.  A.R. Vol. 1 at 150. TR Vol. II at 95, 102.  Dr. Kemper went into great detail describing what a rule based or code emphasis program consisted of and more importantly why

Kaitlyn needs this type of program.  (TR Vol. II at 95, 102-107).  Dr. Kemper also testified as to the difference between a "reading pathology, or a reading disability and a child who is behind in reading."  (TR Vol. II at 108).  As he testified, "a reading pathology or a disorder, it's a neurologically-debilitating condition that exists despite that child having had all of the prerequisites of reading in the home, being read to, rich literature, literate parents, and etcetera." (TR Vol. II at 108-109).  He went on to add, "children who are – often times who come from lower-income urban areas do not have a language pathology.  The neurological make up for these children may be normal.  However, they may not have exposure to reading, being read to, two parents who are literate, who have graduated from high school; possibly they may not have had that rich environment." TR Vol. II at 109.

Dr. Kemper, through his testimony carefully described each test he administered, what the test was used for, what it indicated to him.  He also described how he analyses his results using the pyramid or triangle of literacy and underpinnings of language.  As he testified, the standardized tests that he administers indicated to him that Kaitlyn's disability required her to be placed in a substantially separate language based school.  From the materials provided to Dr. Kemper and the communications from the parent, their advocate and their attorney, it was readily apparent that this was not a language based classroom which catered to all special education students with similar language based learning disabilities.

Dr. Kemper testified that he had also reviewed the READ 180 literature provided to parents. TR Vol. II at 107-108.  This is also the same materials provided to Dr. Souweine.  After reviewing the READ 180 materials Dr. Kemper testified "Well, it appears that this is a program that provides basic foundation skills in reading to children typically who would be from inner city, lower income, urban areas where these children may not have had the environment that

would be conducive to becoming good and competent readers." TR Vol. II at 108.  Moreover, Dr.

Kemper testified that he could not find anywhere in the literature that this was a program for

children with language disorders or pathologies.  TR Vol. II at 108.  He also testified that READ

180 is not an Orton-Gillingham or rule based program. TR Vol. II at 109.

Dr. Kemper was specifically asked about buzz words READ 180 uses in it promotional

literature like 'fluency' and 'phonetics' and 'phonemes.' and what was the difference between an

Orton-Gillingham program, and READ 180, if it's using some of the same words.  TR Vol. II at

110-111.  Dr. Kemper discussed that READ 180 is merely a computer based program, that it was

not a trained individual and that it did not utilize the Orton-Gillingham principles of code

emphasis, and it was not one to one. TR Vol. II at 111.

The Plaintiff's attempt to discredit Dr. Kemper, stating in its Motion for Summary

Judgment that he is not a "reading specialist" because his is not licensed in the State of

Massachusetts as a "reading specialist," is absurd.   As Dr. Kemper fully discussed his

educational background, and experience it is clear that he is eminently qualified not only at

diagnosing reading disabilities, but understanding the actual breakdown in the child's ability to

read, and prescribing effective recommendations and methodologies to remediate the disability.

TR Vol. II at 27-38.   It is also especially troubling for the School District, that they would now

maintain that Dr. Kemper is not a reading specialist, because they embraced his

recommendations.  As the Hearing Officer noted in her Decision that the Plaintiff never disputed

Dr. Kemper's findings or recommendations.[2]   Instead the School District's case consisted of

---

[2] The Hearing Officer held: "Chicopee argued that its reading class, using READ 180 program, met Dr. Kemper's recommendations for direct, systematic reading instruction. I disagree. …The evidence in this Hearing established that READ 180 is a new, exciting, engaging computer assisted tool for developing reading fluency in disadvantaged students attending large public school systems. There is no evidence, however, that it is a targeted, rule based, phonetic system designed to remediate individual reading disabilities. Without showing of effectiveness with the

trying to persuade the Hearing Officer that READ 180 met the criteria as described by Dr. Kemper in his Psycholinguistic Evaluation.

Furthermore, the notion that Dr. Kemper needed to form his opinions by talking with the 8th grade TEAM is also unfounded.  Dr. Kemper's testimony would not have effected had he been advised by the School Districts teachers.  Furthermore all they were offering was a before and after school homework club.  Similarly, Dr. Kemper's opinion would not have been altered had he been advised that Kaitlyn had been withdrawn from the academic support class earlier that year.  Additionally, he did testify that he reviewed the eight grade IEP and thus he was aware that these types of service were proposed in the past.  However, again these types of academic support services were not even close to what he was recommending.  The School District's assertion that Dr. Kemper was not aware of Jodi Rosol, Kaitlyn's therapist, also had no bearing on his testing, or his recommendations.   Dr. Kemper testified that information of that type of disorder does not factor into the testing that he performs. (TR Vol. II at 153).

This leads directly into the testimony provided by Jodi Rosol, Kaitlyn's therapist.  Jodi Rosol testified that the purpose behind the therapy was "concern for Kaitlyn's struggle with learning, for anxiety, for problems with self esteem, self-image." TR Vol. I at 167.  She testified that Kaitlyn had disclosed to her in therapist in the past that "I'm stupid; people think I'm a retard.  I don't like myself. I can't learn, I get frustrated in school.  I have a hard time with homework.  People think I'm weird." TR Vol. I at 168.  Ultimately, Jodi Rosol testified that she no longer needed her services and that she was only staying on in the event that she was forced after the Hearing to go back to the Chicopee Public Schools.  Moreover, Jodi Rosol was yet

---

language disabled population, the Parents were entitled to maintain a reasonable degree of skepticism about the READ 180 program"

another person who could testify as to Kaitlyn's dramatic turnaround once being enrolled at White Oak School.

On cross examination, the School District specifically made reference to a letter that Jodi Rosol wrote and sent to the School District in which she stated that Kaitlyn should be withdrawn from the academic support class because of "heightened anxiety."    The School District has repeatedly tried to make this letter into something it was not.  As Jodi Rosol explained "She was having peer issues with another girl …a lot of teasing, she reported a lot of teasing by this girl, and because of Kaitlyn's issues, she was having a very hard time coping with that, and her anxiety was through the roof, so to speak.  She couldn't focus on anything but that issue." (TR Vol. I at 170).    It was Jodi Rosol's testimony this child did not exhibit excessive anxiety unrelated to anything, which would have been a concern if true.  Her testimony was that Kaitlyn was normal teenager in that she was showing anxiety directly related to an ongoing dispute she was having with another peer and low self esteem and depression because of her lack of success in school.

The parents concluded their case with the testimony of David Drake the director of the White Oak School.  David Drake briefly testified as a rebuttal witness as to his own observations of Kaitlyn socially emotionally.  He stated "Socially emotionally, I see her in the lunch room and at school breaks, in the hallway.  I also talk with her teachers about how she is doing.  And she is associating very well with the other students.  She feels that it is – that she's with the other kids who are like her for the first time.  She's feeling normal.  She's feeling that she can be herself and she doesn't need to hide it." (TR Vol. III at 49).  He also testified that "it's not unusual for me to see issues of mild anxiety, dysthymia, dysphoria, being secondary or tertiary products of a

student's experience of continued failure and frustration in school environments." (TR Vol. III at 62).

