# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **CITY OF CHICOPEE acting through** | ) |
| **CHICOPEE PUBLIC SCHOOLS,** | ) |
| **Plaintiff** | ) |
| | ) **CIVIL ACTION NO. 04-30087-KPN** |
| **v.** | ) |
| | ) |
| **DAVID T. As parent and next friend of** | ) |
| **KAITLYN T. and MASSACHUSETTS** | ) |
| **DEPARTMENT OF EDUCATION** | ) |
| **Defendants** | ) |

**DEFENDANT'S MEMORANDUM IN OPPOSITION TO THE CHICOPEE PUBLIC SCHOOL DISTRICT'S MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF ITS REQUEST FOR SUMMARY JUDGMENT FOR THE DENDANTS**

## INTRODUCTION

This case is an appeal pursuant to Mass. General Laws Chapter 30A § 14(1)(7) and 20 U.S.C. §1415(i)(2)(A) Individuals with Disability Education Act, (hereinafter referred to as the "IDEA"), statutorily promulgated at 20 U.S.C. Ch. 33 § 1400 et al, of an underlying decision rendered by the Bureau of Special Education Appeals (hereinafter referred to as the "BSEA"), on April 7, 2004.

## STANDARD OF REVIEW

It is well settled that the review process of cases on appeals from the BSEA is a limited review. Legislatively and statutory authority does not provide the reviewing court with the broad latitude to alter the findings of the Hearing Officer. The First Circuit Court of Appeals states conclusively on this issue:

> "While the IDEA envisions judicial review, the statute "is by no means an invitation to the courts to substitute their own notions of sound educational

policy for those of the school authorities which they review." *Lenn v. Portland School Committee, 998 F.2d 1083, 1084 (1st Cir. 07/15/1993) citing Rowley, 458 U.S. at 206. See Roland M., 910 F.2d at 989; Colin K. v. Schmidt, 715 F.2d 1, 5 (1st Cir. 1983).*

The First Circuit Court of Appeals also has held:

"In the course of this independent review, the administrative proceedings must be accorded "due weight." Although the exact quantum of weight is subject to the district Judge's exercise of informed discretion, the Judge is not at liberty either to turn a blind eye to administrative findings or to discard them without sound reason." *Lenn v. Portland School Committee, 998 F.2d 1083, 1084 (1st Cir. 07/15/1993) See Hampton, 976 F.2d at 52; G.D. v. Westmoreland Sch. Dist., 930 F.2d 942, 946 (1st Cir. 1991).*

The First Circuit Court of Appeals has also held that:

"'The court, in recognition of the expertise of the administrative agency, must consider the findings carefully and endeavor to respond to the Hearing Officer's resolution of each material issue.' In the end, the judicial function at the trial-court level is 'one of involved oversight,' *Roland M., 910 F.2d at 989;* and in the course of that oversight, the persuasiveness of a particular administrative finding, or the lack thereof, is likely to tell the tale. *Lenn v. Portland School Committee, 998 F.2d 1083, 1085 (1st Cir. 07/15/1993) citing Burlington, 736 F.2d at 792*

## ARGUMENTS

I THE HEARING OFFICER'S DECISION WAS NOT BASED ON IRRELEVANT BACKGROUND TESTIMONY UNRELATED TO THE CENTRAL ISSUE OF THE CASE.

The School District's assertion that the Hearing Officer denied it their right to an impartial Hearing by relying on evidence outside the scope of the appropriateness of the 2003-2004 IEP, is unfounded. No where is there evidence in the Decision or the transcription of the testimony, that the Hearing Officer relied heavily on the 6th and 7th grade IEPs placed into evidence by the parents. Other than brief references to those IEPs the Summary of the Evidence there is no basis for the claim that the Hearing Officer relied on the 6th or 7th grade IEP to form

the basis of her Findings and Conclusions, either substantively or procedurally. It is incredulous for the School District to assert that the Decision "heavily" resets on that particular evidence.

