standard deviations, which doesn't – that's what I'm saying, it doesn't make a lot of sense to me. All of these tests are really administered in the same way. ...So a standard score of 74 or 79 on the WIAT and then a standard score of 94 on the letter/word identification really just doesn't make a lot of sense to me in the sense of, how could these be so different? You know we could all spin out some hypothesis about, you know, one day she was, you know, in a better mood or, you know, more cooperative or something like that, but it just doesn't make sense to me...So when I say I am a little confused, I'm being really honest; I don't understand how she could score in the average range on one test and so differently on another test" TR vol. IV pp. 15-17. Dr. Souweine was asked "as someone with a clinical background, do you have any theories?" TR vol. IV p.17. She answered "Well, it's possible it's related to the test itself. It's possible the norming of the test is quite different between the two tests or the – it's possible that the method of presentation, could be the length of the test, the way the test is laid out, might have created some differences. It's possible, looking more from a more psychological point of view, attention and concentration could impact someone's performance on a test like this. It's possible that anxiety could influence a youngster's performance, and it's also possible that motivation could influence the performance. I really think it's beyond my knowledge to know which of any of those were present here. But I want to highlight that it isn't a clear picture that (the student's) skills are so discrepant from her peers. That's really the point I'm trying to make." TR vol. IV p. 17-18. Dr. Souweine's testimony on direct examination clearly showed that because she did not administer the test herself she was unsure of many conditions which went into determining where Kaitlyn was functioning.

On cross examination Dr, Souweine also testified that she was confused by the Melissa Mannello speech and language evaluation. On cross examination the Melissa Mannello's

evaluation was placed in front of Dr. Souweine.  When asked about her comments on direct examination that it was confusing, she  stated, "I found some of it confusing."   This was her testimony and it should stand.

In addition to Dr. Souweine not having personal knowledge of the testing conditions, she also had no personal or expert knowledge of many of the tests used by Dr. Kemper and Melissa Mannello.  Dr. Souweine was asked on direct examination to comment on the Slosson Oral Reading Test.  She was unable to comment because she was not familiar with that test.  She was then asked to comment on the Grey Oral Reading Test performed at the White Oak School.  On direct exam she stated that she was unable to comment on the results in that the test results were incomplete, missing certain rate and accuracy scores.  She states "I don't know exactly what it reflects…" TR vol. IV p. 22.  She was then asked to compare the reading comprehension section of the Grey Oral Test, in general, to the Woodcock-Johnson or the WIAT tests, in general.  With regards to the WIAT test, Dr. Souweine testified "I can't give you a very good answer about that, because I don't give the WIAT enough to really have a strong opinion about how they compare." TR vol. IV p. 26.  She was then asked "How, if at all, would you anticipate that that level of anxiety would impact on her academic functioning and her testing performance? She answers "Again, without first hand knowledge or a lot of information from the testing, in general, I would say that anxiety can have a tremendous impact on how children perform in a testing situation…" TR vol. IV p. 27.

On cross examination she was again asked to look at one of the tests performed by both Dr. Kemper and Melissa Mannello, an evaluation called the CTOPP.  When asked if she administered the CTOPP she testified "no." TR vol. IV p. 71.  She was asked to comment on language in the evaluation regarding the fact the Melissa Mannello deviated from the standard

administration of the test allowing the child to take additional time and the test was read to her rather than having to read it for her self. Dr. Souweine acknowledged "Well, certainly it wasn't the standard administration of the test, because as the examiner says, she deviated from the prescribed practice by not using the tape, and so she did it orally, which would certainly change the results of the test." TR vol. IV p. 72. Asked about the next test on the evaluation, the WIAT, when asked if she administers that test, she answered, "I don't use the WIAT." TR vol. IV p. 73. She then had some familiarity with the Woodcock-Johnson, however, when asked "is it fair to say that with the Woodcock-Johnson, once again, this is another diagnostic test?" to which she testified "Yes." TR vol. IV p. 75. The she was asked again about the Grey Oral. She previously testified based on White Oak's administration of the Grey Oral that she couldn't extrapolate anything from those results because of missing numbers. On cross she was made aware that Dr. Kemper had also done the Grey Oral Evaluation and clearly provided all the relevant numbers. She then concurred when asked if his findings found Kaitlyn to be functioning in the below average range. She was asked, "But essentially, these [scores] are all below average, correct? She responded "They are all below average." TR vol. IV p. 80. She was then asked about the Slosson Evaluation to which she responded "Yeah, I don't – I don't really know the Slosson." She was then asked about the TOWRE and TORC-3 evaluations given by Dr. Kemper. She stated "Again, I am not familiar – I haven't ever given the TORC-3, so I don't – I wouldn't have a lot to say about it." TR vol. IV p. 89. She was then asked about the TOWL-3 Dr. Kemper administered. She again testified "I don't administer, but I know this test a little bit better." TR vol. IV p. 89. The she was asked about the Test of Written Spelling. She testified she did not administer that test either. TR vol. IV p. 89.

