FILED
IN CLERK'S OFFICE

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS    2006 JUL 21  P 2: 51

U.S. DISTRICT COURT
DISTRICT OF MASS.

CITY OF CHICOPEE acting through )
CHICOPEE PUBLIC SCHOOLS, )
             Plaintiff )
 ) CIVIL ACTION NO. 04-30087
v. )
 )
DAVID T. As parent and next friend of )
KAITLYN T. and MASSACHUSETTS )
DEPARTMENT OF EDUCATION )
           Defendants )
 )

## PARENT'S MEMORANDUM IN SUPPORT FOR THEIR MOTION PRELIMINARY INJUNCTION

The Parents are entitled to relief from this court pursuant to the right afforded to them by the Stay Put Provision of the 20 U.S.C. 1415(j).

The Issues are as follows: In May 2004 the BSEA held for the parents thus creating an "agreement" between parent and state as contemplated by 1415(j) "stay put." The second decision in June 2005 of the BSEA in favor of the School District did not constitute an agreement as contemplated by the statue and thus did not alter the "then current placement." The parent's appealed the matter to the U.S. Federal District Court continuing the litigation. The matter was not resolved and the "then current placement" was not altered until May 24 2006 when the US District Court decided the matter and the parents did not appeal. As such the School District is responsible for paying for the "then current placement" or "stay put placement" for the entire time the litigation was on going. Given that the school district has refused to pay for Kaitlyn's tuition at White Oak or provide transportation the parents are seeking the following relief:

The Plaintiffs, ("parents"), hereby request this court to issue an order for a preliminary injunction on several grounds: (1) the Defendants have failed pay for and support Kaitlyn's "then current placement at the White Oak School; (2) The Defendants be ordered to pay White Oak School all tuition and fees associated with Kaitlyn's placment there from August 31st, 2005 to May 24, 2006. (3) The Defendants be ordered to reimburse the parents pursuant to state rate 41cents per mile, for transportation they provided getting Kaitlyn to school.

### FACTUAL BACKGROUND AND PREVIOUS LEGAL PROCEEDING

Kaitlyn Tharaldson has been diagnosed as having a specific learning disability under the umbrella of a language based learning disability.  She is currently finished the eleventh grade at the White Oak School in Westfield MA.

In September of 2003 the parents rejected the school district's proposed IEP which involved the use of the READ 180 program as the main component of its program located at Chicopee High School.  The parents then unilaterally placed Kaitlyn at the White Oak School. Upon unilaterally placing Kaitlyn at the White Oak School in September 2003 the parents agree that the White Oak School, at that time, was not Kaitlyn's stay put placement.  Shortly thereafter, the parents brought a request for hearing Before the BSEA asserting that the IEP offered failed to offer FAPE and that the White Oak decision was the appropriate placement.  On April 7th 2004 in BSEA matter 04-0093 (*Kaitlyn's freshman year2003-2004 school year*) rendered a decision in favor of the parents.

Within thirty days after the decision was rendered by the BSEA, the matter was appealed by the school district to the United States District Court.

In April 2004 the parents were forced to file Motions for Non-compliance because the school district was failing to recognize White Oak as the current placement.  The School District

asserted before the BSEA that it was their position that because they filed an appeal of the underlying BSEA decision they did not have to pay for White Oak or provide transportation.

On May 21, 2004 the BSEA heard the matter and issued a decision for the parents citing the *Burlington* cases. The decision also made reference to the underlying decision which states in it that an appeal of the BSEA decision does not act as a stay.

In July 2004 the TEAM convened at White Oak and the school district announced they were creating a new program for the fall 2004 called the Brighter Beginnings Program. The parents were presented with an IEP shortly thereafter, and due to concerns that the same READ 180 program was being used, the parents rejected the proposed IEP.

In December 2004, the School District filed for a new hearing with respect to the 2004-2005 school year *(BSEA 05-2029)*.

The appeal of first BSEA decision *(case number 04-30087 MAP)* ensued throughout Kaitlyn's sophomore year. In May 2005, Judge Ponsor, heard the parties' motions for summary judgment and ultimately held for the parents on appeal.

Also in May 2005 the BSEA heard the matter BSEA 05-2029 over four days of hearing. On June 7th of 2005 the BSEA issued a decision for the School District finding that the new IEP offered FAPE. Because the decision for the 2004-2005 was not issued until June 7th Kaitlyn remained at the White Oak School throughout the 2004-2005 school year pursuant to stay put protection 20 U.S.C. 1415(j) at the school district's expense.

With thirty days of the June 7, 2005 BSEA decision, the parents appealed the decision of the BSEA case to the United Stated District Court (05-30158-MAP).