However, the main purpose for the testimony of David Drake was with regard to his knowledge of READ 180. In fact, almost all of David Drake's testimony pertained in one way or another to his knowledge regarding rule based programs and methodology for language based students, and how READ 180 is a program he has seen, and why rejected it as inappropriate for his program which caters exclusively to children with language based learning disabilities. (TR Vol. III at 19, 110). David Drake through complicated and detailed testimony described the differences in rule based methodologies versus what he observed in READ 180. (TR Vol. III at 20-41). David Drake also had first hand knowledge regarding the creator of READ 180, how he began not in educational programming but computers, and his sale of READ 180 to Scholastic. (TR Vol. III at 20-26).

David Drake also discussed his own research into READ 180 and came away from it with the same concerns expressed by Dr. Kemper, that this is a program for disadvantaged inner city children. He states "Well, I saw it was a very professional, slick little computer program which had attractive people on it, some very high end, expensive graphics. It, on the other hand, seemed to – in the area of my interest, seemed to show a real lack of understanding of the best practices in my field. I was disappointed, I have to tell you, because I had seen, in looking through their promotional material, a vast array of buzzwords that are hot in the field …like scaffolding, automaticity, phonemic awareness, phonological processing." (TR Vol. III at 32-33). David Drake described his own experiences with READ 180 and specifically why it was lacking for children with language based learning disabilities. (TR Vol. III at 32-41).

In its Motion for Summary Judgment, the School District states that David Drake could not offer any opinions regarding the appropriateness of the proposed Chicopee program. This is untrue and not reflective of his testimony as evidence by the administrative record. David Drake was specifically asked on cross examination "You have no basis of knowledge that you can give this Hearing Officer relative to the appropriateness of the 9th grade Academy program that has been developed for Kaitlyn and the other students at Chicopee High?" David Drake responded "No, I don't believe that's true." (TR Vol. III at 64). He then stated, referring to READ 180, "Well, I believe that, given the substantial component of the proposed program, as it was related to me, involved the use of a this computer system, I believe I do have knowledge in that regard." (TR Vol. III at 65).

The School District makes another outlandish statement in its Motion for Summary Judgment, that the White Oak School is now not appropriate because it does not have on its staff a speech and language pathologist, or mental health counselors. Once again, the parents assert that the School District stipulated that the White Oak School is a state certified school specializing in remediating Language Based Learning Disabilities. Also, mentioned later herein, Judith Souweine, testified that White Oak School is appropriate. TR Vol. IV at 65.

The School District had hoped to prove that the "Academy" program, and READ 180, provided the same type of services being provided at White Oak School. If they could have proved that the Academy program was at least reasonably calculated to provide some special education services, then that program, which is the least restrictive environment, would automatically be considered the appropriate placement, and the parent's arguments for the appropriateness of the White Oak program would have been moot under the second prong. However, the School District never argued against White Oak School at the Hearing and the

service it provides.  All the marbles were riding on the issue of whether the Academy Program and Read 180 were appropriate.  Once it was determined by the Hearing Officer, after the close of the School District's case, that READ 180 was inappropriate, automatically the parents prevailed on the second prong.  Therefore, based on the fact that that School District stipulated to the appropriateness of White Oak School, there is nothing in the testimony to discuss, thus, this memorandum will not discuss the parent's meeting the second prong.  Nor will this memorandum respond to any of Dr. Souweine observations of White Oak School.

With respect to their first burden, the parents fully established that the IEP proposed by the Chicopee Public Schools, which rested solely on Read 180 as its sole form of remediation, was not a program designed to remediate Dyslexia, an thus it was not appropriate.  With respect to the parent's second burden, proving that the White Oak School was appropriate, the School District stipulated that White Oak School was appropriate by stipulating to Tiffany Drumm's proposed testimony and a portion of David Drake's testimony.  Moreover, Judith Souweine, the School District expert witness, testified that White Oak School was appropriate. [3]

### III  THE PLAINTIFF'S ASSERTS THAT IT MET ITS BURDEN THROUGH THE PRESENTATION DR. SOUWEINE'S TESTIMONY AND THE TESTIMONY OF JANISE WALSH AND DAN SCHREIER IS NOT SUPPORTED BY THE RECORD.

The School District's key witness, Dr. Souweine, was put forth by the Plaintiff to show that Academy Program was appropriate and that READ 180 was an effective methodology that could remediate Kaitlyn's Dyslexia in the manner described by Dr. Kemper.  The Plaintiffs

---

[3] Dr. Souweine testified "I would say that the student appeared comfortable in the environment. She appeared to have peers that she was friendly with. I don't – I didn't see any evidence of difficulty in terms of her participation in the program at all" AR vol. IV p. 45.  She later stated "I would say the White Oak Program is an appropriate

asserts on a number of occasions that they can't understand how Dr. Kemper's testimony was credited over the testimony of Judith Souweine.  As the Decision points out, the School District personnel did not dispute Dr. Kemper's recommendations for programming.  Instated, they embraced his recommendations and attempted to show that READ 180 was a program that met the criteria as described by Dr. Kemper.  The following statement in its Motion for Summary Judgment is further proof that they still do not dispute Dr. Kemper's recommendations:

> "Dr. Souweine was shown Dr. Kemper's report TR.  Vol. I at 151-168, and asked to review his recommendations on page 12 of the report TR. Vol. I at 162.  … Dr. Kemper recommended that the student be educated in a separate, multi sensory, language intensive program.  Dr. Souweine testified that the 9th Grade Academy Program at Chicopee High School was indeed multisensory and language intensive as well as highly structured.  (TR Vol. IV at 61).  The program provided direct remedial instruction and methodologies which allowed students with language disorders to learn effectively and efficiently as recommended by Dr. Kemper. (A.R. Vol. I at 162, TR Vol. IV at 61)."

As the Decision also clearly points out that Dr. Souweine had no previous personal or expert knowledge of READ 180.  The Plaintiffs omit that reasoning from their argument.  Dr. Souweine testified "I had no prior knowledge of this program except for having read about it in Sally Shaywitz's book…but this was my first introduction to this program was when I saw it in Chicopee." TR vol. IV p.115.   As pointed out by the Plaintiff, Dr. Souweine tried out the program herself.  She testified " And I tried it out myself because that's the best way to learn about something." TR vol. IV p. 115.  If she is learning about it she can hardly be an expert. The Defendant's assert that this testimony disqualifies Dr. Souweine from being considered as an expert witness regarding READ 180.    Whereas she had no knowledge of the READ 180 program her testimony at Hearing was appropriately given little weight.