The parents acknowledge that the 6th and 7th Grade IEP's were admitted into evidence by the parents over the objection of the School District. The School District's counsel maintained then as they do now, that the admission of such evidence was irrelevant in that the focus of the proceeding before the BSEA was proposed 9th grade IEP rejected by the parents. Parents countered that objection stating that the 6th and 7th grade IEPs were being offered into evidence not as direct evidence of the appropriateness of the proposed IEP, but to rebut Mr. Shreier's statement at the Pre-Hearing Conference: "that it's a very big burden for a child who's receiving moderate special education services to go from receiving so few services all the way to a private day school." TR Vol. I at 16. The Hearing Officer rejected the parent's reasoning but stated there were other reasons to admit this evidence. The Hearing Officer specifically stated, "This is background information. It is helpful to me to understand how the student developed over time." TR Vol. I at 17-18. She then stated, "They're not probative of the appropriateness of the proposed plan, except to indicate that the school and the parent have, in fact, worked together in the student's interests over – previously, historically. So depending on how the evidence comes out about the proposed plan, they may be helpful in determining whether there is a similarity in programs such that one could expect the same reasonable amount of progress under the proposed IEPs. That's one use for them if they are similar." TR Vol. I at 18.

Based on the above language of the Hearing Officer, nowhere does the she set a standard for herself that she was obligated to compare the similarities of the IEPs or that comparing the similarities was the only purpose for there admission into evidence. In fact, she was clear that how the proposed IEP was submitted would have a bearing on how she would consider that

evidence. As stated by the Hearing Officer in her statement "That's one use for them," inferring that there are a number of purposes for which that information could be relevant.    As the Plaintiffs point out, the IEPs from previous years were not similar, and they correctly point out that the Hearing Officer did not compare them, nor should she have.

It must be reiterated again that the language in the Findings and Conclusions of the Decision do not make any reference to the 6th or 7th grade IEPs. All references in the Findings and Conclusions are in reference to events from the 8th grade school year.  Furthermore, all testimony regarding the 8th grade school year, or any other documents from the 8th grade, were entered into evidence as a direct result of the School District "opening the door" through its submission of that evidence directly or through witnesses.  For example, the School District referenced the prior IEP's and other records from the 8th grade school year through the testimony of Judith Souweine.   The Attorney for the School District asked Ms. Souweine "Now, tell us what you reviewed...."   TR Vol. III at 136.  Ms. Souweine responded "I reviewed several evaluations reports that were completed by the school system, including an evaluation by Miss Simon that was early in the student's school career and another one, a more recent one (in audible) 8th grade by Miss (inaudible)....I also looked at all of the IEPs that were supplied to me that  - I believe I saw IEPs starting in 2nd or 3rd grade all the way through the current IEP." TR Vol. III at 136.  Dr. Souweine then goes into great length talking about the other previous evaluations from earlier school years.

The School District also called as a witness Ms. Andrea Cameron, one of Kaitlyn's eighth grade teachers.  TR Vol. III at 156.  Ms. Cameron was asked by the School District's attorney specifically about her involvement working with Kaitlyn during the eighth grade in the "inclusion

classroom at Fairview Program." TR Vol. III at 158. Ms. Cameron when into great detail about the service and the execution of the IEP from the School District's perspective.[1]

The parents assert that in the Findings and Conclusions of the Hearing Officer's Decision, properly focused on evidence and facts which led up to the proposed IEP. These procedural violations on behalf of the School District, included not giving the parents meaningful access to the READ 180 Summer School Program, or responding to the parents concerns in a meaningful manner. Moreover, these and other procedural violations discussed in the decision are in direct relationship and relevant evidence with respect to the process that created the proposed IEP for the 2003-2004 school year, which led to the parents rejecting it. For example, Ms. Cameron, who was at the TEAM which created the proposed IEP, stated at the Hearing that she felt the 9th grade Academy would be a "good fit" for Kaitlyn, despite never having seen the program, nor having any familiarity with the READ 180 program. TR Vol. III at 212-231,247. It was this type of testimony which caused the parents to second guess the School District's proposed program. The Hearing Officer also pointed out that the School District wasn't even offering READ 180 for the amount of time recommended by Scholastic.