The Plaintiff chose to have a psychologist review the evaluations of speech and language pathologists.  She not only was not an expert in READ 180, but she had little personal knowledge regarding the tests administered by the School District's own speech and language pathologist, Melissa Mannello.  Please also note that this was the School District's evaluation and at no time was Melissa Mannello called as a witness to testify as to her evaluation.

Dr. Souweine also testified that she observed the proposed 9th Grade Academy at Chicopee High School.  Once again her testimony about the program was not based on personal knowledge, but relied heavily on information provided to her from the School District. For example, Dr. Souweine testified that she was impressed with the communication aspect of Chicopee's program described as the 9th Grade Academy.  She testified, "As it was explained to me, there was time put aside in the teacher's day to meet as a team, and I think that's critical feature in making a program successful." TR vol. IV p.54.  Ms. Janis Walsh, a teacher of the learning skills classroom, also testified "at the end of the day, every single day of the week, we meet as an entire team and discuss how the students in the program are doing. And I must say that's an element that was absent when I did similar work at Central High School, and I completely agree with Dr. Souweine's opinion that that is the glue that holds a program together." TR vol. IV p. 130.  At the time of this testimony it appeared that the 9th Grade Academy was made up of sixteen special education children.  It was later exposed by the Hearing Officer by questioning Ms. Walsh directly that, as Ms. Walsh testified, "the 9th grade academy at Chicopee High School is all of the 9th Grade." TR vol. IV p. 184.  The Hearing Officer asked "so the common planning time is not only for the 16 special ed. students? ... It's also for other students, the mainstream students?" Ms. Walsh answered "Right." TR vol. IV p. 184.  Moreover, the meeting time that Dr. Souweine testified about, that was impressed upon her as part of the

program, that was so important in her opinion, was erroneous and overstated. It was really time put aside at the end of the day for the teachers of the entire 9th grade to communicate or prepare for the following day.

Dr. Souweine also testified that she had a difficult time understanding what the 9th Grade Academy was. She testified "Well I'm not really sure what's the 9th grade academy, whether that's a separate idea." TR vol. IV p. 60. She was asked whether the program proposed had an individual tutorial. She answered "It was my understanding that the program as planned included an individual tutorial. I didn't observe." TR vol. IV p. 63. The impressive communication that Dr. Souweine was informed about later evaporated. After Dr. Souweine's testimony Ms Walsh testified that she had not been trained in READ 180, (TR vol. IV p. 188); she testified "I don't give direct reading instruction." TR vol. IV p. 183; and that she had not met the speech and language pathologist. TR vol. IV p. 178.

Eventually, on direct examination Dr. Souweine was asked, in her expert opinion, whether the program proposed by Chicopee was appropriate, she answered. "It's my opinion that the program as described in the proposed IEP would have been appropriate to meet her special education needs." TR vol. IV p. 64. When asked what was the basis for her opinion, she testified "based on all the evaluation reports, which suggest a variety of services, as well as her performance in previous years, I feel that the program as proposed, which included a strong remedial component in language arts area, combined with careful inclusion model, utilizing very experienced special educator, with careful and consistent programming across the curriculum in content area subjects, would have provided an appropriate education in the least restrictive alternative." TR vol. IV p. 65

Dr. Souweine's expert opinion, as discussed in great detail above, was based on other's evaluations where she was either unsure of the results, either because she did not administer them herself, or because she had no knowledge of the tests. She also stated that her opinion was based on the fact that the program had a strong remedial component, namely READ 180, but she had no prior experience with it, and thus, she had no personal or expert experience with it to justify its short term or long term use. She mentioned the use of experienced educator. The testimony revealed that the learning skills teacher had no training in READ 180 and that she had no idea who the speech and language pathologist was. On cross examination Dr. Souweine testified that she was aware that only one teacher at Chicopee High School had been trained by the School District in READ 180 Program, and that she had only one year of relevant teaching experience, which came after working at Mass Mutual for twenty years. TR vol. IV p. 95.