In September of 2005 the attorney for the parents contacted the attorney for the school district regarding the school districts failure to continue paying for the White Oak School and

provide transportation. The school district attorney responded by asserting that it was their belief that because they had prevailed at the last hearing that stay put no longer applied. The parents responded that White Oak was still the stay put placement given that it was the last agreed upon placement between the parents and the state and that BSEA decision, wherein the school district had prevailed, had been appealed. The school district disagreed with the parent's interpretation of stay put.

In November 2005, the parties agreed to request an advisory opinion from the BSEA regarding this issue. The BSEA responded that it could not render an advisory opinion with out a formal request for hearing. (BSEA 06-3347).

On January 10th 2006, the parent's attorney filed a formal request for hearing before the BSEA regarding the pure legal issue of the stay put placement.

The parties then agreed to proceed utilizing the advisory opinion process. This process consists of a BSEA hearing officer hearing limited testimony and rendering an advisory opinion. In this case the parties agreed that the decision would be non-binding.

On March 22, 2006 the parties convened in Worcester before BSEA hearing Officer Raymond Oliver to participate in the advisory process. The parties had previously submitted memorandums regarding their respective positions. The parties presented oral arguments then the hearing officer drafted a brief opinion.

The parents did not hear from the school district regarding whether they would abide by the advisory opinion or whether they would continue to hearing. The matter had been scheduled for hearing on April 24th 2006. In addition to not hearing from the school district the parent's attorney had not heard from the BSEA regarding time and location for the hearing. While on vacation in South Carolina the parents attorney contacted the BSEA. Paul O'Brien at the BSEA

indicated that no one knew about the hearing scheduled for April 24th. He instructed the parents

counsel to submit a motion to continue which would be granted. As such the parent's attorney

filed a request to postpone the hearing for purposes of ascertaining the school district's position

and clarify the hearing details with the BSEA. The postponement was granted and Sara Berman

was assigned to the matter.

On April 26, 2006, the school district's attorney filed a motion for preliminary injunction

in the U.S. District Court.

On April 28, 2006 Sara Berman of the BSEA held a conference call to discuss the case

before the BSEA. Sara Berman stated that she was only recently assigned and she was not aware

of the April 24th hearing date. The school district attorney stated that she had no desire to

proceed to hearing on the issue. The school district's attorney also stated that she was not aware

that the parents had a right to a hearing after the advisory opinion process had been completed.

The parent's attorney stated that they wanted a hearing and decision as soon as possible. The

parents stated that "stay put" is an automatic injunction and that the school district should be

paying and providing transportation until such time they have been successfully granted a stay.

The parents asserted that they, as the complainants, were entitled to the hearing. The parents

also stated during the conference call that a Decision of the BSEA would have to been

immediately followed by the school district thus ending this dispute. The BSEA hearing officer

agreed that the parents were entitled to a hearing. She attempted to set dates for hearing, but the

school district was not sure if they were going to go forward. The school district's attorney

stated on several occasions that she had filed several motions before the U.S. District Court. The

school district's attorney stated that she would file a motion to dismiss the BSEA proceeding.

The school districts attorney never filed any motions with the BSEA which would terminate the

parent's right to hearing.

On May 2nd 2006 the BSEA then sent an Order to parent's attorney's office, via fax, stating there was a conference call for 3:45 on the same day. Parent's attorney was out of the officer the entire day on May 2nd engaged in a trial before the Juvenile Court and did not get the notice in time. A fax was then sent on May 2nd to the parent's attorney regarding a conference call for May 3rd. After completing the trial the Attorney for the Parents never went back to my office and therefore was unaware of the conference call on May 3rd. Parent's attorney was also in trial all day on May 3rd. The parents assert that three business hours is not appropriate notice.

On May 4th the BSEA issued an Order for Status Reports to be filed by the attorneys by May 12th 2006. This Order was sent ONLY via facsimile and not be regular mail to the parties. The parent's attorney never received this fax until May 24th 2006.

On May 16th the BSEA issued a 10 day Order to Show Cause. On May 17th the Parents Attorney responded to the Order.

On May 19th the parents attorney, the school districts attorney and the BSEA represented by the Attorney General's Office appeared before the U.S. District Court Judge regarding the appeal of BSEA matter 05-2029 and the School District's Motions for Preliminary Injunctive Relief regarding the issue of Stay Put. The Judge heard oral argument regarding the issues on appeal and the issue of "then current placement." The parents asserted that Judge Ponsor could not hear the matter of stay put because it was before the BSEA and that pursuant to the exhaustion requirement he was precluded from ruling on that issue. Attorney Thompson on behalf of the School District stated the BSEA matter was going to be dismissed. The Attorney General reported on behalf of the BSEA that in fact the matter was pending before the BSEA and he referenced and produced the Ten (10) Day Order to Show Cause. Attorney Whitcomb also

reference a conversation he had with the BSEA thus giving the BSEA notice of the proceedings in federal court. At the conclusion of the Oral Arguments Judge Ponsor took the matter under advisement.