---

educational environment for her, but it does not meet the criteria of the least restrictive alternative[3] where she could

The Hearing Officer appropriately found, that that in addition to Dr. Souweine not personally evaluating the student that: "Dr. Souweine's knowledge of the READ 180 program came solely through the materials presented to her by Chicopee and her observation of Chicopee's use of the program." The Plaintiff argues that the materials Dr. Souweine reviewed were not all from the School District. The Plaintiff is splicing words; the research studies were done by READ 180's maker Scholastic, as promotional literature, and given to Dr. Souweine for her review by the Plaintiffs. In other words there are no independent research studies on READ 180. Furthermore, the READ 180 promotional documents and the READ 180 research studies are in the administrative record and are available for this courts review. Once again, the record will show that no one who testified could show in any of these documents that this program is for children who suffer from language based learning disabilities such as Dyslexia.

Dr. Souweine's testimony, with respect to her personal observations and knowledge of READ 180, did nothing to bolster the Plaintiff's case. She states "so my impression of the program both based on the research that – again, albeit it's new, there isn't that much research that accompanies it, but they did use it on large scale populations, and the fact that I saw it in operation with kids who you would not traditionally assume would be excited about doing this, and I saw them doing it." TR vol. IV pp. 116-117. Her opinions were based on statements such as this "I saw it in operation, and I was totally impressed with how this group of youngsters, who are of a similar age – and I don't know their exact level of functioning, but I could see what they were reading, so they weren't reading at the highest level, they were engaged in this process and making progress." TR vol. IV pp. 117-118. "Those children in that class I saw were all children who struggled with reading, writing, spelling. So it certainly was a group of – I'm not going to

be educated appropriately." AR vol. IV p. 65.

opine about the similarity of their IEPs or of their diagnosis, because I didn't read those things particularly." TR vol. IV p. 118. She also did not even know if the children were special education students.  It was asked of her "Where all the children in the Read 180 program on IEPs?" She answered: "I believe so. I don't know to a child, but my recollection of my conversation with the teacher was that they were on – all on IEPs.  And my understanding again, I think the SPED director would be a better person to ask this question to – is that the licenses, the way they purchased the program from Scholastic was specifically for children with learning disabilities, and therefore I would imagine those would be people on IEPs." TR vol. IV p. 123.

On direct examination Dr. Souweine was asked "Can you learn it (referring to Dyslexic children) without the rules?" (meaning without rule based methodologies) She testified "I believe they can, and there is some research that supports that approach." TR vol. IV p. 38.  This research was never produced. This line of questioning was followed up on cross examination.  When asked about the research she previously mentioned for non-rule programs, Dr. Souweine stated that she was aware of some programs being developed at UMASS and possibly being used in Gilmontague Schools. TR vol. IV p. 93.  Ultimately, when questioned about this program and how it is utilized by school districts, she testified, "I can't really tell you how school districts are using it, that goes beyond my knowledge of how it is used, but I have seen it used in [UMASS] lab in the absence of rule based programming." TR vol. IV p. 93.

In essence, Dr. Souweine is a psychologist and not a speech and language pathologist. She even testified "I wouldn't call myself a reading specialist, meaning a reading teacher, but I do consider myself a specialist in terms of diagnosing reading disorders." It should be noted again that the diagnosis was never in dispute.  The issue was whether READ 180 could remediate

dyslexia.   To this matter Dr. Souweine had no expert or relevant personal knowledge of the READ 180 program.

Despite the Plaintiffs assertions to the contrary, the Hearing Officer's findings that Dr. Souweine lacked personal knowledge regarding her expert testimony regarding her review of the previous testing is well supported the record.

First, it is important to note that the Melissa Mannello evaluation is an evaluation performed by the School District.   It is a Speech and Language evaluation.   This is the same type of evaluation administered by Dr. Kemper.   This type of evaluation is different from intelligence testing and/or psychological testing done by an neurologist or psychologist.   Dr. Souweine is not a speech and language pathologist, but rather a psychologist.   Moreover, the School District chose to have Dr. Souweine review the testing of Melissa Mannello, rather than have Melissa Mannello testify about the tests she administered.

Second, Dr. Souweine specifically testified that she was confused regarding her review of the testing administered by Melissa Mannello.   On direct examination, the Plaintiff's attorney asked Dr. Souweine what her impression was from review of Melissa Mannello's evaluation. Dr. Souweine answered "In the two test dates reported in this evaluation, 12/4 and 4/9, there are results that are somewhat discrepant from each other, which I can't totally explain in this – because I didn't administer the tests, and I certainly didn't look at the protocol.  So it's a little hard for me to totally understand them." TR vol. IV p.8.  She then adds later "the part that is confusing to me is that part on the similar test, in terms of its description and what its purporting to measure, the Woodcock–Johnson Test of Achievement letter/word identification, (the student's) score is solidly within the average range, a standard score of 95-94, whereas the standard score on word reading is 74.   The difference in those scores is tremendous. It's two

standard deviations, which doesn't – that's what I'm saying, it doesn't make a lot of sense to me. All of these tests are really administered in the same way. …So a standard score of 74 or 79 on the WIAT and then a standard score of 94 on the letter/word identification really just doesn't make a lot of sense to me in the sense of, how could these be so different? You know we could all spin out some hypothesis about, you know, one day she was, you know, in a better mood or, you know, more cooperative or something like that, but it just doesn't make sense to me…So when I say I am a little confused, I'm being really honest; I don't understand how she could score in the average range on one test and so differently on another test" TR vol. IV pp. 15-17.  Dr. Souweine was asked "as someone with a clinical background, do you have any theories?" TR vol. IV p.17.  She answered "Well, it's possible it's related to the test itself. It's possible the norming of the test is quite different between the two tests or the – it's possible that the method of presentation, could be the length of the test, the way the test is laid out, might have created some differences. It's possible, looking more from a more psychological point of view, attention and concentration could impact someone's performance on a test like this. It's possible that anxiety could influence a youngster's performance, and it's also possible that motivation could influence the performance. I really think it's beyond my knowledge to know which of any of those were present here. But I want to highlight that it isn't a clear picture that (the student's) skills are so discrepant from her peers. That's really the point I'm trying to make." TR vol. IV p. 17-18.  Dr. Souweine's testimony on direct examination clearly showed that because she did not administer the test herself she was unsure of many conditions which went into determining where Kaitlyn was functioning.

On cross examination Dr, Souweine also testified that she was confused by the Melissa Mannello speech and language evaluation.   On cross examination the Melissa Mannello's

evaluation was placed in front of Dr. Souweine.  When asked about her comments on direct examination that it was confusing, she  stated, "I found some of it confusing."   This was her testimony and it should stand.