Despite the Plaintiffs assertion to the contrary, the Hearing Officer clearly states in her Decision that the pattern of procedural violation did not rise to the level of rendering the IEP automatically void for lack of FAPE. The Hearing Officer stated in the Decision, that those procedural violations only factored into her Decision when considering what weight to give the

---

[1] Ms. Cameron went into great detail about the services offered to the parents in the eighth grade IEP. She stated "We also discussed that we had the Homework Club before and after school that was offered to her to give her any one to one help that she needed with an English teacher that would have been there to do that. We also offered - there's an after school MCAS prep class that she could have taken that focuses on English language arts that she could have gone to. And then I also offered extra help class during my lunch half hour, because the student wasn't in the academic support class." TR Vol. III at 169. Ms Cameron also stated "It was my understanding that she had been successful in the 6th and 7th grade." TR Vol. III at 173. Ms. Cameron then goes into great discussion regarding the programs and specifically Kaitlyn's performance all the way back to 5th grade.

"parent's belief that Chicopee could not develop an appropriate educational program for their daughter and the resulting unilateral placement." (Decision p 10). The Hearing Officer's reasoning and basis for evaluating evidence and determining what weight to give the evidence is clear and well supported by the record.

## II  THE PARENTS MET THEIR BURDEN OF PROOF THAT THE IEP AND PROGRAM WERE NOT APPROPRIATE AND THAT PLACEMENT CHOSEN BY THE PARENTS WAS APPROPRIATE

This case was unlike any other case prior to it in that it focused on READ 180 and specifically whether it was a program designed to remediate language based learning disabilities. Again, this case focused on the School District's proposed IEP, which offered READ 180, a Scholastic Inc. program, as its sole form of remediation. The parent's request for Hearing asserted as early as June 30, 2003 stated:

> "The IEP offered for the 2003-2004 School Year seeks to place Kaitlyn in a program that will offer some reading pullout. The School District will be using the program READ 180 to remediate Kaitlyn's disability. The parents assert that the program offered by the School District is not intensive enough. The parents also assert that READ 180 is not a program that is designed to effectively remediate the type of disability Kaitlyn has. Moreover, the School District's program and IEP fail to provide real services, methodologies and the intensity Kaitlyn needs in order for her to achieve FAPE." AR Vol. I at 5.

At the hearing the parents met their burden through the testimony of the parent, David Tharaldson, Jodi Rosol, Kaitlyn's therapist, Dr. Robert Kemper, and David Drake, the director of the White Oak School.

The father testified generally about Kaitlyn's educational career and his personal observations about her becoming more and more distressed, not as an expert, but as a father who was observing his child go through something very painful and heart wrenching. TR Vol. I p.

41-159. David Tharaldson admitted on cross examination that he was not an expert that he is "just the father." (TR Vol. I p. 157). In that capacity he testified about becoming alarmed by testing done by the School District during Kaitlyn's eighth grade school year and how that led specifically to his acquiring the services of an advocate to advise him and then Dr. Kemper and his evaluation. TR Vol. I p. 44-65. David Tharaldson then testified in great detail as to how he relied on the advice and counsel of others who had expert knowledge as to the testing results and programs to help him make many of his decisions, such as rejecting the IEP and unilaterally placing his child. TR Vol. I p. 122.

The Defendants acknowledge that the Plaintiff's assertions in its Motion for Summary Judgment that the David Tharaldson, the father, based his decision to reject the IEP on the recommendations of his advocate, and that he never showed the proposed IEP to Dr. Kemper prior to rejecting it, are true. However, even if true, there is nothing wrong with these decisions of the parent. Moreover, the opinions of those who advised the parent were present to provide testimony before the BSEA and thus, the Hearing Officer was able to discern for herself the validity of their advice.

The parent also acknowledges that they visited the White Oak School before the June 2003 TEAM meeting. There is nothing unlawful about this or any of the above mentioned actions of the parents in exploring alternative avenues. The parent eloquently testified about why he rejected that IEP and how he made the decision to unilaterally place his child at White Oak School. He stated at Hearing "We made that decision basically to save our daughter. At that point in time, you know, the wheels had come off the bus; Kaitlyn was losing – Kaitlyn had lost faith in the school system and she was losing faith in us. It seems as though she was holding us responsible for not really solving her problems for her, and we just decided that in order to get

our daughter back, that we needed to explore other options." TR Vol. I p. 73. The father's contribution as a witness to this case was in the capacity as a father as to his personal and fatherly observations.