The School District next placed Janise Walsh on the stand. Ms. Walsh was a teacher who teaches an academic support class. She would have been providing services to Kaitlyn had she attended the Academy. However, before discussing the testimony of Janise Walsh, the School District in Its Motion for Summary Judgment, make two statements still attempting to make it appear that the 9th Grade Academy was a separate small program made of all children who all had language based learning disabilities who would be provided with language based reading methodologies, and that all the teachers got together at the end of every day to discuss the 12 or 16 children in the program.[4] This notion was completely fractured by Ms. Walsh's testimony.

---

[4] First statement "Clearly the 9th Grade Academy Program is not a regular education mainstream program as understood by Dr. Kemper when he testified. It is a co-teaching, inclusion program with a low student teacher ratio ranging from one-to-one reading tutorial, to a science class with 12 students and two teachers. Language based teaching strategies and instruction occur across all curriculum areas at a pace consistent with the student's needs. Teachers have volunteered to participate in the 9th Grade Academy." Plaintiffs Motion for Sum. J. pg. 30. The second statement in Its Motion for Summary Judgment, Mr. Schreier is portrayed as the director of the "school within a school." Plaintiffs Motion for Sum. J. pg. 33. Mr. Schreier never testified to this effect. The term "school within a school" came from the testimony presented by Janice Walsh, who discussed her role as a special educator at

Ms Walsh testified "Well, the students I'm currently working with have – specific learning disabilities. They respond, they're in the average range of intellect. Sometimes it's low average." TR vol. IV p. 136. She then states "My kids, many of them go to some sort of reading class during period one." TR vol. IV p. 137.   On direct, Ms. Walsh was asked "So you're not responsible for teaching READ 180?" to which she stated "No."   TR vol. IV p. 153.   She specifically stated "I don't do anything with the READ 180. The only instruction that I give is, if we are reading and students are having difficulty with any particular word, I would help them sound out that word ...but I don't give direct reading instruction." TR vol. IV p. 183. Ms. Walsh later stated that she has had no training in READ 180.  TR vol. IV p. 188.

On direct she was also asked about who supplied the speech and language pathology.  She responded "I don't know the speech pathologist." TR vol. IV p. 153.  On cross she was asked again about the communication that she stated was the "glue that held the program together." She was asked "So it is fair to say that when the you have – the academy meet with the team ...all the classroom teachers, the speech and language pathologist isn't there?" She answered "No, we've not met with the speech and language pathologist." TR vol. IV p. 178.

The vagaries of Ms. Walsh's testimony prompted several questions from the Hearing Officer which proved to be the final death knell for the "Academy."  First, she stated that class sizes for the mainstream classes were not small, "our classes run from 12 to 20 in terms of numbers of students that are in the class." TR vol. IV p. 180.  Furthermore, the teachers in those

Central High School in Springfield, where she was instrumental in creating the "school within a school." TR vol. IV p.127.  For the record Ms. Walsh was asked on cross examination about her experience at the school within a school. The question was posed "And once again you indicated that program was specifically designed to combat failure due to attendance?"   She answered "Yeah, pretty much, kids that were not motivated to come to school." TR vol. IV p. 168. Mr. Shreier's testimony was the same as Ms. Walsh's testimony that the 9th Grade Academy was the entire 9th grade at Chicopee High School.  TR vol. IV p. 264, 288.

core academic courses had no specialized training in READ 180 or any rule based language methodologies. TR vol. IV p. 171. However, most importantly, the Hearing Officer was able to ferret out from Ms. Walsh that "The 9th Grade Academy at Chicopee High School is all of the 9th grade." TR vol. IV p. 184. The Hearing Officer then asked "So the common planning time is not only for the 16 special ed. Students?" to which Ms. Walsh stated "No." The Hearing Officer clarified her question in disbelief: "It's for the other students, the mainstream students?" To which Ms. Walsh answered "right." TR vol. IV p. 187. Ms. Walsh then refused to give any numbers at to how many students were the subject of the common planning time.

Later on the parents counsel also attempted to elicit from Mr. Schreier how many students were in the "Academy." His testimony was none responsive. He repeatedly stated he did not know. TR vol. IV p. 269. However, when pressed the did state "there's 700 freshman. ...Okay, I can approximate" TR vol. IV p. 270.

Not only was there no language based program, but all the students in Ms. Walsh's support class had different disabilities. On cross exam Ms. Walsh stated: "I have one student who goes to the READ 180 program." TR vol. IV p. 171. She then stated that the some of the others from the academic support class go to another reading class, and "in fact, two, and they read quite well." TR vol. IV p. 171. This demonstrates that the group is not similarly situated, if a group at all.