On May 19th 2006 the School District filed in the U.S. District Court a Voluntary Motion to Withdraw Its Motion for Preliminary Injunctive Relief.

On May 22, 2006, the BSEA issued an Order of Dismissal of the Case citing lack of prosecution. This Order was sent regular mail and not received by the parents until May 25th.

On May 24, the Parents attorney drafted a letter to the hearing officer, Sara Berman, inquiring whether the hearing would be proceeding on May 26th.

Later in the day on May 24th the BSEA faxed the parent's attorney a copy of the Order of dismissal.   Shortly thereafter, on May 24th 2006, the parent's attorney drafted a letter to Sara Berman requesting relief from the Judgment.

On June 7th 2006 the parent's attorney filed a formal Motion and Memorandum with the BSEA request relief from judgment asserting that the BSEA is denying them Subsantive and Procedural Due Process, that it arbitrarily and capriciously dismissed the matter.

The parents contact regional State and Federal Representatives regarding the BSEA's dismissal of the matter for lack of prosecution within a time period of 10 days (May 12 to May 22) who are currently conducting an investigation.

The BSEA responded on June 24, 2006  stating that a BSEA dismissal is final and that they were precluded from hearing the matter any further.

## LAW AND ARGUMENT

The parents assert that they have exhausted their administrative remedies and now come before this court requesting an order for Preliminary Injunctive Relief.

### A. Preliminary Injunction Standards

Over time, the First Circuit has developed a quadripartite test for determining whether litigants are entitled to preliminary injunctive relief. *See Narragansett Indian Tribe, 934 F. 2d 5*. The party seeking preliminary injunction must show: (1) that it has a substantially likelihood of success on the merits; (2) that it faces a significant potential for irreparable injury in the absence of immediate relief, (3) that the ebb and flow of possible hardships are in favorable juxtaposition (i.e. that the issuance of an injunction will not impose more of a burden on the nonmovant that its absence will impose on the movant; and (4) that the granting of prompt injunctive relief will promote (or at least not denigrate) the public interest. McGuire et al v. Rielly et al, 260 F. 3d 36, 42 (1st Cir. 2001).

### 1. The Parents Are Likely To Succeed On The Merits.

The parents must satisfy all prongs of the four-part test to be entitled to injunctive relief. The "sine qua non" of that formulation is whether the parents are likely to succeed on the merits. Weaver, et al v. Henderson. et al, 984 F. 2d 11, 12 (1st Cir. 1993). The "likelihood of success cannot be woven from the gossamer threads of speculation and surmise". Weaver, et al v. Henderson, et al, 984 F. 2d 11, 12 (1st Cir. 1993).

When the parties were before the BSEA even the School District Attorney acknowledged that she would not prevail on the issue of stay put. Based on the stay put statute within the IDEA 20 USC 1400 et al., and the overwhelming case law in support of the parent's position, it is clear that the parents are likely to succeed.

A. THE IDEA AND THE CASE LAW REGARDING THE STAY PUT PROVISION ARE CLEAR AS TO WHEN "STAY PUT" IS INVOKED, HOW LONG IT WILL LAST AND OCCUR AND WHAT CONSITUTES AGREEMENT BETWEEN PARENTS AND BSEA.

Despite the school district's statements before the BSEA that there are no cases or precedent on this issue, the parents attorney was able to find a plethora of case law, exactly on point legally and factually, including the Supreme Court decision, in *Burlington*, which came through the 1st circuit.

The parents specifically rely on five case, *School Committee Town of Burlington v. Department of Education Massachusetts Et Al.* 471 U.S. 359, 105 S. Ct. 1996, 85 L. Ed. 2d 385, 53 U.S.L.W. 4509 (1985) , *Board of Education of Montgomery of Montgomery County v Brett Y., et al.*, 959 F. Supp. 705; 1997 U.S. Dist. LEXIS 9932 (US Dist Ct MD 1997).; *Susquenita Sch. Dist. v. Raelee.S.*, 96 F.3d 78, 82 (3d Cir. 1996); *Drinker, v Colonial School District*, 78 F.3d 859; ( 3rd Cir 1996) U.S. App. LEXIS 4613.; *Clovis Unified Sch. Dist. v. California Office of Admin. Hearings*, 903 F.2d 635 (9th Cir. 1990).