In addition to Dr. Souweine not having personal knowledge of the testing conditions, she also had no personal or expert knowledge of many of the tests used by Dr. Kemper and Melissa Mannello.  Dr. Souweine was asked on direct examination to comment on the Slosson Oral Reading Test.  She was unable to comment because she was not familiar with that test.  She was then asked to comment on the Grey Oral Reading Test performed at the White Oak School.   On direct exam she stated that she was unable to comment on the results in that the test results were incomplete, missing certain rate and accuracy scores.  She states "I don't know exactly what it reflects…" TR vol. IV p. 22.  She was then asked to compare the reading comprehension section of the Grey Oral Test, in general, to the Woodcock-Johnson or the WIAT tests, in general.   With regards to the WIAT test, Dr. Souweine testified "I can't give you a very good answer about that, because I don't give the WIAT enough to really have a strong opinion about how they compare." TR vol. IV p. 26.  She was then asked "How, if at all, would you anticipate that that level of anxiety would impact on her academic functioning and her testing performance? She answers "Again, without first hand knowledge or a lot of information from the testing, in general, I would say that anxiety can have a tremendous impact on how children perform in a testing situation…" TR vol. IV p. 27.

On cross examination she was again asked to look at one of the tests performed by both Dr. Kemper and Melissa Mannello, an evaluation called the CTOPP.  When asked if she administered the CTOPP she testified "no." TR vol. IV p. 71.  She was asked to comment on language in the evaluation regarding the fact the Melissa Mannello deviated from the standard

administration of the test allowing the child to take additional time and the test was read to her rather than having to read it for her self.  Dr. Souweine acknowledged "Well, certainly it wasn't the standard administration of the test, because as the examiner says, she deviated from the prescribed practice by not using the tape, and so she did it orally, which would certainly change the results of the test." TR vol. IV p. 72.  Asked about the next test on the evaluation, the WIAT, when asked if she administers that test, she answered, "I don't use the WIAT." TR vol. IV p. 73. She then had some familiarity with the Woodcock-Johnson, however, when asked "is it fair to say that with the Woodcock-Johnson, once again, this is another diagnostic test?" to which  she testified "Yes." TR vol. IV p. 75.   The she was asked again about the Grey Oral.  She previously testified based on White Oak's administration of the Grey Oral that she couldn't extrapolate anything from those results because of missing numbers.  On cross she was made aware that Dr. Kemper had also done the Grey Oral Evaluation and clearly provided all the relevant numbers. She then concurred when asked if his findings found Kaitlyn to be functioning in the below average range.  She was asked, "But essentially, these [scores] are all below average, correct? She responded "They are all below average." TR vol. IV p. 80.  She was then asked about the Slosson Evaluation to which she responded "Yeah, I don't – I don't really know the Slosson." She was then asked about the TOWRE and TORC-3 evaluations given by Dr. Kemper.  She stated "Again, I am not familiar – I haven't ever given the TORC-3, so I don't – I wouldn't have a lot to say about it." TR vol. IV p. 89.  She was then asked about the TOWL-3 Dr. Kemper administered. She again testified "I don't administer, but I know this test a little bit better." TR vol. IV p. 89.  The she was asked about the Test of Written Spelling.  She testified she did not administer that test either.  TR vol. IV p. 89.

The Plaintiff chose to have a psychologist review the evaluations of speech and language pathologists. She not only was not an expert in READ 180, but she had little personal knowledge regarding the tests administered by the School District's own speech and language pathologist, Melissa Mannello. Please also note that this was the School District's evaluation and at no time was Melissa Mannello called as a witness to testify as to her evaluation.

Dr. Souweine also testified that she observed the proposed 9th Grade Academy at Chicopee High School. Once again her testimony about the program was not based on personal knowledge, but relied heavily on information provided to her from the School District. For example, Dr. Souweine testified that she was impressed with the communication aspect of Chicopee's program described as the 9th Grade Academy. She testified, "As it was explained to me, there was time put aside in the teacher's day to meet as a team, and I think that's critical feature in making a program successful." TR vol. IV p.54. Ms. Janis Walsh, a teacher of the learning skills classroom, also testified "at the end of the day, every single day of the week, we meet as an entire team and discuss how the students in the program are doing. And I must say that's an element that was absent when I did similar work at Central High School, and I completely agree with Dr. Souweine's opinion that that is the glue that holds a program together." TR vol. IV p. 130. At the time of this testimony it appeared that the 9th Grade Academy was made up of sixteen special education children. It was later exposed by the Hearing Officer by questioning Ms. Walsh directly that, as Ms. Walsh testified, "the 9th grade academy at Chicopee High School is all of the 9th Grade." TR vol. IV p. 184. The Hearing Officer asked "so the common planning time is not only for the 16 special ed. students? … It's also for other students, the mainstream students?" Ms. Walsh answered "Right." TR vol. IV p. 184. Moreover, the meeting time that Dr. Souweine testified about, that was impressed upon her as part of the

program, that was so important in her opinion, was erroneous and overstated.  It was really time put aside at the end of the day for the teachers of the entire 9th grade to communicate or prepare for the following day.

Dr. Souweine also testified that she had a difficult time understanding what the 9th Grade Academy was.  She testified "Well I'm not really sure what's the 9th grade academy, whether that's a separate idea." TR vol. IV p. 60.  She was asked whether the program proposed had an individual tutorial. She answered "It was my understanding that the program as planned included an individual tutorial. I didn't observe." TR vol. IV p. 63.   The impressive communication that Dr. Souweine was informed about later evaporated.   After Dr. Souweine's testimony Ms Walsh testified that she had not been trained in READ 180, (TR vol. IV p. 188); she testified "I don't give direct reading instruction." TR vol. IV p. 183; and that she had not met the speech and language pathologist. TR vol. IV p. 178.

Eventually, on direct examination Dr. Souweine was asked, in her expert opinion, whether the program proposed by Chicopee was appropriate, she answered. "It's my opinion that the program as described in the proposed IEP would have been appropriate to meet her special education needs." TR vol. IV p. 64.  When asked what was the basis for her opinion, she testified "based on all the evaluation reports, which suggest a variety of services, as well as her performance in previous years, I feel that the program as proposed, which included a strong remedial component in language arts area, combined with careful inclusion model, utilizing very experienced special educator, with careful and consistent programming across the curriculum in content area subjects, would have provided an appropriate education in the least restrictive alternative." TR vol. IV p. 65

Dr. Souweine's expert opinion, as discussed in great detail above, was based on other's evaluations where she was either unsure of the results, either because she did not administer them herself, or because she had no knowledge of the tests. She also stated that her opinion was based on the fact that the program had a strong remedial component, namely READ 180, but she had no prior experience with it, and thus, she had no personal or expert experience with it to justify its short term or long term use. She mentioned the use of experienced educator. The testimony revealed that the learning skills teacher had no training in READ 180 and that she had no idea who the speech and language pathologist was. On cross examination Dr. Souweine testified that she was aware that only one teacher at Chicopee High School had been trained by the School District in READ 180 Program, and that she had only one year of relevant teaching experience, which came after working at Mass Mutual for twenty years. TR vol. IV p. 95.