The Hearing Officer appropriately considered the testimony of the father, who after, all has valuable insight into the child from a perspective the experts do not have. For example, the father testified as to his personal observations of Kaitlyn after being placed at White Oak School for little more that half a year. He stated "She's a new kid. Totally a new kid. She's really doing well there academically, emotionally, spiritually, the whole bit. Everything from A to Z. She actually enjoys going to school, which is something hat is just different from what we've ever heard from Kaitlyn before. She used to hate school, she used to detest it, and now she can't wait to get back there." TR Vol. I p. 77.

On cross examination the School District attempted to discredit the parent's testimony, but was unsuccessful. Even now, pursuant to its Motion for Summary Judgment, the School District attempts to keep the possibility alive that the parent "rushed to judgment" and condemned the IEP before it emerged at a final product. This notion is not only preposterous, but it is not how that IDEA contemplates parental involvement. The School District states "despite rejecting the IEP the parent acknowledged that the IEP had 'flexibility.'" The father responded, "Yeah, I rejected the IEP, because once you accept, you know, your options are limited. If you reject it, you still have other options open to you." TR Vol. I p. 128. The parent properly rejected an IEP he did not believe offered FAPE. The School District is trying assert that the parents had a different understanding of the IEP, one that extends beyond the four corners of the document. The School District's use of the word "flexibility" is and always has been an excuse and an attempt not to get pinned down by an IEP because it was lacking specific

services. The creation of an IEP is governed by strict federal and state regulations. *See 34 CFR 300 and 603 CMR 28.00.* The regulations seek to ensure that all services are listed in the IEP in there appropriate places. Therefore, the School District's attempt to suggest that there were services available that were not listed in the IEP; that the parent should have know this, and specifically that they should have known what those services were, is not only ridiculous, but it is a contrary to the federal and state regulations.

At the Hearing the School District's again and again tried to put the onus on the parent. The School District contended that the parents knew that the READ 180 program was being offered over the summer and that the parents were responsible for her failure to attend. This is not what was reflected by the testimony of the father. David Tharaldson testified with respect to the READ 180 summer services, that they knew they were being offered, "but we received a note that Kaitlyn had been placed on the waiting list, so, you know, that was it." TR Vol. I p. 72. On cross exam the father testified again "the only time that we reviewed anything during the summer was, I believe somebody from the high school sent us - or actually, no, left a message on our phone saying that the program was going on, but at that point in time, it was either half or three-quarters over." TR Vol. I p. 159. Again the Decision of the Hearing Officer appropriately put the onus back on the School District for not only offering, but ensuring the execution and delivery of those services. TR Vol. I p. 103.

The Parent's key witness, Dr. Robert Kemper testified that Kaitlyn needed to receive intensive rule based language services derived from Orton-Gillingham principles, in a substantially separate, multisensory classroom, across all academic domains with similarly situated peers. A.R. Vol. 1 at 150. TR Vol. II at 95, 102. Dr. Kemper went into great detail describing what a rule based or code emphasis program consisted of and more importantly why

Kaitlyn needs this type of program. (TR Vol. II at 95, 102-107). Dr. Kemper also testified as to the difference between a "reading pathology, or a reading disability and a child who is behind in reading." (TR Vol. II at 108). As he testified, "a reading pathology or a disorder, it's a neurologically-debilitating condition that exists despite that child having had all of the prerequisites of reading in the home, being read to, rich literature, literate parents, and etcetera." (TR Vol. II at 108-109). He went on to add, "children who are – often times who come from lower-income urban areas do not have a language pathology. The neurological make up for these children may be normal. However, they may not have exposure to reading, being read to, two parents who are literate, who have graduated from high school; possibly they may not have had that rich environment." TR Vol. II at 109.

Dr. Kemper, through his testimony carefully described each test he administered, what the test was used for, what it indicated to him. He also described how he analyses his results using the pyramid or triangle of literacy and underpinnings of language. As he testified, the standardized tests that he administers indicated to him that Kaitlyn's disability required her to be placed in a substantially separate language based school. From the materials provided to Dr. Kemper and the communications from the parent, their advocate and their attorney, it was readily apparent that this was not a language based classroom which catered to all special education students with similar language based learning disabilities.