It was evident from Ms. Walsh's testimony that there was no language based reading program at Chicopee High School, specifically for children with language based learning disabilities like Kaitlyn's disability. In essence, Kaitlyn would have gone to a general academic support class which consisted of 16 other students with varying disabilities. This academic support class had no connection with the reading component, namely READ 180, or any speech

and language services, and for that matter the primary focus of that class was not on reading. Only one other student was getting READ 180 from that particular group.

The School District completed the presentation of its testimony with Daniel Schreier, the special education director for the Chicopee Public Schools.

The School District again through Mr. Shreier's testimony attempted to use the word flexibility to assert that there were additional services available and that all the parents had to do was communicate that they wanted them. TR vol. IV p. 211. The concept that the IEP is a flexible, "living breathing document" is an excuse for not designating services on the IEP. TR vol. IV p. 218. All of these concepts infer that these services were there all along. This was not the case. The parents rejected the IEP two days after receiving it in June and never heard from the school district again until the Pre-Hearing Conference. Similarly, the parents made it very well know at the TEAM meeting that they wanted specifically rule based programming and a real language based classroom. The IEP was never altered to reflect these supposed additional services, even after the August Pre-Hearing Conference when the School District said they could make these services available.

Mr. Shreier's testimony lacked any acknowledgement of accountability on behalf of the school district to the student. For example, Mr. Schreier repeatedly stated through his testimony that they only offered services because the parent wanted it, or it could have been provided if the parents asked, or we have done that for other students. TR vol. IV p. 211, 216,218,245,256, 264. He even stated that she could go to college courses if she just asked. TR vol. IV p. 223, 278. The School District would like this Court to hold that the IEP is always in a state of constant state of flux. Of course if this is true then there is never any one moment in time when the services they are offering can be determined to be wanting or inappropriate. The facts are that the parties met

29

in June, 2002, and as Mr. Schreier testified he was present at the Team meeting. The School District had the opportunity to review Dr. Kemper's testing, and in direct response it offered the READ 180 program in which they had just financially invested a large amount of money in. Mr. Schreier testified on a number of occasions that he had to be "cognizant of our budget, and I would imagine I would not have a job for much longer if I didn't do that." AR vol. IV p. 283. The fact is the Mr. Schreier spent approximately $250,000.00 on getting READ 180 up and going and he wasn't going to spend additional money to send anyone out of district. TR vol. IV p. 299. It was asked of him whether he could see the parent point of view, that "at White Oak School, she can receive this education within four years and not have to have their child miss electives, miss lunch, graduate on time, never miss a beat, still enjoy after school activities and all of those things?" AR vol. IV p. 278-279. His discombobulated non-responsive answer was as follows: "I think students can – lots of students can benefit from small environments. I think that's helpful for lots of students. I think through, the flexibility that the Chicopee Public Schools can offer for a child, whether it be supplemental or additional services, is just something White Oak can't do. I mean, I would contend that the Chicopee Public Schools' budget is much larger, and we have different options." TR vol. IV p. 279.

Mr. Schreier also testified that he reviewed the same research provided to the other experts did, namely the READ 180 promotional information. TR vol. IV p. 229,236. The only independent source in which he saw this program mentioned was in a book by neurologist Sally Shaywitz. TR vol. IV p. 246. This book was proffered by the School District as evidence. It should be noted that READ 180 is mentioned in passing in a foot note in her book along with several other programs. There was no indication as to how it should be used or in what capacity. As the Hearing Officer pointed out this evidence could not be afforded much weight in that we

30

had no way of knowing why she listed this program. As counsel for the parents objected she could have been paid to list this program in her book without ever seeing it, using it, or seeing it in action.

Mr. Schreier also testified that he did see the READ 180 program used in the Holyoke Public School prior to purchasing it for the Chicopee Public Schools. He stated "The first time I saw it was in Holyoke. And I was actually very impressed with the students who, once again, were not very motivated to be in school, not very interested in reading." TR vol. IV p. 246. His description of this program and how it was being used in Holyoke, fits Scholastic's recommended use for the program. It was intended for inner-city schools, where children have not been afforded acquisition to literacy because of poverty or because English is a second language or is not spoken in the home. Compliment to TR at 172-245.

Towards the end of his testimony, Mr. Schreier was asked by the Hearing Officer whether Chicopee was tracking the results of the students as he indicated they were. TR vol. IV p. 281. He acknowledged that none of that data, which claimed existed and showed students were doing well, was ever placed into evidence. TR vol. IV p. 281.