In the actual case of *Brett Y* the Plaintiff Board of Education of Montgomery County (board) appealed a decision of an administrative law judge (ALJ) that defendant student was denied a free and appropriate public education under the Individuals with Disabilities Education Act (IDEA), 20.U.S.C.S. § 1400 et seq.. The student and the parents sought a preliminary Injunction to enforce the placement at the private school.

Factually the case as bar is very similar to the Brett Y case. In Brett Y. the parents the rejected the proposed IEP, unilaterally placed their child and requested a due process hearing challenging the school district's failure to provide the student with a free appropriate public education (FAPE) as required by the Individuals with Disabilities Education Act (IDEA). At the due process hearing, the ALJ found that the board had committed serious procedural violations

9

that denied the student a FAPE and further found that his placement at the residential school was

appropriate. The court granted the student and the parents a preliminary injunction requiring the

school district to pay for the student's private placement through the end of the school year

pending the school district's appeal of the ALJ's decision.

The following legal anaylisis portions found below are taken entirely from Brett Y. and

are unaltered with little or no discussion or comparison to the present case. This was done

purposfully because the facts and legal anaylsis as prensented in this case is so closly related the

parents felt court decision speaks for itself as it clearly discusses all the issues and nicely

incorporates and discusses all the relevant cases on this subject.

## I. "DISCUSSION A. IDEA STATUTORY FRAMEWORK

### A. THE "STAY PUT" PROVISION

"Disputes often arise over the proper placement and educational program for a disabled student and the review process described above can be cumbersome and lengthy. Therefore, a child's placement during the course of administrative and judicial proceedings typically has great significance for all concerned. Susquenita Sch. Dist. v. Raelee.S., 96 F.3d 78, 82 (3d Cir. 1996); see also Burlington, 471 U.S. at 361 ("important practical questions arise concerning [*709] interim placement of the child and financial responsibility for that placement").

The IDEA requires that during the course of administrative and judicial proceedings, "unless the State or local educational agency and the parents or guardian otherwise agree, the child shall remain in the then current educational placement. [**10] . . ." 20 U.S.C. § 1415(e)(3). This requirement has come to be known as the IDEA'S "pendent placement" or "stay put" provision. Susquenita, 96 F.3d at 82. This provision represents Congress' policy choice that all handicapped children, regardless of whether their case is meritorious or not, are to remain in their current educational placement until the dispute with regard to their placement is ultimately resolved. Drinker v. Colonial Sen. Dist., /8 h.Jd 8b9, 864-65 (3d Cir. 1996) (citing Woods v. New Jersey Dep't of Educ., No. 93-5123, 20 Indiv. Disabilities Educ. L. Rep. (LRP Publications) 439, 440 (3d Cir. Sept. 17, 1993)). Courts have held, ..., that ""the "stay put" provision affords an "automatic" preliminary injunction to maintain the child's placement, eliminating the need for parents to make the usual showing required for obtaining preliminary injunctive relief. See Honig, 484 U.S. at 326; see also, e.g., King v. Pine Plains Cent. Sen. Dist., 918 F. Supp. 772, 783 (S.D.N.Y. 1996); Cochran v. District of Columbia, 660 F. Supp. 314, 319 (D.D.C. 1987); Saleh v. District of Columbia, 660 F. Supp. 212, 215 (D.D.C. 1987)."

The central question thus becomes: what is Brett's "current educational placement"

C. CURRENT EDUCATIONAL PLACEMENT

"Given the protective purpose underlying the "stay put" provision, it is typically invoked by a child's parents in order to maintain a placement where the parents disagree with a change proposed by the school district; the provision is used to block school districts from effecting unilateral change in the child's educational program. Susquenita, 96 F.3d at 83; cf. also Honig, 484 U.S. at 323 ("We think it clear . . . that Congress very much meant to strip schools of the unilateral authority they had traditionally employed to exclude disabled students . . . from school"); Burlington, 471 U.S. at 373 ("We think at least one purpose of § 1415(e)(3) was to prevent school officials from removing a child from the regular public school classroom over the parents' objection pending completion of the review proceedings"). In cases of this type, "the dispositive factor in deciding a child's 'current educational placement' should be the Individualized Education Program . . . actually functioning when the 'stay put' is invoked." Drinker, 78 F.3d at 867 (quoting [**12] Woods, 20 Indiv. Disabilities Educ. L. Rep. (LRP Publications) at 440)."