The School District next placed Janise Walsh on the stand. Ms. Walsh was a teacher who teaches an academic support class. She would have been providing services to Kaitlyn had she attended the Academy. However, before discussing the testimony of Janise Walsh, the School District in Its Motion for Summary Judgment, make two statements still attempting to make it appear that the 9th Grade Academy was a separate small program made of all children who all had language based learning disabilities who would be provided with language based reading methodologies, and that all the teachers got together at the end of every day to discuss the 12 or 16 children in the program.[4] This notion was completely fractured by Ms. Walsh's testimony.

---

[4] First statement "Clearly the 9th Grade Academy Program is not a regular education mainstream program as understood by Dr. Kemper when he testified. It is a co-teaching, inclusion program with a low student teacher ratio ranging from one-to-one reading tutorial, to a science class with 12 students and two teachers. Language based teaching strategies and instruction occur across all curriculum areas at a pace consistent with the student's needs. Teachers have volunteered to participate in the 9th Grade Academy." Plaintiffs Motion for Sum. J. pg. 30. The second statement in Its Motion for Summary Judgment, Mr. Schreier is portrayed as the director of the "school within a school." Plaintiffs Motion for Sum. J. pg. 33. Mr. Schreier never testified to this effect. The term "school within a school" came from the testimony presented by Janice Walsh, who discussed her role as a special educator at

Ms Walsh testified "Well, the students I'm currently working with have – specific learning disabilities. They respond, they're in the average range of intellect.  Sometimes it's low average."  TR vol. IV p. 136.  She then states "My kids, many of them go to some sort of reading class during period one." TR vol. IV p. 137.   On direct, Ms. Walsh was asked "So you're not responsible for teaching READ 180?" to which she stated "No."  TR vol. IV p. 153.  She specifically  stated "I don't do anything with the READ 180.  The only instruction that I give is, if we are reading and students are having difficulty with any particular word, I would help them sound out that word …but I don't give direct reading instruction." TR vol. IV p. 183. Ms. Walsh later stated that she has had no training in READ 180.  TR vol. IV p. 188.

On direct she was also asked about who supplied the speech and language pathology.  She responded "I don't know the speech pathologist." TR vol. IV p. 153.  On cross she was asked again about the communication that she stated was the "glue that held the program together." She was asked "So it is fair to say that when the you have – the academy meet with the team …all the classroom teachers, the speech and language pathologist isn't there?" She answered "No, we've not met with the speech and language pathologist." TR vol. IV p. 178.

The vagaries of Ms. Walsh's testimony prompted several questions from the Hearing Officer which proved to be the final death knell for the "Academy."  First, she stated that class sizes for the mainstream classes were not small, "our classes run from 12 to 20 in terms of numbers of students that are in the class." TR vol. IV p. 180.  Furthermore, the teachers in those

Central High School in Springfield, where she was instrumental in creating the "school within a school." TR vol. IV p.127.  For the record Ms. Walsh was asked on cross examination about her experience at the school within a school. The question was posed "And once again you indicated that program was specifically designed to combat failure due to attendance?"    She answered "Yeah, pretty much, kids that were not motivated to come to school." TR vol. IV p. 168.  Mr. Shreier's testimony was the same as Ms. Walsh's testimony that the 9th Grade Academy was the entire 9th grade at Chicopee High School.  TR vol. IV p. 264, 288.

core academic courses had no specialized training in READ 180 or any rule based language methodologies. TR vol. IV p. 171. However, most importantly, the Hearing Officer was able to ferret out from Ms. Walsh that "The 9th Grade Academy at Chicopee High School is all of the 9[th] grade." TR vol. IV p. 184. The Hearing Officer then asked "So the common planning time is not only for the 16 special ed. Students?" to which Ms. Walsh stated "No." The Hearing Officer clarified her question in disbelief: "It's for the other students, the mainstream students?" To which Ms. Walsh answered "right." TR vol. IV p. 187. Ms. Walsh then refused to give any numbers at to how many students were the subject of the common planning time.

Later on the parents counsel also attempted to elicit from Mr. Schreier how many students were in the "Academy." His testimony was none responsive. He repeatedly stated he did not know. TR vol. IV p. 269. However, when pressed the did state "there's 700 freshman. …Okay, I can approximate" TR vol. IV p. 270.

Not only was there no language based program, but all the students in Ms. Walsh's support class had different disabilities. On cross exam Ms. Walsh stated: "I have one student who goes to the READ 180 program." TR vol. IV p. 171. She then stated that the some of the others from the academic support class go to another reading class, and "in fact, two, and they read quite well." TR vol. IV p. 171. This demonstrates that the group is not similarly situated, if a group at all.

It was evident from Ms. Walsh's testimony that there was no language based reading program at Chicopee High School, specifically for children with language based learning disabilities like Kaitlyn's disability. In essence, Kaitlyn would have gone to a general academic support class which consisted of 16 other students with varying disabilities. This academic support class had no connection with the reading component, namely READ 180, or any speech

and language services, and for that matter the primary focus of that class was not on reading. Only one other student was getting READ 180 from that particular group.

The School District completed the presentation of its testimony with Daniel Schreier, the special education director for the Chicopee Public Schools.

The School District again through Mr. Shreier's testimony attempted to use the word flexibility to assert that there were additional services available and that all the parents had to do was communicate that they wanted them. TR vol. IV p. 211. The concept that the IEP is a flexible, "living breathing document" is an excuse for not designating services on the IEP. TR vol. IV p. 218. All of these concepts infer that these services were there all along. This was not the case. The parents rejected the IEP two days after receiving it in June and never heard from the school district again until the Pre-Hearing Conference. Similarly, the parents made it very well know at the TEAM meeting that they wanted specifically rule based programming and a real language based classroom. The IEP was never altered to reflect these supposed additional services, even after the August Pre-Hearing Conference when the School District said they could make these services available.

Mr. Shreier's testimony lacked any acknowledgement of accountability on behalf of the school district to the student. For example, Mr. Schreier repeatedly stated through his testimony that they only offered services because the parent wanted it, or it could have been provided if the parents asked, or we have done that for other students. TR vol. IV p. 211, 216,218,245,256, 264. He even stated that she could go to college courses if she just asked. TR vol. IV p. 223, 278. The School District would like this Court to hold that the IEP is always in a state of constant state of flux. Of course if this is true then there is never any one moment in time when the services they are offering can be determined to be wanting or inappropriate. The facts are that the parties met

in June, 2002, and as Mr. Schreier testified he was present at the Team meeting. The School District had the opportunity to review Dr. Kemper's testing, and in direct response it offered the READ 180 program in which they had just financially invested a large amount of money in. Mr. Schreier testified on a number of occasions that he had to be "cognizant of our budget, and I would imagine I would not have a job for much longer if I didn't do that." AR vol. IV p. 283. The fact is the Mr. Schreier spent approximately $250,000.00 on getting READ 180 up and going and he wasn't going to spend additional money to send anyone out of district. TR vol. IV p. 299. It was asked of him whether he could see the parent point of view, that "at White Oak School, she can receive this education within four years and not have to have their child miss electives, miss lunch, graduate on time, never miss a beat, still enjoy after school activities and all of those things?" AR vol. IV p. 278-279. His discombobulated non-responsive answer was as follows: "I think students can – lots of students can benefit from small environments. I think that's helpful for lots of students. I think through, the flexibility that the Chicopee Public Schools can offer for a child, whether it be supplemental or additional services, is just something White Oak can't do. I mean, I would contend that the Chicopee Public Schools' budget is much larger, and we have different options." TR vol. IV p. 279.