Dr. Kemper testified that he had also reviewed the READ 180 literature provided to parents. TR Vol. II at 107-108. This is also the same materials provided to Dr. Souweine. After reviewing the READ 180 materials Dr. Kemper testified "Well, it appears that this is a program that provides basic foundation skills in reading to children typically who would be from inner city, lower income, urban areas where these children may not have had the environment that

would be conducive to becoming good and competent readers." TR Vol. II at 108. Moreover, Dr. Kemper testified that he could not find anywhere in the literature that this was a program for children with language disorders or pathologies. TR Vol. II at 108. He also testified that READ 180 is not an Orton-Gillingham or rule based program. TR Vol. II at 109.

Dr. Kemper was specifically asked about buzz words READ 180 uses in it promotional literature like 'fluency' and 'phonetics' and 'phonemes.' and what was the difference between an Orton-Gillingham program, and READ 180, if it's using some of the same words. TR Vol. II at 110-111. Dr. Kemper discussed that READ 180 is merely a computer based program, that it was not a trained individual and that it did not utilize the Orton-Gillingham principles of code emphasis, and it was not one to one. TR Vol. II at 111.

The Plaintiff's attempt to discredit Dr. Kemper, stating in its Motion for Summary Judgment that he is not a "reading specialist" because his is not licensed in the State of Massachusetts as a "reading specialist," is absurd.  As Dr. Kemper fully discussed his educational background, and experience it is clear that he is eminently qualified not only at diagnosing reading disabilities, but understanding the actual breakdown in the child's ability to read, and prescribing effective recommendations and methodologies to remediate the disability. TR Vol. II at 27-38.  It is also especially troubling for the School District, that they would now maintain that Dr. Kemper is not a reading specialist, because they embraced his recommendations. As the Hearing Officer noted in her Decision that the Plaintiff never disputed Dr. Kemper's findings or recommendations.[2]  Instead the School District's case consisted of

---

[2] The Hearing Officer held: "Chicopee argued that its reading class, using READ 180 program, met Dr. Kemper's recommendations for direct, systematic reading instruction. I disagree. ...The evidence in this Hearing established that READ 180 is a new, exciting, engaging computer assisted tool for developing reading fluency in disadvantaged students attending large public school systems. There is no evidence, however, that it is a targeted, rule based, phonetic system designed to remediate individual reading disabilities. Without showing of effectiveness with the

trying to persuade the Hearing Officer that READ 180 met the criteria as described by Dr. Kemper in his Psycholinguistic Evaluation.

Furthermore, the notion that Dr. Kemper needed to form his opinions by talking with the 8th grade TEAM is also unfounded. Dr. Kemper's testimony would not have effected had he been advised by the School Districts teachers. Furthermore all they were offering was a before and after school homework club. Similarly, Dr. Kemper's opinion would not have been altered had he been advised that Kaitlyn had been withdrawn from the academic support class earlier that year. Additionally, he did testify that he reviewed the eight grade IEP and thus he was aware that these types of service were proposed in the past. However, again these types of academic support services were not even close to what he was recommending. The School District's assertion that Dr. Kemper was not aware of Jodi Rosol, Kaitlyn's therapist, also had no bearing on his testing, or his recommendations. Dr. Kemper testified that information of that type of disorder does not factor into the testing that he performs. (TR Vol. II at 153).

This leads directly into the testimony provided by Jodi Rosol, Kaitlyn's therapist. Jodi Rosol testified that the purpose behind the therapy was "concern for Kaitlyn's struggle with learning, for anxiety, for problems with self esteem, self-image." TR Vol. I at 167. She testified that Kaitlyn had disclosed to her in therapist in the past that "I'm stupid; people think I'm a retard. I don't like myself. I can't learn, I get frustrated in school. I have a hard time with homework. People think I'm weird." TR Vol. I at 168. Ultimately, Jodi Rosol testified that she no longer needed her services and that she was only staying on in the event that she was forced after the Hearing to go back to the Chicopee Public Schools. Moreover, Jodi Rosol was yet

---

language disabled population, the Parents were entitled to maintain a reasonable degree of skepticism about the READ 180 program"

another person who could testify as to Kaitlyn's dramatic turnaround once being enrolled at White Oak School.