The Hearing Officer also inquired from Mr. Schreier as to how many teachers in the district were trained in READ 180. After several attempts to illicit this information Mr. Schreier finally admitted only two. TR vol. IV p. 296. Ms Hardy-Woolridge was one of those two, and the one who would have been providing services to Kaitlyn. Ms Hardy-Woolridge is so new to teaching the Mr. Schreier wasn't even sure if she was certified yet. He stated when asked about her certification to teach "I believe she doesn't have it, she should shortly, at least have her licensures a special education moderate special needs teacher." TR vol. IV p. 202. It should also be noted that at the time of the trial, Ms Hardy-Woolridge has just taken up teaching after a long

employment at Mass Mutual in an unrelated career. Compliment to TAR at 21. Ms Hardy-Woolridge would have been starting her second year as a teacher and Kaitlyn's entire reading program was resting on this teacher. This is a direct procedural violation of the IDEA which clearly provides that the teacher must have experience in the child's disability.

The parents conclude this argument by asserting that in this case the most compelling evidence was the lack there of it. Ms. Hardy Woolridge, the only teacher trained in READ 180 at Chicopee High School, was never brought forward to testify. There was never any evidence presented, despite volumes of documents presented regarding READ 180, that it is a program for children with Dyslexia, let alone language disabled special education children. The literature provided from READ 180 by the School District is clear that it is a program designed to help children who were not exposed to language because of poverty, neglect or possible English as a second language, and that it was designed to help those regular education students to catch up. Compliment to TR at 172-245. The Plaintiff's reasoning is self serving and its appeal, which rests on choosing to ignore or omit language clearly stated in the Decision and administrative record, falls short of giving the District Court any vehicle or basis to conclude for them.

## IV  HEARING OFFICER'S DECISION WAS NOT ARBITRARY OR CAPRICIOUS AS IT WAS THOROUGHLY SUPPORTED BY THE EVIDENCE.

Despite the Plaintiff's claims that the Decision was arbitrary and capricious, from a casual reading the administrative record alone, this Court can determine that the facts support the Decision of the Hearing Officer.

A. The Hearing Officer's consideration of the procedural violations only served as evidence of the parent growing mistrust of the School District, not that the procedural violations amounted to a denial of FAPE.

The School District asserts that the Hearing Officer's findings with respect to the procedural violations had the force and effect of resulting in an inappropriate IEP. This is not true.

The Hearing Officer specifically held that:

> "While each of these lapses, considered alone, would not constitute the type of serious procedural irregularity contemplated by the Court in Roland M. v Concord School Committee, 910 F.2d 983 (1st Cir. 1990) cert. den. 499 U.S. 912 (1991), when it determined that procedural violations could form the basis of an equitable award under the IDEA, the pattern of non-responsiveness established by this case provides support for the Parents' belief that Chicopee could not develop an appropriate educational program for their daughter and the resulting unilateral placements. " Decision pg 10.

Thus, the School District's belief that the Hearing Officer found that the procedural violations were so serious as to find that the IEP was inappropriate, is just not true. The Hearing Officer only found that the existence of the procedural violation supported the parent's belief that the Chicopee Public School could not get the job done.

Moreover, the parent's belief's were warranted. The School District went out of its way on a smear campaign to characterize Kaitlyn in a very negative manner as a socially emotionally impaired child.   Ms. Cameron stated that from her observations Kaitlyn was functioning academically as "quite an average student." TR Vol. III at 174.  It was her testimony that Kaitlyn's issues were social emotional.  She states "My observations of her social emotional, there was, a little bit, inconsistent." TR Vol. III at 179. She is then led into a discussion about how psychological services could have been made available to her from River Valley if she

wanted them. TR Vol. III at 180. The School District still maintains in Its Motion for Summary Judgment that Andrea Picard-Cameron made significant attempts to elicit the cooperation of the parents in addressing these social emotional problems, however, she stated the parents refused. See Plaintiff's Motion for Summary Judgment at 39.    Ms. Cameron was reminded on cross examination that Kaitlyn had been accessing the adjustment counselor and tried to use the schools mediation process to deal with a dispute with another female student. TR Vol. III at 226. They then tried to take the letter from Jodi Rosol (Plaintiff's Motion for Summary Judgment "Exhibit A") and attempt to paint a picture of Kaitlyn as a child whose primary disability was an extreme social emotional disability which was completely unrelated to her reading disability.