"The instant case is quite different from the typical case, however. In this case, it is the parents who advocate change. The Yaders had no desire for Brett to continue at Richard Montgomery, nor, apparently, did they want him to attend RICA. Instead, the Yaders chose to place Brett at Grove at their own expense and seek reimbursement. The Yaders apparently would concede that Richard Montgomery, or perhaps RICA, would have been the appropriate pendent placement within the meaning of the IDEA at the time that they unilaterally placed Brett at Grove. They argue, however, that when the administrative Decision rendered her decision in their favor, Grove became Brett's pendent placement. The Board apparently takes the position that Brett's current educational placement is Richard Montgomery, but, in any event, that it is not Grove. As noted above, the "stay put" provision reads as follows: "During the pendency of any proceedings conducted pursuant to this sections, unless the state or local educational agency and the parents or guardian otherwise agree, the child shall remain in the then current educational placement . . . [**13] ." 20 U.S.C. § 1415(e)(3) (emphasis added). In Burlington, although the issue was the parents' entitlement to reimbursement, the Supreme Court had occasion to consider what constitutes "agreement" by the state for purposes of this provision. In Burlington, the Town argued that the parents were not entitled to reimbursement, in part because [*710] they violated the "stay put" by unilaterally placing their child in a private school. In considering this argument, the Court stated that "the[appellate panel]'s decision in favor of the [parents] and the [private school] placement would seem to constitute agreement by the State to the change of placement." 471 U.S. at 372. The Court went on to hold that as of the date that the state administrative decision was rendered in the parents' favor, the parents were no longer in violation of §1415(e)(3). Id. The only two United States Courts of Appeals to have squarely addressed the issue have concluded that the Supreme Court's decision in Burlington compels the conclusion that "once parents receive a state administrative decision that the offered public placement was inadequate and their unilateral private placement was appropriate, [**14] the private placement becomes the "current educational placement," and the school system is financially responsible for the cost of that placement during the pendency of the underlying litigation. See Susquenita, 96 F.3d 78; Clovis Unified Sch. Dist. v. California Office of Admin. Hearings, 903 F.2d 635 (9th Cir. 1990). n2

In Susquenita, a case very similar to the instant case, the Court of Appeals for the Third Circuit was called upon to decide whether the parents of a child with disabilities were entitled to have their daughter's private school placement funded by the local public school district prior to the conclusion of litigation establishing the propriety of that placement. [**15] Relying on § 1415(e)(3) and Burlington, the court of appeals held that the parents were so entitled.

In Susquenita, the parents rejected the school system's proposed IEP for their daughter Raelee, withdrew her from public school, and placed her in a private school for the learning disabled. The parents then invoked their right to a due process hearing in order to determine whether Raelee had been properly placed and, accordingly, whether they were entitled to tuition reimbursement. The hearing officer found that the IEP which Susquenita had proposed was appropriate and denied reimbursement. The parents appealed this decision to a three member state special education appeals panel. n3 The panel reversed the hearing officer's decision, finding that the IEP was deficient and that the program offered by the private school was appropriate for Raelee. The panel then stated, in dicta, that unless their order were overturned in a state or federal court, the private school! placement would constitute Raelee's pendent placement. Susquenita appealed the panel's decision to the United States District Court for the Middle District of Pennsylvania, and requested a stay of the panel's decision [**16] pending its appeal. The district court denied the motion for a stay, effectively directing that the student remain in the private school placement and that this placement be funded by the school district pending resolution of the merits of the underlying litigation. Susquenita appealed, and the Third Circuit held that the district court properly declined to enter a stay.

The parents argued, and the Third Circuit agreed, that the panel decision constituted "agreement" by the State to a change of placement, and that therefore a new pendent placement was created for which the school district was obligated to pay. The court reasoned as follows: The decision of the Supreme Court in Burlington established that a ruling by the education appeals panel in favor of the parents' position constitutes agreement [**17] for purposes of section 1415(e)(3). . . .Susquenita argues that a pendent placement appropriate at the outset of administrative proceedings is fixed for the duration of the proceedings and cannot be altered by an administrative ruling in the parents' favor. Accepting this position [*711] would contravene the language of the statute and the holding in Burlington. Furthermore, it would mean that the panel decision in favor of the parents is of no practical significance unless and until it is affirmed by a decision that cannot be or is not appealed. As we have explained, section 1415(e)(3) was drafted to guard the interests of parents and their children. We cannot agree that this same section should be used here as a weapon by the Susquenita School District to force parents to maintain a child in a public school placement which the state appeals panel has held inappropriate. It is undisputed that once there is state agreement with respect to the pendent placement, a fortiori, financial responsibility on the part of the local school district follows. Thus, from the point of the panel decision forward -- academic year 1995-1996 and following -- Raelee's pendent placement, by agreement [**18] of the state, is the private school and Susquenita is obligated to pay for that placement. Susquenita, 96 F.3d at 83-84 (footnote omitted).