Mr. Schreier also testified that he reviewed the same research provided to the other experts did, namely the READ 180 promotional information. TR vol. IV p. 229,236. The only independent source in which he saw this program mentioned was in a book by neurologist Sally Shaywitz. TR vol. IV p. 246. This book was proffered by the School District as evidence. It should be noted that READ 180 is mentioned in passing in a foot note in her book along with several other programs. There was no indication as to how it should be used or in what capacity. As the Hearing Officer pointed out this evidence could not be afforded much weight in that we

had no way of knowing why she listed this program. As counsel for the parents objected she could have been paid to list this program in her book without ever seeing it, using it, or seeing it in action.

Mr. Schreier also testified that he did see the READ 180 program used in the Holyoke Public School prior to purchasing it for the Chicopee Public Schools. He stated "The first time I saw it was in Holyoke. And I was actually very impressed with the students who, once again, were not very motivated to be in school, not very interested in reading." TR vol. IV p. 246. His description of this program and how it was being used in Holyoke, fits Scholastic's recommended use for the program. It was intended for inner-city schools, where children have not been afforded acquisition to literacy because of poverty or because English is a second language or is not spoken in the home. Compliment to TR at 172-245.

Towards the end of his testimony, Mr. Schreier was asked by the Hearing Officer whether Chicopee was tracking the results of the students as he indicated they were. TR vol. IV p. 281. He acknowledged that none of that data, which claimed existed and showed students were doing well, was ever placed into evidence. TR vol. IV p. 281.

The Hearing Officer also inquired from Mr. Schreier as to how many teachers in the district were trained in READ 180. After several attempts to illicit this information Mr. Schreier finally admitted only two. TR vol. IV p. 296. Ms Hardy-Woolridge was one of those two, and the one who would have been providing services to Kaitlyn. Ms Hardy-Woolridge is so new to teaching the Mr. Schreier wasn't even sure if she was certified yet. He stated when asked about her certification to teach "I believe she doesn't have it, she should shortly, at least have her licensures a special education moderate special needs teacher." TR vol. IV p. 202. It should also be noted that at the time of the trial, Ms Hardy-Woolridge has just taken up teaching after a long

employment at Mass Mutual in an unrelated career.  Compliment to TAR at 21.  Ms Hardy-Woolridge would have been starting her second year as a teacher and Kaitlyn's entire reading program was resting on this teacher.  This is a direct procedural violation of the IDEA which clearly provides that the teacher must have experience in the child's disability.

The parents conclude this argument by asserting that in this case the most compelling evidence was the lack there of it.  Ms. Hardy Woolridge, the only teacher trained in READ 180 at Chicopee High School, was never brought forward to testify.  There was never any evidence presented, despite volumes of documents presented regarding READ 180, that it is a program for children with Dyslexia, let alone language disabled special education children.  The literature provided from READ 180 by the School District is clear that it is a program designed to help children who were not exposed to language because of poverty, neglect or possible English as a second language, and that it was designed to help those regular education students to catch up.  Compliment to TR at 172-245.  The Plaintiff's reasoning is self serving and its appeal, which rests on choosing to ignore or omit language clearly stated in the Decision and administrative record, falls short of giving the District Court any vehicle or basis to conclude for them.

IV   HEARING OFFICER'S DECISION WAS NOT ARBITRARY OR CAPRICIOUS AS IT WAS THOROUGHLY SUPPORTED BY THE EVIDENCE.

Despite the Plaintiff's claims that the Decision was arbitrary and capricious, from a casual reading the administrative record alone, this Court can determine that the facts support the Decision of the Hearing Officer.

A.   The Hearing Officer's consideration of the procedural violations only served as evidence of the parent growing mistrust of the School District, not that the procedural violations amounted to a denial of FAPE.

The School District asserts that the Hearing Officer's findings with respect to the procedural violations had the force and effect of resulting in an inappropriate IEP.  This is not true.

The Hearing Officer specifically held that:

> "While each of these lapses, considered alone, would not constitute the type of serious procedural irregularity contemplated by the Court in Roland M. v Concord School Committee, 910 F.2d 983 (1st Cir. 1990) cert. den. 499 U.S. 912 (1991), when it determined that procedural violations could form the basis of an equitable award under the IDEA, the pattern of non-responsiveness established by this case provides support for the Parents' belief that Chicopee could not develop an appropriate educational program for their daughter and the resulting unilateral placements. " Decision pg 10.

Thus, the School District's belief that the Hearing Officer found that the procedural violations were so serious as to find that the IEP was inappropriate, is just not true.  The Hearing Officer only found that the existence of the procedural violation supported the parent's belief that the Chicopee Public School could not get the job done.

Moreover, the parent's belief's were warranted. The School District went out of its way on a smear campaign to characterize Kaitlyn in a very negative manner as a socially emotionally impaired child.   Ms. Cameron stated that from her observations Kaitlyn was functioning academically as "quite an average student." TR Vol. III at 174.   It was her testimony that Kaitlyn's issues were social emotional.   She states "My observations of her social emotional, there was, a little bit, inconsistent." TR Vol. III at 179. She is then led into a discussion about how psychological services could have been made available to her from River Valley if she

wanted them.  TR Vol. III at 180.  The School District still maintains in Its Motion for Summary Judgment that Andrea Picard-Cameron made significant attempts to elicit the cooperation of the parents in addressing these social emotional problems, however, she stated the parents refused. See Plaintiff's Motion for Summary Judgment at 39.   Ms. Cameron was reminded on cross examination that Kaitlyn had been accessing the adjustment counselor and tried to use the schools mediation process to deal with a dispute with another female student.  TR Vol. III at 226. They then tried to take the letter from Jodi Rosol (Plaintiff's Motion for Summary Judgment "Exhibit A") and attempt to paint a picture of Kaitlyn as a child whose primary disability was an extreme social emotional disability which was completely unrelated to her reading disability.