On cross examination, the School District specifically made reference to a letter that Jodi Rosol wrote and sent to the School District in which she stated that Kaitlyn should be withdrawn from the academic support class because of "heightened anxiety." The School District has repeatedly tried to make this letter into something it was not. As Jodi Rosol explained "She was having peer issues with another girl …a lot of teasing, she reported a lot of teasing by this girl, and because of Kaitlyn's issues, she was having a very hard time coping with that, and her anxiety was through the roof, so to speak. She couldn't focus on anything but that issue." (TR Vol. I at 170). It was Jodi Rosol's testimony this child did not exhibit excessive anxiety unrelated to anything, which would have been a concern if true. Her testimony was that Kaitlyn was normal teenager in that she was showing anxiety directly related to an ongoing dispute she was having with another peer and low self esteem and depression because of her lack of success in school.

The parents concluded their case with the testimony of David Drake the director of the White Oak School. David Drake briefly testified as a rebuttal witness as to his own observations of Kaitlyn socially emotionally. He stated "Socially emotionally, I see her in the lunch room and at school breaks, in the hallway. I also talk with her teachers about how she is doing. And she is associating very well with the other students. She feels that it is – that she's with the other kids who are like her for the first time. She's feeling normal. She's feeling that she can be herself and she doesn't need to hide it." (TR Vol. III at 49). He also testified that "it's not unusual for me to see issues of mild anxiety, dysthymia, dysphoria, being secondary or tertiary products of a

student's experience of continued failure and frustration in school environments." (TR Vol. III at 62).

However, the main purpose for the testimony of David Drake was with regard to his knowledge of READ 180. In fact, almost all of David Drake's testimony pertained in one way or another to his knowledge regarding rule based programs and methodology for language based students, and how READ 180 is a program he has seen, and why rejected it as inappropriate for his program which caters exclusively to children with language based learning disabilities. (TR Vol. III at 19, 110). David Drake through complicated and detailed testimony described the differences in rule based methodologies versus what he observed in READ 180. (TR Vol. III at 20-41). David Drake also had first hand knowledge regarding the creator of READ 180, how he began not in educational programming but computers, and his sale of READ 180 to Scholastic. (TR Vol. III at 20-26).

David Drake also discussed his own research into READ 180 and came away from it with the same concerns expressed by Dr. Kemper, that this is a program for disadvantaged inner city children. He states "Well, I saw it was a very professional, slick little computer program which had attractive people on it, some very high end, expensive graphics. It, on the other hand, seemed to – in the area of my interest, seemed to show a real lack of understanding of the best practices in my field. I was disappointed, I have to tell you, because I had seen, in looking through their promotional material, a vast array of buzzwords that are hot in the field …like scaffolding, automaticity, phonemic awareness, phonological processing." (TR Vol. III at 32-33). David Drake described his own experiences with READ 180 and specifically why it was lacking for children with language based learning disabilities. (TR Vol. III at 32-41).

In its Motion for Summary Judgment, the School District states that David Drake could not offer any opinions regarding the appropriateness of the proposed Chicopee program. This is untrue and not reflective of his testimony as evidence by the administrative record. David Drake was specifically asked on cross examination "You have no basis of knowledge that you can give this Hearing Officer relative to the appropriateness of the 9th grade Academy program that has been developed for Kaitlyn and the other students at Chicopee High?" David Drake responded "No, I don't believe that's true." (TR Vol. III at 64). He then stated, referring to READ 180, "Well, I believe that, given the substantial component of the proposed program, as it was related to me, involved the use of a this computer system, I believe I do have knowledge in that regard." (TR Vol. III at 65).

The School District makes another outlandish statement in its Motion for Summary Judgment, that the White Oak School is now not appropriate because it does not have on its staff a speech and language pathologist, or mental health counselors. Once again, the parents assert that the School District stipulated that the White Oak School is a state certified school specializing in remediating Language Based Learning Disabilities. Also, mentioned later herein, Judith Souweine, testified that White Oak School is appropriate. TR Vol. IV at 65.

The School District had hoped to prove that the "Academy" program, and READ 180, provided the same type of services being provided at White Oak School. If they could have proved that the Academy program was at least reasonably calculated to provide some special education services, then that program, which is the least restrictive environment, would automatically be considered the appropriate placement, and the parent's arguments for the appropriateness of the White Oak program would have been moot under the second prong. However, the School District never argued against White Oak School at the Hearing and the

service it provides. All the marbles were riding on the issue of whether the Academy Program and Read 180 were appropriate. Once it was determined by the Hearing Officer, after the close of the School District's case, that READ 180 was inappropriate, automatically the parents prevailed on the second prong. Therefore, based on the fact that that School District stipulated to the appropriateness of White Oak School, there is nothing in the testimony to discuss, thus, this memorandum will not discuss the parent's meeting the second prong. Nor will this memorandum respond to any of Dr. Souweine observations of White Oak School.