On cross examination, Ms. Cameron admitted that all social emotional concerns regarding the 8th grade were stemming from an on going altercation she was having with one other student in the academic support class. (TR Vol. III at 230-231).  However, it took Jodi Rosol, through her own testimony, as discussed above, to promptly dispel the School District's attempts to characterize Kaitlyn as an extremely socially emotionally impaired child.  Jodi Rosol also dispelled the School District earlier statement that they were prohibited by the parents from talking with her.  Even though this issue was put to rest below, the School District still asserts in Plaintiff's Motion for Summary Judgment, that they were prohibited from talking with Jodi Rosol.  Parents point out that on cross examination, Ms. Cameron was asked about whether the school had made contact with Jodi Rosol, Kaitlyn's private therapist. TR Vol. III at 224.  Ms. Cameron admitted on cross that Jodi Rosol was present at the April 14, 2003 TEAM meeting and could have spoke with her. TR vol. III p. 224. Furthermore, Ms. Rosol's letter of February 10, 2003, attached to Plaintiff's Motion for Summary Judgment as "Exhibit A" states "Please do not

hesitate to contact me with any concerns or questions regarding the above information. I can be reached at 536-5473 ext. 177."

In the end, Ms. Cameron admitted that she never felt concerned enough to make a referral for a clinical psychological evaluation. TR Vol. III at 227. Nor did she or any other school district personnel ever convene that TEAM to specifically discuss these so called concerns. As the School District points out the "TEAM majority," which is the School District, often dictates the IEP offered. The School District could have called a TEAM and if it was serious that those services were needed, it had all the control it needed to put those services in the IEP. Obviously the parents could have rejected those services. Then the parties are supposed to go before the BSEA with their disagreement. The premise is that both parties are in good faith working together on behalf of the child. That is what the Hearing Officer is saying. The School District never legally, through the TEAM process, made an affirmative stand with respect to what services they say this child needed. Therefore, Ms. Cameron's repeatedly attempts to place blame on the parents is unwarranted. This is not the law, or how the TEAM process works. Mr. Schreier acknowledged this, stating "we can file – if the parents don't sign it, we can file, if we suspect that it would result in denial of FAPE, so I believe it's our expectation to file." TR vol. III at 265. The School District never filed with the BSEA and they are estopped now from going back in time saying that the parents denied their own child FAPE because they rejected imaginary options and services.

The School District, on it cross examination of the father, also attempted to elicit testimony that Kaitlyn was plagued by repeated absences because of her social emotional problems. The School District then presented Kaitlyn's absenteeism record from the 8th grade, trying to make it appear as if she had missed an excessive amount of school. They asserted that

she missed 54 classes during the 8th grade school year. The Father promptly responded that 54 classes if approximately 5 school days for the entire school year and not excessive in the least bit considering she had the flu and was out for several days in a row.

The School District, in bad faith, and in an obstructionist fashion, went out of its way to present testimony and documentary evidence from preceding school years to try to paint Kaitlyn as an average, but troubled student. Overall, the School District brought to light those issues and cannot now assert that the Hearing Officer unduly considered those facts.

The academic services were also never offered either during the eighth grade. Mr. Schreier states:

> "It sounds like the parents had additional concerns during the 8th grade, and we were willing to make other additional interventions to remediate any concerns that were there. The Lexia option was still an availability there. We didn't – that was always an option (inaudible) could have gone back to having reading, reading intervention to work on the rule based as an 8th grader. We could have also had something called READ XL, which is another intervention by Scholastic that, once again, deals with the issue of being respectful for the student based on his or her ability." TR vol. IV at 244-245.

Once again the School District talks about what could have been, not what they did to ensure FAPE.

The School District also asserts that the Hearing Officer incorrectly held that 2003-2004 IEP failed to include direct instruction in basic decoding. The School District asserts that the IEP included language regarding instruction in the general education classroom which would provide a "phonetic approach to reading." This is why Hearing Officer's with specific knowledge regarding special education are best suited to hear and decide these cases. First, the general education classroom, is the regular classes in which it was testified to that as many as 22 student

36

could be in the class. Second, direct instruction means that one person is teaching the student with a particular methodology, such as a rule based program. Third, phonetic approach is one of those exploited buzz words. The definition of "phonetic" is "belonging to or associated with sounds of human speech." Encarta Dictionary. So as long as they were using human speech in the classroom they were okay. This is not what Dr. Kemper meant. He was talking about a language based classroom that was comprised of no more than eight students, all of whom had a language based learning disability. Direct instruction he discusses is through the tutorial, then systematically reinforced in the classroom by teachers who are trained in the same methodology used by the tutor during the direct instruction.