In addition to relying on the statutory language and the Supreme Court's Burlington decision, the Susquenita court found that the policies underlying the IDEA and its administrative process

supported its conclusion:

In this case, as in many other cases, where parents who disagree with an IEP proposal for their child wait for the merits of their case to be addressed through the process of administrative and judicial review, they must make a choice. They may have the child remain in what they believe to be an inappropriate placement or they may elect to pay for what they deem appropriate. This choice is real only for parents who have the financial wherewithal to pay for alternative placement. While parents who reject a proposed IEP bear the initial expenses of a unilateral placement, the school district's financial responsibility should begin when there is an administrative or judicial decision vindicating the parents' position. The purpose of the Act, which is to ensure that every child receive a "free and appropriate education" [**19] is not advanced by requiring parents, who have succeeded in obtaining a ruling that a proposed IEP is inadequate, to front the funds for continued private education. The burden that such an approach would place on many families is overwhelming. . . . Without interim financial support, a parent's "choice" to have his child remain in what the state has determined to be an appropriate private [sic] placement amounts to no choice at all. The prospect of reimbursement at the end of the litigation turnpike is of little consolation to a parent who cannot pay the toll at the outset.

In Clovis, the Court of Appeals for the Ninth Circuit likewise considered parents' argument that a state administrative decision in favor of their unilateral placement decision created a "new" pendent placement for purposes of the "stay put" provision. Relying on Burlington, the court concluded that, under the "stay put" provision, the school district was responsible for maintaining the student's private placement after the administrative decision that the placement was appropriate, and until a court directed otherwise. Clovis, 903 F.2d at 641.The [**20] only potentially significant distinction between Susquenita and Clovis on the one hand and the instant case on the other, is that in those cases the challenges that led to the administrative decisions in the parents' favor were substantive, whereas the challenge in this case was procedural. In other words, in Susquenita and Clovis, the parents challenged the substantive adequacy of the school systems' proposed placements, and so the state administrative agencies had occasion to conclude that the school systems' proposed placements were inadequate and that the parents' choices of placement were proper. The panel in Susquenita even went so far as to state that the parents' choice of private placement should remain the student's pendent placement.

In this case, on the other hand, the Yaders won their administrative ruling on the ground that MCPS had committed serious procedural violations of the IDEA. The court does not think, however, [*712] that this distinction forecloses reliance on Susquenita and Clovis in this case. Significantly, Judge Sylvester did explicitly determine that Brett's placement at Grove was proper. This conclusion was necessary to her holding [**21] that the Yaders were entitled to reimbursement of the cost associated with their unilateral placement of Brett. See Florence, 510 U.S. at 15; Burlington, 471 U.S. at 369. Furthermore, there is no dispute among the parties that Richard Montgomery was not an appropriate placement, and while Judge Sylvester did not explicitly find that RICA would not be an appropriate placement (she had no occasion so to find, because a placement at RICA was not in effect at the time the Yaders unilaterally enrolled Brett at Grove), she did conclude that the Board's recommendation of an initial placement at Richard Montgomery with a transition to RICA would not have been feasible under the circumstances. In sum, given Judge Sylvester's conclusions that MCPS denied Brett a FAPE for the 1996-97

school year and that his placement at Grove was proper, the court believes that her ruling can be said to constitute state "agreement" to a change in placement to Grove, within the meaning of Susquenita and Clovis.

In light of the emerging case law in this area, as exemplified by Susquenita and Clovis, and the apparent lack of any contrary authority, the court is persuaded that the state administrative decision in favor of the Yaders constitutes "agreement" by the State to a change in Brett's educational placement to Grove within the meaning of the "stay put" provision of the IDEA, thereby entitling the Yaders to a preliminary injunction requiring the Board to maintain Brett's placement at Grove at the [**26] Board's expense.

## D. SCOPE OF RELIEF

In sum, the court holds only that Judge Sylvester's December 1996 ruling constitutes an agreement by the State to change Brett's educational placement to Grove, and that the Yaders therefore are entitled to a preliminary injunction requiring the Board to maintain Brett's placement at Grove at the Board's expense through the remainder of the school year.

## III. CONCLUSION
For the foregoing reasons, Defendants' motion for a preliminary injunction is GRANTED. Plaintiff is ORDERED to maintain Brett Yader's current educational placement at Grove through the remainder of [**29] the 1996-97 school year at Plaintiff's expense. A separate order will be entered."