On  cross  examination,  Ms.  Cameron  admitted  that  all  social  emotional  concerns regarding the 8th grade were stemming from an on going altercation she was having with one other student in the academic support class. (TR Vol. III at 230-231).  However, it took Jodi Rosol, through her own testimony, as discussed above, to promptly dispel the School District's attempts to characterize Kaitlyn as an extremely socially emotionally impaired child.  Jodi Rosol also dispelled the School District earlier statement that they were prohibited by the parents from talking with her.  Even though this issue was put to rest below, the School District still asserts in Plaintiff's Motion for Summary Judgment, that they were prohibited from talking with Jodi Rosol.   Parents point out that on cross examination, Ms. Cameron was asked about whether the school had made contact with Jodi Rosol, Kaitlyn's private therapist. TR Vol. III at 224.  Ms. Cameron admitted on cross that Jodi Rosol was present at the April 14, 2003 TEAM meeting and could have spoke with her. TR vol. III p.  224.  Furthermore, Ms. Rosol's letter of February 10, 2003, attached to Plaintiff's Motion for Summary Judgment as "Exhibit A" states "Please do not

hesitate to contact me with any concerns or questions regarding the above information.  I can be reached at 536-5473 ext. 177."

In the end, Ms. Cameron admitted that she never felt concerned enough to make a referral for a clinical psychological evaluation. TR Vol. III at 227.   Nor did she or any other school district personnel ever convene that TEAM to specifically discuss these so called concerns.  As the School District points out the "TEAM majority," which is the School District, often dictates the IEP offered.  The School District could have called a TEAM and if it was serious that those services were needed, it had all the control it needed to put those services in the IEP.  Obviously the parents could have rejected those services.  Then the parties are supposed to go before the BSEA with their disagreement.  The premise is that both parties are in good faith working together on behalf of the child.  That is what the Hearing Officer is saying.  The School District never legally, through the TEAM process, made an affirmative stand with respect to what services they say this child needed.  Therefore, Ms. Cameron's repeatedly attempts to place blame on the parents is unwarranted.  This is not the law, or how the TEAM process works.  Mr. Schreier acknowledged this, stating "we can file – if the parents don't sign it, we can file, if we suspect that it would result in denial of FAPE, so I believe it's our expectation to file." TR vol. III at 265.  The School District never filed with the BSEA and they are estopped now from going back in time saying that the parents denied their own child FAPE because they rejected imaginary options and services.

The School District, on it cross examination of the father, also attempted to elicit testimony that Kaitlyn was plagued by repeated absences because of her social emotional problems.  The School District then presented Kaitlyn's absenteeism record from the 8th grade, trying to make it appear as if she had missed an excessive amount of school.   They asserted that

she missed 54 classes during the 8th grade school year.  The Father promptly responded that 54

classes if approximately 5 school days for the entire school year and not excessive in the least bit

considering she had the flu and was out for several days in a row.

The School District, in bad faith, and in an obstructionist fashion, went out of its way to

present testimony and documentary evidence from preceding school years to try to paint Kaitlyn

as an average, but troubled student.   Overall, the School District brought to light those issues and

cannot now assert that the Hearing Officer unduly considered those facts.

The academic services were also never offered either during the eighth grade.    Mr.

Schreier states:

> "It sounds like the parents had additional concerns during the 8th grade, and
> we were willing to make other additional interventions to remediate any
> concerns that were there.  The Lexia option was still an availability there.
> We didn't – that was always an option (inaudible) could have gone back to
> having reading, reading intervention to work on the rule based as an 8th
> grader. We could have also had something called READ XL, which is
> another intervention by Scholastic that, once again, deals with the issue of
> being respectful for the student based on his or her ability." TR vol. IV at
> 244-245.

Once again the School District talks about what could have been, not what they did to

ensure FAPE.

The School District also asserts that the Hearing Officer incorrectly held that 2003-2004

IEP failed to include direct instruction in basic decoding.  The School District asserts that the IEP

included language regarding instruction in the general education classroom which would provide

a "phonetic approach to reading."    This is why Hearing Officer's with specific knowledge

regarding special education are best suited to hear and decide these cases.  First, the general

education classroom, is the regular classes in which it was testified to that as many as 22 student

could be in the class.  Second, direct instruction means that one person is teaching the student with a particular methodology, such as a rule based program.  Third, phonetic approach is one of those exploited buzz words.  The definition of "phonetic" is "belonging to or associated with sounds of human speech." Encarta Dictionary.  So as long as they were using human speech in the classroom they were okay.   This is not what Dr. Kemper meant.  He was talking about a language based classroom that was comprised of no more than eight students, all of whom had a language based learning disability.  Direct instruction he discusses is through the tutorial, then systematically reinforced in the classroom by teachers who are trained in the same methodology used by the tutor during the direct instruction.

The School District also maintains that the Decision, which held that the School District failed to formalize its offer to the parents to provide additional services after the Pre-Hearing Conference, is a violation of the law in that the Hearing Officer failed to consider the IEP as it emerged from the administrative process.  First, the School District never presented a new IEP to the parents for their consideration. Additionally, the Hearing Officer correctly determined that the offer, as made via the status report, was not formalized in that the School District never specified to the parents the type of Orton-Gillingham services it would provide.

For example, Orton-Gillingham is the originator of rule based programming, many years ago an it is not a brand name.  The rule based programs that are currently offered locally are programs such as Benchmark, Wilson, Project Read or Lets Read.  *See Kemper's testimony* (TR Vol. 1 pgs 102-105, 112-115).  Similarly, the parents were never informed as to who would deliver these services.   These programs must be delivered by a certified speech and language pathologist or someone who has been thoroughly trained and experienced not only with the program, but children with language based learning disabilities.  Second, even if the School

District had memorialized this offer in the form of a new IEP, the parents would have rejected it as grossly inadequate for the following reasons. The addition of one hour of rule based programming is completely inadequate. At White Oak School Kaitlyn is immersed in rule based programming in every class, in her tutorial and even in extras. The only way to learn the rule is to be inundated as Dr. Kemper's evaluations states "Kaitlyn's multisensory, structured language program will need to be implemented within the context of a substantially separate school that is devoted to addressing the needs of children who have significant language impairments. Student/teacher ratio should be small (a maximum of 8:1) in which direct teaching is performed in a systematic manner, with continuous review of previously learned information and the teaching of skills across various contexts, in order to facilitate generalization effects." (T.R Vol. I p. 162). Learning a rule based program is a kin to learning a foreign language, it cannot be accomplished with fluency and automaticity with one hour of instruction per day, five days a week.

The IEP was not even offering to administer READ 180 according to Scholastic's guidelines. As the Hearing Officer stated in the decision: "That skepticism grew into a reasonable objection when the proposed IEP failed to provide the full 90 minutes daily of READ 180 instruction recommended by the program developers…" Moreover, despite the School District's assertion that the Decision was based entirely on procedural violations, the Decision clearly provides an entire section of substantive reasons why the IEP proposed by the School District was inappropriate.