With respect to their first burden, the parents fully established that the IEP proposed by the Chicopee Public Schools, which rested solely on Read 180 as its sole form of remediation, was not a program designed to remediate Dyslexia, an thus it was not appropriate. With respect to the parent's second burden, proving that the White Oak School was appropriate, the School District stipulated that White Oak School was appropriate by stipulating to Tiffany Drumm's proposed testimony and a portion of David Drake's testimony. Moreover, Judith Souweine, the School District expert witness, testified that White Oak School was appropriate.[3]

III THE PLAINTIFF'S ASSERTS THAT IT MET ITS BURDEN THROUGH THE PRESENTATION DR. SOUWEINE'S TESTIMONY AND THE TESTIMONY OF JANISE WALSH AND DAN SCHREIER IS NOT SUPPORTED BY THE RECORD.

The School District's key witness, Dr. Souweine, was put forth by the Plaintiff to show that Academy Program was appropriate and that READ 180 was an effective methodology that could remediate Kaitlyn's Dyslexia in the manner described by Dr. Kemper. The Plaintiffs

---

[3] Dr. Souweine testified "I would say that the student appeared comfortable in the environment. She appeared to have peers that she was friendly with. I don't – I didn't see any evidence of difficulty in terms of her participation in the program at all" AR vol. IV p. 45. She later stated "I would say the White Oak Program is an appropriate

asserts on a number of occasions that they can't understand how Dr. Kemper's testimony was credited over the testimony of Judith Souweine. As the Decision points out, the School District personnel did not dispute Dr. Kemper's recommendations for programming. Instated, they embraced his recommendations and attempted to show that READ 180 was a program that met the criteria as described by Dr. Kemper. The following statement in its Motion for Summary Judgment is further proof that they still do not dispute Dr. Kemper's recommendations:

> "Dr. Souweine was shown Dr. Kemper's report TR. Vol. I at 151-168, and asked to review his recommendations on page 12 of the report TR. Vol. I at 162. ... Dr. Kemper recommended that the student be educated in a separate, multi sensory, language intensive program. Dr. Souweine testified that the 9th Grade Academy Program at Chicopee High School was indeed multisensory and language intensive as well as highly structured. (TR Vol. IV at 61). The program provided direct remedial instruction and methodologies which allowed students with language disorders to learn effectively and efficiently as recommended by Dr. Kemper. (A.R. Vol. I at 162, TR Vol. IV at 61)."

As the Decision also clearly points out that Dr. Souweine had no previous personal or expert knowledge of READ 180. The Plaintiffs omit that reasoning from their argument. Dr. Souweine testified "I had no prior knowledge of this program except for having read about it in Sally Shaywitz's book...but this was my first introduction to this program was when I saw it in Chicopee." TR vol. IV p.115.  As pointed out by the Plaintiff, Dr. Souweine tried out the program herself. She testified " And I tried it out myself because that's the best way to learn about something." TR vol. IV p. 115. If she is learning about it she can hardly be an expert. The Defendant's assert that this testimony disqualifies Dr. Souweine from being considered as an expert witness regarding READ 180.    Whereas she had no knowledge of the READ 180 program her testimony at Hearing was appropriately given little weight.

---

educational environment for her, but it does not meet the criteria of the least restrictive alternative[3] where she could

The Hearing Officer appropriately found, that that in addition to Dr. Souweine not personally evaluating the student that: "Dr. Souweine's knowledge of the READ 180 program came solely through the materials presented to her by Chicopee and her observation of Chicopee's use of the program." The Plaintiff argues that the materials Dr. Souweine reviewed were not all from the School District. The Plaintiff is splicing words; the research studies were done by READ 180's maker Scholastic, as promotional literature, and given to Dr. Souweine for her review by the Plaintiffs. In other words there are no independent research studies on READ 180. Furthermore, the READ 180 promotional documents and the READ 180 research studies are in the administrative record and are available for this courts review. Once again, the record will show that no one who testified could show in any of these documents that this program is for children who suffer from language based learning disabilities such as Dyslexia.