The School District also maintains that the Decision, which held that the School District failed to formalize its offer to the parents to provide additional services after the Pre-Hearing Conference, is a violation of the law in that the Hearing Officer failed to consider the IEP as it emerged from the administrative process. First, the School District never presented a new IEP to the parents for their consideration. Additionally, the Hearing Officer correctly determined that the offer, as made via the status report, was not formalized in that the School District never specified to the parents the type of Orton-Gillingham services it would provide.

For example, Orton-Gillingham is the originator of rule based programming, many years ago an it is not a brand name. The rule based programs that are currently offered locally are programs such as Benchmark, Wilson, Project Read or Lets Read. *See Kemper's testimony* (TR Vol. 1 pgs 102-105, 112-115). Similarly, the parents were never informed as to who would deliver these services. These programs must be delivered by a certified speech and language pathologist or someone who has been thoroughly trained and experienced not only with the program, but children with language based learning disabilities. Second, even if the School

District had memorialized this offer in the form of a new IEP, the parents would have rejected it as grossly inadequate for the following reasons. The addition of one hour of rule based programming is completely inadequate. At White Oak School Kaitlyn is immersed in rule based programming in every class, in her tutorial and even in extras. The only way to learn the rule is to be inundated as Dr. Kemper's evaluations states "Kaitlyn's multisensory, structured language program will need to be implemented within the context of a substantially separate school that is devoted to addressing the needs of children who have significant language impairments. Student/teacher ratio should be small (a maximum of 8:1) in which direct teaching is performed in a systematic manner, with continuous review of previously learned information and the teaching of skills across various contexts, in order to facilitate generalization effects." (T.R Vol. I p. 162). Learning a rule based program is a kin to learning a foreign language, it cannot be accomplished with fluency and automaticity with one hour of instruction per day, five days a week.

The IEP was not even offering to administer READ 180 according to Scholastic's guidelines. As the Hearing Officer stated in the decision: "That skepticism grew into a reasonable objection when the proposed IEP failed to provide the full 90 minutes daily of READ 180 instruction recommended by the program developers..." Moreover, despite the School District's assertion that the Decision was based entirely on procedural violations, the Decision clearly provides an entire section of substantive reasons why the IEP proposed by the School District was inappropriate.

Once again Dr. Kemper testified as to his findings and recommendations, and the School District agreed with his findings. The fact is that READ 180 was determined not to be an appropriate program for children with language based learning disabilities. Therefore, because

READ 180, the main component of the program was still in place, the extra tutorial was worthless.    Furthermore, this tutorial was proposed to be given after school.   Although the issue was not litigated, this is a violation of the IDEA.   The services must be given during the normal course of the school day.    The father testified at Hearing why he would have rejected this tutorial had it been presented to him in the form of a new IEP.   He stated "Well, it doesn't seem fair to me to make a student go all the way through school, through their school day and then have them stay after school to try to understand something that they didn't get during the school period.  So if I did, indeed, reject them, that would be the reason." TR Vol. I p. 153.

The finality of the proposed additional services, namely the after school tutorial, was contemplated by the parents and the parent still chose to unilaterally place their child, with full knowledge that those services could have been made available.   Therefore, the School District's argument that *Douglas v. Greenfield Public Schools* 164 F. Supp.2d 157 (D. Mass. 2001), applies, is not supported by the testimony taken below.

The School District also asserts that the parents entered into an agreement before the BSEA at the Pre-Trial Conference to have an expert observe Kaitlyn, in the proposed Academy. The School District refers to its' Status Report as the factual authority for this statement.  (T.R Vol. I at 19).   The Plaintiff fails to mention the Parent's Status Report, which refuted Attorney Thompson's version of the Pre-Hearing Conference and letter drafted by parent's counsel, dated September 22, 2003, which requested a phone conference to discuss Attorney Thompson's mischaracterization of the events which transpired at the Pre-Hearing Conference. (A.R Vol. at 23 and 28 respectively).   In essence, the letter stated to the Hearing Officer as early as September 22, 2003, that they were "increasingly growing weary of the School District's attempts to alter

the agreement into something more suited to fit its purposes." Additionally, the Parent's appropriately objected to any evidence from the Pre-Hearing Conference from being submitted.

Again, the Hearing Officer's consideration of the procedural violations only served as evidence of the parent growing mistrust of the School District.