The next case the parent's cite is *Drinker, v Colonial School District* 78 F.3d 859; ( 3rd Cir 1996) U.S. App. LEXIS 4613. Although this case was cited in *Brett Y.* that decision excluded language which the parents now cite which they feel is relvant to the issues in this case. The *Drinker* decision factually has a few twists which shed additional light on the stay put provision and supports the parent's arguments. The court stated the school district position which was "several-fold." As the court states "Colonial interprets Pennsylvania's two-tier system of administrative review as providing for "finality" of decision at the "local" level of impartial hearing officer review to the extent that such a decision is not appealed to the state level. See at 10-11 (citing 20 U.S.C. § 1415(c) and (e)(1); 34 C.F.R. § 300.509). Decisions made at the state level, according to the school district, are final to the extent [**18] that they are not appealed for judicial review. Id. at 11 (citing 20 U.S.C. § 1415(e)(1); 34 C.F.R. § 300.510(d))."

The reason the *Drinker* case is important is because the administrative decision in this case ordered a favorable decision for the school district, which provided for a transition back to the public school. Although the school felt the transition period was too long and appealed it and although the parents did not appeal it, the Court still held that the parents contested the decision and thus it was within the spirit of the IDEA to uphold the stay provision and mandate the school district to pay for the private school placement. The Court in *Drinker* held:

> "We will assume without deciding that the district court properly concluded that the underlying placement dispute was resolved when the Drinkers did not appeal Dr. Redfern's decision. Nevertheless, Colonial's conclusion that the court's application of the stay put provision of section 1415(e)(3) was inappropriate does not follow. Colonial makes the conceptual mistake of separately cabining the issues of placement and transition, concepts that cannot be so radically separated. nl5 While it is true that the Drinkers acquiesced in Dr. Redfern's placement decision, that decision included, as part and parcel of the plan, a nearly-one-year transition program for Daniel. In contrast, the appeals decision of March 1994 aimed to place Daniel at Whitemarsh by April 24, 1994, with barely a three-week transition period. Transition periods and timing of placement [**21] are integral elements of any educational program, elements that were not settled by any stretch of the imagination even were we to address Colonial's claim that the bare fact of placement at Whitemarsh had been decided as of March 17, 1994. Thus, Dr. Redfern's placement decision, though settling the issue of where Daniel ultimately would be placed, had not settled the timing and transition issues, since those elements were contested hotly through the time of the February 13, 1995 decision of the district court. Consequently, Colonial's claim that section 1415(e)(3)'s mandate to maintain the Gladwyne placement could not apply past the first appeals panel's decision is not an accurate statement of the section's application."

This decision discusses the "agreement" between state and school district and clearly held that this combination does not create "agreement" as contemplated by stay put. This case clearly held for the parents asserting that a "then current placement" only applies when parents and the state agree pursuant to a BSEA decision or some of the court decision.

It should be clear from the statute and the case law that supports it, that the 2004 BSEA decision created "stay put placement" for Kaitlyn at the White Oak School. Similarly, the June

BSEA decision for the School District did not constitute the same type of agreement that invokes or disrupts the "then current placement." Thus Kaitlyn's "then current placement" was the White Oak School from May 2004 until such time the matter was resolved or no-longer litigated which was May 2006.

Based on the strength of the statute alone, in conjunction with the supporting case law, the parents are more than likely to succeed on the merits of the case.

2. There is no risk of irreparable harm to the School District.

A preliminary injunction requires not only a substantial likelihood of success on the merits but also showing that denial would "subject the moving party to substantial risk of irreparable harm." Dos-Simons of Warrick Inc., 102 F. 3d 12, 18 (1st Cir. 1996).

Based on the clarity of the statute and the case law the parents were justified to leave Kaitlyn at White Oak at least until the District Court heard the matter in May 2006. The parents were forthright in bringing this issue to the attention of the School District in September 2005. However, due to non-payment by the School District the White Oak School is looking to the parents for payment. Overall, non-payment for Kaitlyn's spot at White Oak by the school district could harm Kaitlyn's ability to continue and/or graduate from the White Oak School. Similarly, private schools can retain the child's records and grades if non-payment occurs. Thus, the injury to Kaitlyn by the school's failure to pay for her tuition is real. Furthermore, the parents were justified leaving Kaitlyn at White Oak. The statute and case law clearly protected her. The parents now should not be threatened by an obligation that was never theirs.