Once again Dr. Kemper testified as to his findings and recommendations, and the School District agreed with his findings. The fact is that READ 180 was determined not to be an appropriate program for children with language based learning disabilities. Therefore, because

READ 180, the main component of the program was still in place, the extra tutorial was worthless.    Furthermore, this tutorial was proposed to be given after school.    Although the issue was not litigated, this is a violation of the IDEA.    The services must be given during the normal course of the school day.    The father testified at Hearing why he would have rejected this tutorial had it been presented to him in the form of a new IEP.    He stated "Well, it doesn't seem fair to me to make a student go all the way through school, through their school day and then have them stay after school to try to understand something that they didn't get during the school period.    So if I did, indeed, reject them, that would be the reason." TR Vol. I p. 153.

The finality of the proposed additional services, namely the after school tutorial, was contemplated by the parents and the parent still chose to unilaterally place their child, with full knowledge that those services could have been made available.    Therefore, the School District's argument that *Douglas v. Greenfield Public Schools* 164 F. Supp.2d 157 (D. Mass. 2001), applies, is not supported by the testimony taken below.

The School District also asserts that the parents entered into an agreement before the BSEA at the Pre-Trial Conference to have an expert observe Kaitlyn, in the proposed Academy. The School District refers to its' Status Report as the factual authority for this statement.    (T.R Vol. I at 19).    The Plaintiff fails to mention the Parent's Status Report, which refuted Attorney Thompson's version of the Pre-Hearing Conference and letter drafted by parent's counsel, dated September 22, 2003, which requested a phone conference to discuss Attorney Thompson's mischaracterization of the events which transpired at the Pre-Hearing Conference. (A.R Vol. at 23 and 28 respectively).    In essence, the letter stated to the Hearing Officer as early as September 22, 2003, that they were "increasingly growing weary of the School District's attempts to alter

the agreement into something more suited to fit its purposes."  Additionally, the Parent's

appropriately objected to any evidence from the Pre-Hearing Conference from being submitted.

Again, the Hearing Officer's consideration of the procedural violations only served as

evidence of the parent growing mistrust of the School District.

B.  The Hearing Officer's Decision was Substantively Supported by the Record.

The Parents adamantly disagree with the School District's characterization of the nature

of the issues in dispute before the BSEA.  The School District states:

> "Chicopee acknowledges that there was considerable agreement between
> the findings and recommendations of Dr. Kemper and those of Chicopee's
> evaluators. Both agreed that the student should be placed in a 'language
> based, multisensory program geared to meeting the learning needs of
> students with specific learning disabilities, including dyslexia. The parties
> further agreed with the need of small class sizes, direct and consistent
> instruction by teachers trained to remediate language learning disabilities
> as well as a daily tutorial to focus on systematic reading instruction.  The
> parties disagreed, however, with the location of the recommended services
> and the exact nature of the teaching model." Plaintiff's Motion for
> Summary Judgment at 45.

First, Dr. Kemper recommended that Kaitlyn be placed in a substantially separate

program for children who all have Dyslexia, or language based learning disabilities like Kaitlyn.

The evidence from Ms. Wash's testimony was clear that the academic core classes were a

combination of special education students, with varying disabilities and regular education

children with no disabilities.  Also she testified some of the children in the academic support

could read quite well. TR vol. III at 171. Furthermore, the children from the academic support

would leave and go to various other classes for their various disabilities.  The tutorial offered by

the School District was READ 180, which were have already shown was not rule based,

systematic code emphasis instruction as recommended by Kemper.  He also testified that the

tutorial should be administered by a teacher with trained experience in Dyslexia, not a computer. Additionally, Ms. Hardy-Woolridge also did not fit the description of a person trained in Dyslexia or even experienced as a teacher of special education children. Moreover, she had received training in READ 180 only weeks prior to the beginning of that school year.   Also Ms. Walsh testified that she provided no direct instruction and that she had never met the speech and language pathologist.  This alone demonstrates that no other students in her class needs speech and language therapy, and therefore, these students did not have the same disability as Kaitlyn.

The School District states in its Motion for Summary Judgment that there is no foundation for the Hearing Officer's statement that the "proposed class size would range from 12 to 20 students." See Plaintiffs Motion for Summary Judgment at 48.  There testimony from Ms. Walsh who clearly stated "I can't give you the exact numbers, but our average, our classes run from 12 to 20 students."  TR vol. III at 180.   Moreover, Dr. Kemper clearly states in his evaluation the student teacher ratio should be no more that 8:1.

Finally, the parties did disagree on the location, however, the parents disagreed on the location because it did not provide for any of the programming recommendations as described by Dr. Kemper.  Despite the School District's assertions to the contrary,  Mr. Schreier's testimony regarding READ 180 was unpersuasive.  The Hearing Officer was easily able to discern that it was not rule based, not research based, and not for special education children with Dyslexia.

## CONCLUSION

The parents assert that the Hearing Officer's Decision was not erroneous.   The Chicopee Public Schools have specifically asserted that its appeal is based on the grounds that the "Bureau's decision is patently inconsistent with evidence at Hearing."  This assertion is based solely on the Plaintiff's interpretation of the BSEA decision, which is totally self-serving.  The

administrative record fails to back up this claim.  This case focused on the School District's proposed IEP, which offered READ 180, a Scholastic Inc. program, as its sole form of remediation.  The Hearing Officer clearly stated regarding that issue:

> "Chicopee argued that its reading class, using READ 180 program, met Dr. Kemper's recommendations for direct, systematic reading instruction. I disagree. …The evidence in this Hearing established that READ 180 is a new, exciting, engaging computer assisted tool for developing reading fluency in disadvantaged students attending large public school systems. There is no evidence, however, that it is a targeted, rule based, phonetic system designed to remediate individual reading disabilities. Without showing of effectiveness with the language disabled population, the Parents were entitled to maintain a reasonable degree of skepticism about the READ 180 program"

The parents also assert that from the evidence submitted into administrative record, or the hundreds of pages of literature regarding READ 180, along with the testimony of every witness for or against the School District, no one could point to any evidence that READ 180 is a program designed for Dyslexic or language based learning disabled students.  The record shows that the School District trained one teacher in READ 180 only weeks prior to the beginning of the school year and that teacher had only recently taken up teaching after a twenty-year career at Mass Mutual Insurance Company.  Moreover, the School District chose not to have that teacher testify at the Hearing.

The parents established their burden that the IEP and placement proposed by the School District was inappropriate.  On the other hand, the School District failed to establish its burden that READ 180, or the Academy, were appropriate.  Moreover, the Hearing Officer's Decision was well reasoned and supported by the testimony and administrative record.  As such this court should reject the arguments of the Plaintiff and uphold the Decision of the Hearing Officer.

Respectfully submitted,
The Defendants
By their attorney

December 17, 2004                    **/S/DEREK M. BEAULIEU**
                                     Derek M. Beaulieu, Esq.
                                     1242 Main Street, Suite 306
                                     Springfield, MA 01103
                                     BBO#644185