Dr. Souweine's testimony, with respect to her personal observations and knowledge of READ 180, did nothing to bolster the Plaintiff's case. She states "so my impression of the program both based on the research that – again, albeit it's new, there isn't that much research that accompanies it, but they did use it on large scale populations, and the fact that I saw it in operation with kids who you would not traditionally assume would be excited about doing this, and I saw them doing it." TR vol. IV pp. 116-117. Her opinions were based on statements such as this "I saw it in operation, and I was totally impressed with how this group of youngsters, who are of a similar age – and I don't know their exact level of functioning, but I could see what they were reading, so they weren't reading at the highest level, they were engaged in this process and making progress." TR vol. IV pp. 117-118. "Those children in that class I saw were all children who struggled with reading, writing, spelling. So it certainly was a group of – I'm not going to

be educated appropriately." AR vol. IV p. 65.

opine about the similarity of their IEPs or of their diagnosis, because I didn't read those things particularly." TR vol. IV p. 118. She also did not even know if the children were special education students. It was asked of her "Where all the children in the Read 180 program on IEPs?" She answered: "I believe so. I don't know to a child, but my recollection of my conversation with the teacher was that they were on – all on IEPs. And my understanding again, I think the SPED director would be a better person to ask this question to – is that the licenses, the way they purchased the program from Scholastic was specifically for children with learning disabilities, and therefore I would imagine those would be people on IEPs." TR vol. IV p. 123.

On direct examination Dr. Souweine was asked "Can you learn it (referring to Dyslexic children) without the rules?" (meaning without rule based methodologies) She testified "I believe they can, and there is some research that supports that approach." TR vol. IV p. 38. This research was never produced. This line of questioning was followed up on cross examination. When asked about the research she previously mentioned for non-rule programs, Dr. Souweine stated that she was aware of some programs being developed at UMASS and possibly being used in Gilmontague Schools. TR vol. IV p. 93. Ultimately, when questioned about this program and how it is utilized by school districts, she testified, "I can't really tell you how school districts are using it, that goes beyond my knowledge of how it is used, but I have seen it used in [UMASS] lab in the absence of rule based programming." TR vol. IV p. 93.

In essence, Dr. Souweine is a psychologist and not a speech and language pathologist. She even testified "I wouldn't call myself a reading specialist, meaning a reading teacher, but I do consider myself a specialist in terms of diagnosing reading disorders." It should be noted again that the diagnosis was never in dispute. The issue was whether READ 180 could remediate

dyslexia. To this matter Dr. Souweine had no expert or relevant personal knowledge of the READ 180 program.

Despite the Plaintiffs assertions to the contrary, the Hearing Officer's findings that Dr. Souweine lacked personal knowledge regarding her expert testimony regarding her review of the previous testing is well supported the record.

First, it is important to note that the Melissa Mannello evaluation is an evaluation performed by the School District. It is a Speech and Language evaluation. This is the same type of evaluation administered by Dr. Kemper. This type of evaluation is different from intelligence testing and/or psychological testing done by an neurologist or psychologist. Dr. Souweine is not a speech and language pathologist, but rather a psychologist. Moreover, the School District chose to have Dr. Souweine review the testing of Melissa Mannello, rather than have Melissa Mannello testify about the tests she administered.

Second, Dr. Souweine specifically testified that she was confused regarding her review of the testing administered by Melissa Mannello. On direct examination, the Plaintiff's attorney asked Dr. Souweine what her impression was from review of Melissa Mannello's evaluation. Dr. Souweine answered "In the two test dates reported in this evaluation, 12/4 and 4/9, there are results that are somewhat discrepant from each other, which I can't totally explain in this – because I didn't administer the tests, and I certainly didn't look at the protocol. So it's a little hard for me to totally understand them." TR vol. IV p.8. She then adds later "the part that is confusing to me is that part on the similar test, in terms of its description and what its purporting to measure, the Woodcock–Johnson Test of Achievement letter/word identification, (the student's) score is solidly within the average range, a standard score of 95-94, whereas the standard score on word reading is 74. The difference in those scores is tremendous. It's two

20