B. The Hearing Officer's Decision was Substantively Supported by the Record.

The Parents adamantly disagree with the School District's characterization of the nature of the issues in dispute before the BSEA. The School District states:

> "Chicopee acknowledges that there was considerable agreement between the findings and recommendations of Dr. Kemper and those of Chicopee's evaluators. Both agreed that the student should be placed in a 'language based, multisensory program geared to meeting the learning needs of students with specific learning disabilities, including dyslexia. The parties further agreed with the need of small class sizes, direct and consistent instruction by teachers trained to remediate language learning disabilities as well as a daily tutorial to focus on systematic reading instruction. The parties disagreed, however, with the location of the recommended services and the exact nature of the teaching model." Plaintiff's Motion for Summary Judgment at 45.

First, Dr. Kemper recommended that Kaitlyn be placed in a substantially separate program for children who all have Dyslexia, or language based learning disabilities like Kaitlyn. The evidence from Ms. Wash's testimony was clear that the academic core classes were a combination of special education students, with varying disabilities and regular education children with no disabilities. Also she testified some of the children in the academic support could read quite well. TR vol. III at 171. Furthermore, the children from the academic support would leave and go to various other classes for their various disabilities. The tutorial offered by the School District was READ 180, which were have already shown was not rule based, systematic code emphasis instruction as recommended by Kemper. He also testified that the

tutorial should be administered by a teacher with trained experience in Dyslexia, not a computer. Additionally, Ms. Hardy-Woolridge also did not fit the description of a person trained in Dyslexia or even experienced as a teacher of special education children. Moreover, she had received training in READ 180 only weeks prior to the beginning of that school year. Also Ms. Walsh testified that she provided no direct instruction and that she had never met the speech and language pathologist. This alone demonstrates that no other students in her class needs speech and language therapy, and therefore, these students did not have the same disability as Kaitlyn.

The School District states in its Motion for Summary Judgment that there is no foundation for the Hearing Officer's statement that the "proposed class size would range from 12 to 20 students." See Plaintiffs Motion for Summary Judgment at 48. There testimony from Ms. Walsh who clearly stated "I can't give you the exact numbers, but our average, our classes run from 12 to 20 students." TR vol. III at 180. Moreover, Dr. Kemper clearly states in his evaluation the student teacher ratio should be no more that 8:1.

Finally, the parties did disagree on the location, however, the parents disagreed on the location because it did not provide for any of the programming recommendations as described by Dr. Kemper. Despite the School District's assertions to the contrary, Mr. Schreier's testimony regarding READ 180 was unpersuasive. The Hearing Officer was easily able to discern that it was not rule based, not research based, and not for special education children with Dyslexia.

**CONCLUSION**

The parents assert that the Hearing Officer's Decision was not erroneous. The Chicopee Public Schools have specifically asserted that its appeal is based on the grounds that the "Bureau's decision is patently inconsistent with evidence at Hearing." This assertion is based solely on the Plaintiff's interpretation of the BSEA decision, which is totally self-serving. The

41

administrative record fails to back up this claim. This case focused on the School District's proposed IEP, which offered READ 180, a Scholastic Inc. program, as its sole form of remediation. The Hearing Officer clearly stated regarding that issue:

> "Chicopee argued that its reading class, using READ 180 program, met Dr. Kemper's recommendations for direct, systematic reading instruction. I disagree. ...The evidence in this Hearing established that READ 180 is a new, exciting, engaging computer assisted tool for developing reading fluency in disadvantaged students attending large public school systems. There is no evidence, however, that it is a targeted, rule based, phonetic system designed to remediate individual reading disabilities. Without showing of effectiveness with the language disabled population, the Parents were entitled to maintain a reasonable degree of skepticism about the READ 180 program"

The parents also assert that from the evidence submitted into administrative record, or the hundreds of pages of literature regarding READ 180, along with the testimony of every witness for or against the School District, no one could point to any evidence that READ 180 is a program designed for Dyslexic or language based learning disabled students. The record shows that the School District trained one teacher in READ 180 only weeks prior to the beginning of the school year and that teacher had only recently taken up teaching after a twenty-year career at Mass Mutual Insurance Company. Moreover, the School District chose not to have that teacher testify at the Hearing.

The parents established their burden that the IEP and placement proposed by the School District was inappropriate. On the other hand, the School District failed to establish its burden that READ 180, or the Academy, were appropriate. Moreover, the Hearing Officer's Decision was well reasoned and supported by the testimony and administrative record. As such this court should reject the arguments of the Plaintiff and uphold the Decision of the Hearing Officer.

Respectfully submitted,
The Defendants
By their attorney

December 17, 2004

**/S/DEREK M. BEAULIEU**

Derek M. Beaulieu, Esq.
1242 Main Street, Suite 306
Springfield, MA 01103
BBO#644185