On the other hand, the school district is a large municipality that has legally challenged this matter from the beginning. While the school district has repeatedly asserted that payment so long after the first case is unfair, it has not been able to assert that it would be financially harmful

to it.    The Susquenita case discussed this same argument in the context of determining whether the school district would suffer irreparable harm.  In determining whether the parties met their burden for preliminary injunctive relief the Court in Susqenita held **"The only harm which we can conceive of is the financial burden which will be borne by the district during the pendency of this appeal**. Id. (emphasis added).  The court even considered the fact that pursuant to Burlington "that, [*81] under current case law, the district would not be entitled to recover funds expended to maintain Raelee in private school even if it were to prevail on appeal."  The court, found "Taken together, we find that the relevant considerations do not justify granting the stay requested by the district."

The case law is overwhelmingly in support of the child's right to remain their stay put placement until such time the matter is resolved.  The school district's only argument, that it would be financially harmed, has already been decided and considered not to meet the burden of irreparable harm.

3. The balancing of relative equities weighs in favor of the parents.

The case law clearly discusses this issue.  Where the school district's argument is financial, the parent's argument pertains to the appropriateness of programming for their child.

As discussed in the case law, if a parent were to prevail on appeal it would be hollow victory given that years of lost time and instruction would not be able to be recouped.  Moreover, the child's best interests were clearly legislated to out weight the school district's financial interests.

4. The public policy reasons of the IDEA are clearly in favor of the parent's argument.

The school district specifically stated that it should not have to pay when they have a program that has been found by the BSEA to be appropriate.  First, the parents would disagree

that the Brighter Beginnings Program is or ever was appropriate. The issue of methodology, available classes and the cognitive grouping of the students in that program is being hotly contested on appeal. The parents assert that if Kaitlyn where denied the White Oak School she would suffer emotionally as a result of being denied scientifically proven methodologies and an appropriate peer group. This is exactly why the stay put provision was created. In the event that the parents had prevailed on appeal and demonstrated that White Oak was the appropriate placement, as many courts have stated it would be a "hollow victory" for the parents because that time they lost is not something they can ever recoup.

The public policy reasons for stay put have been thoroughly discussed by the U.S. Supreme Court in Burlington, then further discussed and clarified by the circuit courts. All of these courts have clearly said that the IDEA is a law written to protect parents and children. This was made clear when Congress enacted the stay put provision to apply only when parents and the state agree. Again, these courts have balanced the equities in numerous cases and clearly and unanimously held that although it can seem financially unfair to school districts to be funding placements while the matter is on appeal for years at a time, this is what the IDEA intended. Therefore, at this time, given that the appeal is still ongoing, a preliminary injunction would be in contrast to the public policy philosophies as embodied in the IDEA.

## IN CONCLUSION

The parent's assert that a BSEA decision in favor of a school district only becomes final and controlling when all litigation has been exhausted, concluded, or not appropriately acted upon. As such, the last decision wherein the parents and the state agreed was the first decision BSEA 04-0093 which specified White Oak as the appropriate placement. This legal distinction or "agreement" created the "then current placement" and it will remain so while the current

"litigation is still pending" or the school and parents otherwise agree.

The White Oak was her placement when the second BSEA case was initiated by the School District. Similarly, it remained her "then current placement" until the matter was decided by the District Court on May 24, 2006. As the Court of Appeals for the 6th Circuit has stated *Thomas v, Cincinnati Bd. of Educ.*, 918 F.2d bl8, b2b-2b (.6th Cir.) as cited in *Drinker*: "Because the term connotes preservation of the status quo, it refers to the operative placement actually functioning at the time the dispute first arises. If an IEP has been implemented, then that program's placement will be the one subject to the stay put provision. And where . . . the dispute arises before any IEP has been implemented, the 'current educational placement' will be the operative placement under which the child is actually receiving instruction at the time the dispute arises. *Thomas v, Cincinnati Bd. of Educ.*, 918 F.2d bl8, b2b-2b (.6th Cir.)."

Therefore, the stay put placement was White Oak as of May 2004 and remained in effect until May 24, 2006 and as such the School District is responsible for payment of that placement during that time and providing transportation.

Respectfully Submitted
Kaitlyn T, by her attorney

July 21, 2006

Derek M. Beaulieu, Esq.
P.O. Box 60452
Longmeadow MA 01116
BBO# 644185

## CERTIFICATE OF SERVICE

I, Derek M. Beaulieu, Attorney for Kaitlyn T. hereby certify that on this day of July, 2006, I delivered by hand a copy of the DEFENDANTS MEMORANDUM IN SUPPORT OF INJUNCTIVE RELIEF to Claire Thompson, Esq., Doherty, Wallace, Pillsbury & Murphy, P.C., One Monarch Place Suite 1900, Springfield, MA 01144-1900

July 21, 2006

Derek M. Beaulieu, Esq.